**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>        Plaintiff, | Criminal Action<br>No. 1:25-76 |
| vs. | Washington, DC<br>December 5, 2025 |
| CORTNEY MERRITTS,<br>        Defendant. | 1:02 p.m. |

_____

TRANSCRIPT OF PRE-TRIAL CONFERENCE
**BEFORE THE HONORABLE JIA M. COBB**
UNITED STATES DISTRICT MAGISTRATE JUDGE

_____

APPEARANCES:

| | |
|---|---|
| **For Plaintiff:** | **Brian P. Kelly**<br>  DOJ-USAO<br>  601 D Street NW<br>  Washington, DC 20530<br>  Email: brian.kelly3@usdoj.gov<br>**Emily A. Miller**<br>  USAO – D.C.<br>  Fraud & Public Corruption<br>  555 4th Street, NW, Suite 5836<br>  Washington, DC 20530<br>  Email: emily.miller2@usdoj.gov |
| **For Defendant:** | **Joseph A. DiRuzzo , III**<br>  MARGULIS GELFAND DIRUZZO & LAMBSON<br>  500 East Broward Blvd., Suite 900<br>  Ft. Lauderdale, FL 33394<br>  Email: jd@margulisgelfand.com |
| **Reported By:** | **Lorraine T. Herman, RPR, CRC**<br>  Official Court Reporter<br>  U.S. District & Bankruptcy Courts<br>  333 Constitution Avenue NW<br>  Washington, DC 20001<br>  lorraine_herman@dcd.uscourts.gov |

**\*\*\*** Proceedings recorded by stenotype shorthand.
**\*\*\*** Transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

**DEPUTY CLERK:**  Your Honor, we are now calling for the record Criminal Case 25-76, *United States of America vs. Cortney Merritts.*

Counsel, beginning with the government, please approach the lectern and state your appearances for the record.

**MR. KELLY:**  Good morning, Your Honor.  Brian Kelly and Emily Miller for the United States.

**THE COURT:**  Okay.  Good morning.

**MR. DiRUZZO:**  Good morning, Your Honor.  Joseph DiRuzzo on behalf of Cortney Merritts, who is directly to my left and seated.

**THE COURT:**  Okay.  All right.  Good morning, everyone.  We are here for the pretrial conference.  I just want to confirm that both sides will be ready for trial.

Government, you intend to be ready for trial?

**MR. KELLY:**  Yes, Your Honor.

**THE COURT:**  Okay.  And defense ready for trial?

**MR. DiRUZZO:**  Yes.

**THE COURT:**  I just also wanted to confirm the length of trial just so we can know for purposes of coordinating with the jury office.  My understanding is the parties expect this to be about a week?

**MR. KELLY:**  That's correct, Your Honor.

**THE COURT:** Okay.

You agree with that?

**MR. DiRUZZO:** I concur.

**THE COURT:** Okay. I don't typically sit on Fridays, although if the parties want me to, I think I can. If it could be the difference between finishing versus carrying over to Monday, does the government have a preference?

**MR. KELLY:** I mean, Your Honor, I think, without looking at a calendar, that Monday may be Martin Luther King Day.

**THE COURT:** Oh, it is.

**MR. KELLY:** So that would have us carrying over to that following Tuesday.

**THE COURT:** Okay.

**MR. KELLY:** We are happy to sit on Friday, if that's not an inconvenience for the Court.

**THE COURT:** Okay.

**MR. KELLY:** Ultimately, we'll defer to your preference.

**MS. MILLER:** My guess is that you're going to have jurors taking three-day weekends.

**THE COURT:** Okay. Yeah, that's a good point.

What is the defense preference?

**MR. DiRUZZO:** Our preference is to go on Friday.

Hopefully, we'll already be into either closings or deliberation, but given that counsel for Mr. Merritts and Mr. Merritts, everyone is from out of town.  Our preference is to get it done as soon as possible.

**THE COURT:**  Okay.  Let me -- I'm just going to look at my calendar to make sure.  I think what we can do is we can plan to sit on Friday.  I can see about moving around.  I have a hearing but I can move that around.  If we're running into a problem confirming jurors and the only issue is people are planning to be away Friday, we can revisit that, but hopefully that doesn't become an issue.

Okay.  One housekeeping thing before we start 'cause I always forget to do this, I usually have each side pick a seat for alternates.  So defense, for first alternate, just pick a number 1 through 14.  That will be the first alternate juror seat.

**MR. DiRUZZO:**  I'm lost.

**THE COURT:**  Okay.  So there's going to be two alternate jurors.  I don't do the alternates 13 and 14, because they know they're alternates and they don't pay attention.  So I have each side pick a number between 1 and 14.  So if you pick 2, that means whoever is in seat number 2 will be the first alternate.  And the government will pick a number and then that will be the second alternate.  Sorry.

5

**MR. DiRUZZO:** Okay. Understood.

**THE COURT:** Okay.

**MR. DiRUZZO:** Nine.

**THE COURT:** Nine, okay.

Government?

**MR. KELLY:** Four, Your Honor.

**THE COURT:** Okay. So the juror in seat number 9 will be our first alternate, and the juror in seat number 4 will be the second alternate. All right. Give me one second.

Okay. I've reviewed the parties' pretrial statement. The first thing that I want to do is just put the plea offer on the record. Mr. Merritts, I don't do this because I'm suggesting that you should plea, but part of my responsibility is to just make sure that all plea offers were conveyed to you, that you received them, had an opportunity to discuss it with your attorney and that you declined them.

So can the government just put on the record from your pretrial statement what the -- I think there were maybe two plea offers extended at some point. If you wouldn't mind just putting that on the record, and I'll confirm what is represented in the pretrial statement that both of those offers were rejected.

**MR. KELLY:** Yes, Your Honor.

On June 6th, 2024, the government extended a pre-indictment plea offer which would have been for Mr. Merritts to plead guilty to one count of bank fraud in violation of 18 U.S.C. Section 1344.

And then on June 16th, 2025, the government extended a post-indictment plea offer, which would have been for Mr. Merritts to plead guilty to one count of wire fraud in violation of 18 U.S.C. 1343.

**THE COURT:**  Okay.

And Mr. DiRuzzo, you communicated those offers to Mr. Merritts?

**MR. DiRUZZO:**  My co-counsel has, yes.

**THE COURT:**  Okay.  Okay.

And Mr. Merritts, if you could just speak into that microphone.  I just want to confirm that -- I want to make sure this is not the first time that you are hearing that those plea offers were extended to you.

**THE DEFENDANT:**  No, ma'am.  It's not the first time.

**THE COURT:**  Okay.  All right.

Okay.  So let's just start with the voir dire.  I had received the parties' proposed questions, and then I have a standard voir dire.  So I essentially took the parties' questions and, where there was duplication with my standard voir dire, I just consolidated the questions or

used my standard question.

Just so the parties know, I only ask yes-or-no questions of the jury panel. So, essentially, all of the jurors, potential jurors that come in will get a notecard. I will read off each voir dire question. If they have a "yes" answer, they will put the number of the question on their notecard. So if they have a "yes" answer to number 1, they'll write "1" on the notecard and so on.

Then we clear the courtroom and bring every single juror in, in the panel individually at least up until we have enough that we've qualified enough to proceed with peremptory strikes.

So even if someone doesn't ask -- answer any questions, we'll bring them in, make sure they understood all the questions. And I do allow attorneys to do brief follow-up. So some of the questions that were proposed, I didn't include in the voir dire, that does not prohibit parties, if someone gives a "yes" answer and you want more information, to probe -- to follow up on the questions that they've given.

So again, I try to, you know, keep the questions broad and to, you know, not ask more questions than necessary to make sure that we're getting a fair jury panel and I do allow follow-up questions.

So I did want to address a specific voir dire

question because it relates to a motion *in limine* that I'll resolve. And that is the defense wanted a question about Mr. Merritts' wife who is a former Congresswoman. I know the government had objected.

I'll hear from the parties about whether she's going to be a witness or not or the extent to which she could be mentioned in trial. But regardless, I think, given that there is a chance, you know, depending on what happens in trial, that her name could come up, I don't want a situation where jurors might be familiar with her and we don't know if they have strong feelings.

And so I think it's actually important for both sides to know whether jurors have feelings, positive or negative, that might make them unfair in the event that she's called as a witness, particularly that the defense has included her on their witness list.

Again, maybe she doesn't get called or maybe there is some limit to her testimony or maybe, after a proffer, it's determined she's not relevant. But I just don't want any mid-trial issues. So I just wanted to explain why I included that question.

So with that, I'll start with the government. Do you have other objections, edits, additions? Any questions that I didn't include that you wanted that you feel strongly about, we can discuss that now.

**MR. KELLY:**  No, Your Honor.  We didn't have any other objections or issues with the proposed voir dire.

**THE COURT:**  Okay.

**MR. KELLY:**  I think, as to the question about Ms. Bush being included in voir dire, we understand Your Honor's concern that it is prudent to front a potential juror bias or prejudice issue in either direction.  And to the extent that she is brought into the trial --

**THE COURT:**  Yeah.

**MR. KELLY:**  -- I just want to know, and I understand you'll hear argument on this later that, one of our concerns is that the defense is attempting to sort of insert her into this case, either through voir dire or opening statements or through cross-examination of the government's witnesses with no actual intention of ever calling her, in part, because she has no relevant testimony to offer.

**THE COURT:**  Okay.

**MR. KELLY:**  So we are concerned about, sort of, the confusion that it may inject to the jury.  Why are we being asked about Congresswoman Corey Bush?  But we do understand, you know, sort of the prudential reason for Your Honor wanting to do that.

**THE COURT:**  Okay.  And like I said, we'll address some of those issues when we get into the motions in limine.

Does the defense have any objections, additions, edits?

MR. DiRUZZO:  No, none that were otherwise before the Court.

THE COURT:  Okay.  All right, great.

Okay, we're just going to take a minute to get back online.

(Brief pause.)

MR. KELLY:  Are we back on, Your Honor?

THE COURT:  Yes.

MR. KELLY:  I apologize.  I actually have one other thing that isn't necessarily an objection.

THE COURT:  Sure.

MR. KELLY:  I just wanted to make sure that Your Honor had noted in the proposed statement of the case. We were fine with all of it.  There had been the one reference to, at the end, "the government has the burden to prove beyond a reasonable doubt, if it can."

THE COURT:  Oh, okay.

MR. KELLY:  And we had objected to the inclusion of the words "if it can" as being superfluous.  It sort of puts the thumb on the scale a little bit in our opinion without really adding anything --

THE COURT:  Okay.

MR. KELLY:  -- to the defense, you know, position

obviously that we do bear the burden of proof.  But we had just included that objection in the filing.

**THE COURT:**  I see, okay.

**MR. KELLY:**  And to the extent Your Honor saw that and rejected our objection, that's fine.  But to the extent that you had not seen it or considered it we did want to flesh that out.

**THE COURT:**  Okay.  What is the defense's position about -- I mean, it doesn't really add anything.  What is the defense's position?

**MR. DiRUZZO:**  It's not wrong, I would say that.  So I think that the Court would be well within its discretion to keep it.

**THE COURT:**  Okay.  What is -- why is it included?  I'm just curious what you think it adds.

**MR. DiRUZZO:**  Well, I think it's an inappropriate statement of the law and -- that's it, Judge.

**THE COURT:**  Okay.  Well, the way I -- I mean, I don't think it's wrong.  I don't think it adds anything.  The way I usually approach this is unless it is not accurate, I usually let the defense frame their, kind of, part of the statement the way they want to.

The same way, when the government was outlining its allegations, I did take out the initial additional language that the defense had proposed that I thought was

kind of redundant to the element.  So I'll leave it just because I don't think it's prejudicial if the defense wants to keep it.

**MS. MILLER:**  Your Honor.

**THE COURT:**  Yes, come on up.

**MS. MILLER:**  Going back to the voir dire for just a moment.

**THE COURT:**  Yes.  Yes.

**MS. MILLER:**  A thought that occurred to us is, to not create confusion in the panel about why Ms. Bush might be mentioned, could we amend the question to somehow indicate that she is a family member or a spouse or something like that and so you may hear something about her?

**THE COURT:**  Oh, sure.  I think that's fair.  Do you have any problem with that?  "So you heard that you may hear from or about former U.S. Congresswoman Corey Bush, who is Mr. Merritts' wife" or who -- any problem with that?  What does the government propose?

**MR. KELLY:**  I think maybe we would propose family member, Your Honor.

**THE COURT:**  Okay.  I don't have any problem with that.

And again, the defense is fine with -- I think it's fair to explain.

**MR. DiRUZZO:**  Yes.

**THE COURT:** Okay. Then moving to the preliminary jury instructions which are very standard from the Red Book. The only addition are the elements. I think the elements that I've included are elements that have been given in this district and are very -- they're probably closer to what the government proposed, but the parties weren't that far apart. I think the only difference is this one gives a little bit more detail about what a wire communication is.

Does the government have any objections to the statement of the elements? And again, for purposes of the preliminary instructions, I just give the basic elements. Obviously, at the final charging conference, we'll discuss instructions concerning definitions as they relate to these elements.

But just in terms of the basic mechanical elements of the charge of wire fraud, does the government have any problem with the instructions as I've articulated them?

**MR. KELLY:** The only point we'd like to make, Your Honor, is that the first element of Your Honor's proposed instructions, I believe, say that the government must prove the defendant, "entered into a scheme to defraud."

**THE COURT:** Okay.

**MR. KELLY:** And in our proposed jury instruction, which was taken from the 11th Circuit, we had proposed that

the defendant devised or participated in a scheme.  And we think that the "or participated in a scheme" language is important to make clearer to the jury that the defendant could be convicted even if he did not personally submit one or either of the charged loan applications himself.

To that point, the Indictment does allege that the defendant "transmitted and caused to be transmitted and did aid and abet."  That's Paragraph 37 and throughout the statement of the case the parties proposed as the defendant "prepared and submitted and caused to be submitted."

**THE COURT:**  Sure, okay.  I think that's accurate.

Does the defense disagree?  I mean, you can be convicted if you participated in wire fraud and all of these elements are met.

**MR. DiRUZZO:**  My only concern, Your Honor, is I'm a little worried that we might be getting into what would be more of like conspiracy land or Section 2, like aiding and abetting.

If I remember correctly, the Indictment did not charge anything in respect to aiding and abetting or have any mention of *Pinkerton*.  So I'm a little concerned that if we start bringing in the possibility of other individuals that you might unnecessarily or improperly expand the scope of the Indictment.

**THE COURT:**  What is the government's response?

**MR. KELLY:** Just that, again, Your Honor, the Indictment literally says in the charging language that the defendant "transmitted and caused to be transmitted and did aid and abet."

The language that we proposed from the Eleventh Circuit "devised or participated in a scheme," I mean, that seems to be black-letter law. We'd be happy to brief the issue.

**THE COURT:** No, no. I don't think this is an inaccurate statement of law. If you participate in a scheme to defraud and meet all of these elements, it seems clear to me that you'd be guilty of wire fraud the same as if you are the master mind or a participant. So I don't see a concern here. So I will make that edit over defense objection.

So "the defendant knowingly and willingly devised or participated in a scheme to defraud or to obtain money or property by means of false or fraudulent pretenses, representations or promises."

**MR. KELLY:** Yes, Your Honor. Thank you.

**THE COURT:** All right. Okay. So I will make that correction or edit, again, over defense objection.

Any other concerns from the government about the proposed elements?

**MR. KELLY:** No, Your Honor.

**THE COURT:** Okay.

So for the defense, I've ruled on this first issue.  Any other concerns about any of the other elements?

**MR. DiRUZZO:**  No, Judge.

**THE COURT:**  Okay.  All right.  So -- and anything else about the preliminary instructions generally?  Again, they're Red Book instructions but if someone has something additional?

**MR. KELLY:**  No objections, Your Honor.

**THE COURT:**  Okay.  Anything from the defense?

**MR. DiRUZZO:**  No.

**THE COURT:**  Okay.  So just for purposes of exhibit objections, if the objection is something like relevance, foundation, authentication, I'll deal with that at the time of trial just because, without context, it's hard for me to rule on that.

Some of these documents relate to Motions in Limine, so we'll resolve those shortly.  But are there any exhibit-related issues from either side that are not covered by a motion *in limine* that the parties think would be helpful to have a pretrial ruling on?

**MR. KELLY:**  Not for the government, Your Honor.

**THE COURT:**  Okay.  For the defense?

**MR. DiRUZZO:**  No, Your Honor.

**THE COURT:**  Okay.  All right.  Great.  Just give me one second, here.

Okay.  So I'm prepared to rule on the Motion to Dismiss the Indictment.  I'll put my reasoning on the record.

I'm going to deny the motion.  The -- and I'm referring to ECF-13.  It's the Motion to Dismiss the Indictment pursuant to the Federal Rule of Criminal Procedure 12.  An Indictment is sufficient if it contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend.

And two, enables him to plead an acquittal or conviction and bar of future prosecutions for the same offense.  That's from *Hamling v. United States*, 418 U.S. 87 (1974).

The defendant argues that the Indictment fails to inform him as to which of the 11 mentioned wire communications constitute the basis for the two counts of wire fraud.  I have reviewed the Indictment.  I do find the Indictment to be clear.  There are two counts at issue in this case.

One is based on defendant's transmission of his EIDL application on July 8th, 2020.  And the other is based on defendant's submission of his PPP loan application on April 22nd, 2021; that's clear in the Indictment.

While the Indictment certainly mentions other acts, the government has not alleged that those other

communications satisfy the elements of wire fraud.  They are not pled as separate counts in the Indictment.  Essentially, I think this Indictment actually has probably much more information than even required to describe the specific crimes with which Mr. Merritts has been accused of.

So I do find that the Indictment has satisfied the requirements of the Sixth and Fifth Amendments.  I find that defendant was properly charged by the grand jury, is on notice of the charged conduct and can prepare his defense.  So I will deny ECF-13.

There's also a Motion to Dismiss for selective prosecution which is ECF-14.  I do want to understand kind of what the class is that Mr. Merritts is suggesting that he's part of that's distinct from others who have not been prosecuted for this offense.  If you can just clarify that and then I'll be prepared to rule.

**MR. DiRUZZO:**  Your Honor, it's our position that Mr. Merritts is in a class of individuals that, according to the government's theory, he admitted PPP fraud for a very modest amount of $22,000.  And given that -- putting aside police officers who hold a special position of authority and respect and they get some of the benefits, like qualified immunity but are held to a higher standard, putting aside those individuals, that my client was indicted when very few to, you know, hardly ever individuals are indicted.

Now, the government has in its moving papers or in its opposition papers cited to five cases.  Your Honor, I would submit we have five instances nationwide.  And using some basic math, if there are a thousand PPP fraud cases that would be .5 percent, half a percent, if there are 10,000 PPP fraud cases, which I think is a little more realistic in a country of over 300 million, that is .05.  That's five basis points.

So when you look at the number of cases, you know, number of fraud cases out there and the number that have been indicted for such a small number, it leads to what I think the natural question is:  Why and why wasn't this case brought in the context of some type of civil resolution?

And it's our position, Your Honor, that it is selective that the thrust of the underlying investigation wasn't to Congresswoman Bush and my client.  And then when there was nothing that was to be found, you know, they pivoted and then -- and that's why we're here.

I would say, Your Honor, that I think, if the Court has concerns, I think that the Court should consider exercising its discretion to allow discovery.  To quote Justice Brandeis, "Sunlight is the best of disinfectants."

I would think, if the government truly believes that there is nothing to see here, that, you know, I'm going proverbial open kimono, would allow everyone to make sure

that nothing untoward has happened.

So with that being said, Your Honor, I submit that, given the rather small dollar amount, something that, in my view, I think best case scenario for the government look at zone B, in my experience you don't get too many federal criminal indictments where in the government's best day you're looking at a zone B as compared to a zone D.

And so that, again, just reiterates the strangeness of this Indictment in comparison to the most federal criminal fraud cases.

**THE COURT:** Okay. And then what's your response to the government's argument about why are you picking 30,000 as the baseline? Aren't you kind of arbitrarily...

**MR. DiRUZZO:** Well, at some -- I mean, at some level it is arbitrary. We could have picked 25,000. We could have picked, you know, 35,000, 50,000, but I don't think that number -- I think, if you look at that number in comparison -- and again, putting aside the police officers, if you picked 50,000, I don't think that it would move the analysis, it would move the proverbial needle.

Personally, I think if -- I think 35, if my recollection of (2)(b) is correct, I think that's the next level that kicks you up. I think it's under 2B subsection (b)(1), like, at (D) perhaps. And I think that's where, you know, it takes you into the next level.

But that's my recollection, Your Honor.  You can't hold me to that and obviously the guidelines are what the guidelines are.

THE COURT:  And then why are we removing police officers?

MR. DiRUZZO:  Because, again, you know, police officers have a special role in our criminal justice system.  For example, they get special protections.  Many jurisdictions have, you know, battery and law enforcement.  It takes a normal battery to a -- and enhancements and police officers are given qualified immunity.

THE COURT:  Well, not for fraud, though.  There's no immunity for PPP loan fraud.

MR. DiRUZZO:  No, of course.  Just as a general proposition, police officers are given certain protections in a society and are held to a higher standard.  That's in particular given that they are the ones that are on the front lines and enforcing the law and they are literally law enforcement.

THE COURT:  Okay.  Does the government have anything to add in addition to what's in its briefs?

MR. KELLY:  Not necessarily anything that's in addition to our briefs, Your Honor.  If I could just respond to a couple points quickly.

THE COURT:  Sure.

MR. KELLY:  One, as to the limited number of cases that we cited in our opposition, that was literally based off of a 10-minute Google search.

THE COURT:  Okay.

MR. KELLY:  It was by no means intended to be, you know, sort of a 50-state survey of every PPP fraud case that's been prosecuted in the last several years.

And, Your Honor, I think you hit it on the point that this does appear to be a somewhat arbitrary and artificially narrow comparison group.  And courts actually have rejected artificially narrow comparators for purposes of selective prosecution claims.

To that point, we didn't actually raise this in our opposition, but it occurs to the government it's not even clear why we would be limiting the universe of similar prosecutions to PPP fraud.

THE COURT:  I was thinking the same thing.  It's really just wire fraud.

MR. KELLY:  It's just fraud.  It's just fraud, Your Honor.

THE COURT:  Yeah.

MR. KELLY:  It could even be -- it could be healthcare fraud.  It could be wire fraud.  It could be mail fraud.  It could be bank fraud.  And I guarantee, Your Honor, without having done the research but I'll stake my

reputation on it, there are going to be plenty of cases out there in this office and throughout the country of cases of similar magnitude that have been prosecuted.

And as to sort of the open-the-kimono, what's-the-harm, in terms of requesting discovery, a selective prosecution standard is extremely high.  And the burden is on the defendant to meet that standard of showing discriminatory effect and discriminatory intent.

And for the reasons stated in our motion, the defendants have just fallen woefully short of providing any evidence for that.  And, Your Honor, it is cited in our opposition but the -- to even obtain discovery related to a selective prosecution claim under D.C. Circuit and U.S. Supreme Court law, the defendant still has to make a colorable claim of selective prosecution, which requires, quote, from *U.S. v. Bass*, 536 U.S. at 863, it requires a defendant to offer some evidence of both discriminatory effect and discriminatory intent.

And in *U.S. v. Armstrong*, 517 U.S. at 464, 468, that is a, quote, "rigorous standard," which, quote, "itself is a significant barrier to the litigation of insubstantial claims."

According to *U.S. v. Stone*, 394 F.Supp.3d 1 at 31, a DDC case from 2019, quoting Armstrong, "a defendant must provide something more than mere speculation or personal

conclusions based on anecdotal evidence."

Simply stated, Your Honor, there is no colorable claim here and the defendant is not entitled to discovery.

**THE COURT:**  Okay.  Thank you.

All right.  Anything more from the defense before I rule?

**MR. DiRUZZO:**  No.

**THE COURT:**  Okay.  So I appreciate the defense's arguments.  I will deny the motion.

To begin, the presumption of regularity applies to prosecutorial decisions.  And in the absence of clear evidence to the contrary, courts presume that prosecutors have properly discharged their official duties.  That's from a D.C. Circuit decision from 2016, *United States v. Fokker Services B.V.*, 818 F.3d 733.

To dispel that presumption, a criminal defendant must present clear evidence to the contrary that the prosecutor's actions had a discriminatory effect and were motivated by a discriminatory purpose.  That's from *U.S. v. Armstrong*, which the parties have cited in their briefs.

I find that the defendant has not shown that he was singled out for prosecution from among other similarly situated or that the prosecution was improperly motivated, for example, based on race, religion or another arbitrary classification, here, political affiliation or connection to

political affiliation.

First, I find that the defense has failed to properly identify the group to which he is similarly situated.  The defense initially suggested that the group is all subject to the jurisdiction of the United States Attorney's Office for the District of Columbia, who has allegedly submitted false PPP or EIDL claims for losses under 30,000.

I do agree with the government that, you know, it's not clear to me why 30,000 is the threshold.  I also agree with the argument made today that the defendant is charged with two counts of wire fraud.  So I do think it would be appropriate to consider wire fraud more broadly.

Second, even taking this group that the defense has identified for comparison, you know, there is just some evidence that there are other similarly situated that have been prosecuted for this type of loan fraud in this amount. I don't think that there is a meaningful difference between MPD officers in this context, although I appreciate that in some circumstances they have special protections.

But the government has pointed to individuals that were charged with PPP fraud for amounts even lower than what Mr. Merritts is charged with.  And, you know, the argument that the defendant is not similarly situated to MPD officers because the U.S. Attorney's Office has increased interest in

prosecuting wrongdoing within, just continues to narrow the group for comparison, including excluding other evidence that the U.S. Attorney's Office has prosecuted other people in this district for similar amounts for specifically pandemic loan fraud not to mention what I can say from my personal experience fraud generally in this district.

So I also find that the defense has failed to offer any evidence, even in direct evidence, of improper motive that would justify discovery on this issue. So because I find that the defense has failed to demonstrate discriminatory effect and offers only speculation as to discriminatory motive, the Court will deny that motion. And again, I agree that it's a high standard for dismissal and even for discovery.

Okay. So both of the Motions to Dismiss have been denied which means we are going to trial. So let's get into the motions in limine.

So I want to start with the defendant's motion related to the corporate records which is ECF-21. Before I get into the meat of the parties' arguments, can I ask the government, I'm wondering if there is a real dispute here. If you could just explain to me or maybe proffer, how do you plan to introduce and discuss the evidence at trial when you say you want to attribute it to him? I mean, is it -- are you going to get out that it was obtained pursuant to a

subpoena?

**MS. MILLER:**  My plan at this juncture, Your Honor, would be to elicit that Vetted was subpoenaed, that Vetted voluntarily responded to the subpoena, and the subpoena asked for the universe, which is in evidence.

And in response to the universe received these limited documents.  This is going a little bit further but then, in addition, although that purported to be everything they could find at the time, they provided additional documents of a similar nature, more text messages, it appears, of the defendants and their exhibit list, their defense exhibit list.

Taking all of these together and the way that they are relevant is that there are lots of discussions about business of the defendant, potential moving jobs, what he would charge, what he did charge.  And if you took all of those jobs -- and I haven't done this yet but I plan to.

**THE COURT:**  Okay.

**MS. MILLER:**  But just from a quick looking at the text messages, if you added up everything that he produced to us, it doesn't come close to justifying the amount of revenue that he stated that he made when he submitted his loan applications.  And so it is probative of the falsity of those statements, along with like the bank records and everything else.

So I think being able to say "that's about him and what he produced" is important because it's really tying my hands behind my back to try and say "well Vetted produced them."  It almost sets up this weird false narrative that Vetted is something other than him.  And maybe he has records that Vetted didn't have when he and Vetted are, in fact, one and the same.

And he is claiming that they gave us everything.  It was through counsel.  You know, in response to the subpoena, they're claiming they gave us everything they could find.  Apparently they did find some more, but that would be the gist of the argument.

**THE COURT:**  Okay.  So I guess that was my question because initially you had said that you were going to elicit that Vetted was subpoenaed, that Vetted voluntarily responded to the subpoena.  But then later you want to say that Mr. Merritts produced the documents, not Vetted.

**MS. MILLER:**  Well, that he is a -- that Vetted is a sole proprietorship and that the documents that we have show that he owns it 100 percent.

**THE COURT:**  Okay.

**MS. MILLER:**  And that, as a matter of law, there's no legal distinction.  It's just a doing-business-as name.  There is no legal distinction between him and Vetted.  And so when you are looking at this evidence and seeing what he

voluntarily produced in response to the Vetted subpoena, what you are looking at doesn't add up to what he said.

**THE COURT:** Right. I guess I'm just interested in, when you put the witness on the stand, what do you intend to elicit in terms of, because you're not going to ask the witness to describe what a sole proprietorship is.

**MS. MILLER:** I would put on through the witness did -- was the grand jury, through the summary witness we would put on, did you -- was a subpoena issued? Yes. Is this the subpoena? Yes. What does it ask for? Highlight all the relevant -- it asked for the universe. Did the government receive a response? Yes, it did. Is government X, you know, the response? Yes.

Did you pick out all of the messages that have anything to do with business, potential business, actual business?

**THE COURT:** Yeah.

**MS. MILLER:** Yes. And did you, you know, add it all up and -- I haven't done that much yet.

**THE COURT:** Yeah. No, no, no.

I am just trying to understand, it sounds -- and again, I will resolve the legal issue but it sounds like the defense's concern was eliciting that Mr. Merritts produced the documents. And if you don't intend to elicit specifically Mr. Merritts produced documents, then we don't

really have a dispute.  And if we do, that's fine.  I'm not suggesting you can't do that, but I just want to know if this is even an issue before I dig in.

**MS. MILLER:**  As I understood their objection, it's not just saying that he produced them but it's attributing them to him, like saying that these somehow have anything to do with him and his defense.

**THE COURT:**  Oh, okay.

**MS. MILLER:**  Or the prosecution of them.

**THE COURT:**  Yeah, I'm going to ask them a clarification about the attribution issue.  I mean, once they're in evidence, are these texts from his cell phone?

**MS. MILLER:**  Well, that's part of the reason that I think it's important to attribute to the fact that they came from Vetted and that Vetted is a sole proprietorship. And so when you say "Vetted" you can say him because, while you can look at the face of the screenshots, I think we can authenticate them through the fact that they were produced by his counsel in response to a subpoena to his company that he is the 100 percent owner of.

**THE COURT:**  Okay.

**MS. MILLER:**  And then I think if you look at the face of the screenshots, you will see his name, Cortney, you will see his phone number at the -- you know, in certain ones of them which we can authenticate with other records or

with witnesses.

So I think that it's important to say that these things came through his counsel. I think that that's obviously slightly different for the items he produced in connection with his exhibit list because that wasn't in response to a request for production. But again, I think, for authentication purposes, we can look at those and say, do they look like the other ones that his lawyer also gave us?

THE COURT: Okay. Sure.

Okay. Can I hear from the defense and just try to understand -- I want to understand your argument, because obvious -- it sounds like, based on the proffer that these are relevant documents. You don't disagree with that, do you?

MR. DiRUZZO: At this stage I don't.

THE COURT: Okay. So the government is going to have to lay a foundation for their authentication and admissibility at trial. What exactly are you objecting to in terms of how they do that?

MR. DiRUZZO: Well, Your Honor, it's, from my perspective, when the government issues a grand jury subpoena to an entity and the entity responds, I think it's fair for the government to say that these documents came from the entity.

But what I have a problem with is the government skipping over his evidentiary burden and immediately attributing documents from an entity to an individual if that makes sense.

THE COURT:  Okay.  So you don't have a problem with -- again, before I get into the legal issue, I'm just trying to flesh out if we have a dispute.

You heard Ms. Miller's, kind of, summary of what she would ask.  She's going to get out that there was a subpoena to Vetted; that the defendant is the sole proprietor of Vetted; that, you know, there was a response to the subpoena, this is what was produced.

MR. DiRUZZO:  I think all of that with the exception of the, you know, it's a sole proprietorship, because I'm going to anticipate that the individual that's going to testify is going to lack personal knowledge as to whether the entity is a sole proprietorship.  And that crucial piece of information is going to have to come in through other witnesses and other bits of evidence.

THE COURT:  Sure.  And you can object.  Assume that they can -- they call a witness with knowledge and that's before the jury either through the witness for these documents, part of their investigation through documents, through business records, they determined that there was a sole proprietorship.  So just assume -- again, you can

object if the witness isn't qualified to testify about that, but just assume, for the sake of argument, that they are able to do that.

What is the problem with that line of questioning and what exactly are you objecting to?

**MR. DiRUZZO:**  There's no problem with that line of questioning.

**THE COURT:**  Okay.

**MR. DiRUZZO:**  The problem that we have is skipping over the evidentiary foundation and just saying "Vetted equals Cortney Merritts."

There needs to be some evidentiary foundation in the proverbial chain in order to make the connection.  And from my perspective, what the government is trying to do is skip over their evidentiary burden and automatically connect the dots.

**THE COURT:**  Okay.  But what Ms. Miller suggested would connect -- I mean, you want to connect the dots because the jury is not going to know who Vetted is versus Mr. Merritts.

You know, this sounds more like a foundation issue than a potential Fifth Amendment issue.  Your problem is, you know, the government, if it has evidence, can establish it served a subpoena to Vetted.  Vetted -- again, assuming that they have the evidence for this, Vetted is a sole --

Mr. Merritts is the sole proprietor of Vetted, that the sole proprietorship, which Mr. Merritts, responded to the subpoena.  These are the documents produced.  This is what they show.

You don't have a problem with any of that.  Right?

**MR. DiRUZZO:**  No, because I think, being realistic, that's coming in.  Right?  And so I think it's coming in.

**THE COURT:**  Okay.

**MR. DiRUZZO:**  But, you know, I think for me, the real problem I have is the possibility of the witness saying, "I got this from Vetted."  Vetted is Mr. Merritts.  And then all of that additional evidentiary foundation, you know, the government doesn't have to do that work and the jury hears that Vetted is Mr. Merritts.

**THE COURT:**  Okay.  You're going to lay the foundation to connect Vetted, and the connection is the sole proprietorship?

**MS. MILLER:**  Yes, Your Honor.

**THE COURT:**  Okay.

**MS. MILLER:**  We, in fact, laid out numerous pieces of evidence that the defendant so admitted that starting at Page 3 of our opposition.

**THE COURT:**  Okay.  All right.  I mean, the reason I wanted to go this route is because it didn't really seem

like a Fifth Amendment issue.  I'm not being called upon, when the subpoena is served, to resolve any disputes about whether Mr. Merritts had to respond to the subpoena.  I mean, you know, based on the case law, Mr. Merritts could have resisted responding on behalf of Vetted and made this argument that it's a sole proprietorship.  But instead documents were produced and now the documents have been turned over.

And so if the question is just:  What is the evidentiary foundation that the government needs to lay to admit these documents and to sufficiently tie them to Mr. Merritts, you know, it sounds like the government plans to do that.  And if the government doesn't do that, as with any evidence, you're free to object during trial if you think the proper evidentiary foundation hasn't been laid.  So I'm going to deny ECF-21.

You know, again, it was framed as a Fifth Amendment issue.  I didn't see anything in the moving papers that demonstrated that, you know, a defendant's, kind of, failure or decision not to assert a Fifth Amendment privilege and resist production of documents, that then on the back end I would limit the government's attribution of the records to the defendant as a remedy for that.

So I was prepared to deny it, but it sounds like we really don't even have a dispute about whether or not

these documents could come in if the appropriate foundation is laid and whether they could be attributed to Mr. Merritts if the appropriate foundation is laid.

So again, I'm going to deny that motion with the caveat that obviously you are free to object at trial if the government doesn't lay a foundation for the admissibility of those documents and does not tie them to Mr. Merritts before attributing them to him.

Okay.  All right.  For ECF-22, that's the defendant's motion regarding expert testimony, I'm going to deny that as moot.  The government has confirmed that it will not be seeking to introduce expert testimony at trial. I'll address some separately the issue of the summary exhibits and whether those exhibits are appropriately admitted.

Again, for Mr. Merritts, if at trial the government asks questions of a witness that seeks to elicit testimony based on the witness's training and experience that seems to veer into expert testimony, again, you're free to object.  But I accept the government's representation that it didn't disclose any expert testimony because it doesn't have any expert testimony that it plans to introduce at trial.

So that, ECF-22 is denied as moot.

Okay, now we're at ECF-23, which is the

government's motion to admit evidence.  I understand the motion to encompass three types of records.  One is what I'll categorize as kind of routine business records; two are government records; and then three, there is the issue of summary exhibits.

I did not understand the defendant to be objecting to the admissibility and authentication of the routine business records; is that correct?  There was no objection there?

**MR. DiRUZZO:**  That's correct.

**THE COURT:**  Okay.

**MR. DiRUZZO:**  At least as for his business records portion.

**THE COURT:**  Okay.  So I'm going to grant that portion of the government's motion to admit business records and documents under Rule 902.11 and .13.  Again, the government is required to lay any sufficient foundation for records to establish their relevance and admissibility at trial.  So the defendant can object on those grounds at trial, but I will grant the government's motion.

With respect to the motion to introduce the self-authenticating signed and sealed government records under 902.1, I would grant that motion, except I want the government's position with respect to the documents that certify the absence of records, because the defense is

objecting to that coming in.

MR. DiRUZZO: That's correct.

THE COURT: So there's been an objection. Will you have the person who conducted the search prepared to testify at trial?

MS. MILLER: Yes, Your Honor.

THE COURT: Okay. All right. So I'll grant in part and deny in part the government's motion to introduce those self-authenticating signed records. And those records will come in as self-authenticating, except with respect to the documents that certify the absence Of records.

There has been an objection to the two IRS Forms 3050, 3050 certifications under Rule 803.10. So the government must and will produce a witness to testify about the lack of those records; and that person will be available for Mr. Merritts to cross-examine.

Let me ask, just to confirm with Mr. Merritts, are there any other government records, apart from those two IRS certifications, that the government intends to introduce at trial that you object to under --

MR. DiRUZZO: Confrontation clause.

THE COURT: -- confrontation clause?

There was some reference to some SBA records but I wasn't exactly clear.

MR. DiRUZZO: Yes, Your Honor.

I think I can make it easy for you.  Any type of government certification of lack of --

**THE COURT:**  Yes.

**MR. DiRUZZO:**  -- lack of absence, that would fall under this general claim.

**THE COURT:**  Okay.  But are there other records that the government intends to introduce?

**MS. MILLER:**  Lack of records?

**THE COURT:**  Lack of, yeah.

**MS. MILLER:**  No, Your Honor.

**THE COURT:**  Okay.  All right.  So it sounds like the only lack of records would be from the IRS.  Just to be clear, the defense has objected, so if there is some other entity from which the government wants to elicit that there were no records found, they would have to produce a witness to testify about their efforts so that that person could be available for cross-examination.

Okay.  Finally, I will grant, over the defense objection, the government's motion to permit the summary exhibits under Rule 1006.  I do find it appropriate to allow the government to introduce charts and graphs summarizing the voluminous financial information at issue in this case.

The Circuit has repeatedly permitted similar accounting summaries that utilize basic calculations of financial invoices and other data to create charts, graphs

or timelines.

Mr. Merritts will have the opportunity to cross-examination the FBI agents who prepared these summary exhibits to contest any categories, labels or underlying data that the defendant disputes the accuracy of.  And the government has also noted that it will instruct its witnesses not to provide any improper opinion or influential testimony in relation to those exhibits.

I also will, as I understand case law, be prepared to give a limiting instruction, if the parties want, advising what the purpose of the summary exhibits are.

Oh, did you?

Yes.

**MS. MILLER:**  Sorry, Your Honor.

I believe that, if I'm correct, with respect to 1006 there is a limiting instruction.

**THE COURT:**  Yes.

**MS. MILLER:**  I think that applies when you do summary exhibits before the jury.

**THE COURT:**  Okay.

**MS. MILLER:**  Like the ones that are not admitted into evidence.

**THE COURT:**  I see, to let them know that it's an aid but not required.

**MS. MILLER:**  Yes.  I don't --

**THE COURT:** Okay.

**MS. MILLER:** I don't think the limiting instruction rule applies to Rule 1000 --

**THE COURT:** To summarizing the voluminous records?

**MS. MILLER:** [Nodded]

**THE COURT:** Okay.

I was just going to suggest that, if there is any explanation I need to give to the jury about what they're seeing, I'd be prepared to do that. But the parties can let me know if they think that's appropriate, but I will permit the government to introduce the summary exhibits.

Okay. Now moving on to the government's Motion to Exclude Evidence, which I believe is ECF-24. First, I'll deny as moot the government's Motion to Exclude Evidence or arguments seeking jury nullification because the defense has represented that he will not make such arguments or introduce such evidence.

Again, I know we have to get into the weeds of some of the specific issues, which we will do shortly, but, you know, I trust that the defense knows that jury nullification would be improper to ask the jury to do in any way. And if the defense makes any arguments or asks any questions and attempts to do that, the government can object and I will instruct the jury accordingly. So I'll deny that as moot.

Second, I will deny in part the government's Motion to Exclude Character Evidence and Prior Good Acts. I say "in part" because, to the extent that it covers any general statements of good character, which can't be offered, I don't understand the defense to understand they could do that. But just to be clear, that's not permissible.

But the federal rules clearly allow a defendant to offer character evidence under 404 and 405 of a pertinent trait that's relevant to an element of the offense. So, for example, in this case, it's a fraud case, so evidence that demonstrates a character for qualities like truthfulness could be pertinent in a case about fraud.

So I won't preclude the defense from introducing appropriate character evidence, if that's what he chooses to do. Again, if there's an issue with respect to the extent of that testimony, I can deal with those objections during trial.

Okay. Third, with respect to the government's Motion to Exclude Statements about Punishment or Collateral Consequences of Conviction, I'm going to deny that as moot because the defendant has represented that he will not introduce evidence about punishment or consequences or make any such arguments.

You know, I do think, you know, in closing, can a

defendant say, you know, please consider all of the evidence carefully because this is a very serious matter and is important to Mr. Merritts?  Sure.

Can he say, you know, "if you convict, Mr. Merritts is looking at X time"?  No.  Can they talk about collateral consequences?  No.

So again, I think this is one of those things where I trust the defense understands what's appropriate and what's not.  And if the defense starts down a line of making an argument or asking a question that seems to be attempting to elicit statements about punishment or collateral consequences, government can object and I will deal with it and instruct the jury accordingly if I need to instruct them as to what's permissible and not.

But I accept that Mr. Merritts has experienced counsel that knows that he can't make arguments about punishment or collateral consequences.

Okay.  So then -- okay.  So now we're at the issue of the investigation of former Congresswoman Corey Bush. Let me hear from the government on this.  Am I right that my understanding, from the limited information I have, is there was an investigation into Ms. Bush and Mr. Merritts and that these -- this alleged fraud was discovered in connection with that investigation?

**MR. KELLY:**  That's correct, Your Honor.

**THE COURT:**  Okay.

**MR. KELLY:**  So, yes.  There was the campaign -- the misuse of campaigns funds investigation.

**THE COURT:**  Okay.

**MR. KELLY:**  Primarily focused on Ms. Bush that also, of course, included Mr. Merritts.  Since the allegations included that she had misused campaign funds to pay him for security services.

**THE COURT:**  Okay.

**MR. KELLY:**  During the course of that investigation, the agents were investigating whether or not Mr. Merritts actually had any sort of security-related company or firm.  And as part of that investigation, they queried whether he had ever applied for any COVID relief-related loans for any business.

Nothing came back for a security business, but the loans at issue in this case did come back as to his purported moving business.  And the agents realized, from having reviewed his financial records, that the representations in the loan applications were not consistent with what they had seen in his financial records.

And at that time point in time, the decision was made to open -- you can call it a separate -- I mean it's not a separate investigation -- it is a separate investigation because they're investigating completely

separate crimes --

THE COURT:  Different issues.

MR. KELLY:  -- different people, different timeframes, different conduct, different criminal statutes. But, yes, it was somewhat happenstance that the evidence that led to the charges of this case was uncovered during the other investigation.

THE COURT:  Okay.  And then let me be clear, so you're moving to exclude that.  So you have no intention, if I were to grant the motion and I'll hear from the defense, you're not going to explain to the jury kind of how Mr. Merritts ended up in this seat by laying out any of this information?

MR. KELLY:  No, Your Honor.

I mean I think that it could be appropriate for testimony to be elicited in general terms that there was, you know, an ongoing investigation and during that investigation, you know, they uncovered this evidence that I just very rudimentary -- you know, rudimentarily -- I don't know if that's a word, Your Honor -- laid out.

But just as if, if the evidence in this case had been uncovered while Mr. Merritts or Ms. Bush were being investigated for murder, I guarantee, Your Honor, the defense would be taking the complete opposite position here that the government should in no way be allowed to get into,

whatsoever, the details or the outcome or anything having to do with that murder investigation. And we think it's equally true here.

THE COURT: Sure. So I'm just trying to understand before I ask the defense for more information on this. You know, if I were to grant this motion, you would or you would not, in general terms, have an investigating agent testify about how Mr. Merritts came -- I mean, you would just start with this investigation, not kind of the investigative steps that led to it; is that right?

MR. KELLY: Court's indulgence. I just want to --

THE COURT: Sure. Yeah.

(Discussion off the record between government counsel.)

MR. KELLY: Your Honor, it's just -- I think we could do something very general, such as, during an unrelated investigation in which Mr. Merritts was not a target, you know --

THE COURT: Okay.

MR. KELLY: -- you uncovered X, Y, Z.

THE COURT: Yeah, I'm not even trying to -- I'm not even there yet. I just want to know kind of what your intention was. You know, if I were to say I'm granting this motion in full, is it your preference not even to do it in general terms? I'm not asking for like a concession between your position and the defense.

I just want to know, you know, from your perspective, like if you got your way and you could try this case exactly how you want, you wouldn't even mention it in general terms or you would?

**MR. KELLY:**  I don't think that we would need to, Your Honor.

**THE COURT:**  Okay.

**MR. KELLY:**  I mean, if an investigation was launched because, you know, there was a whistleblower complaint for example, we wouldn't necessarily elicit testimony from the agent that there was an anonymous complaint and that caused you to look into this.

We would just say, you know, "did you open that investigation into whether or not Mr. Merritts had submitted fraudulent COVID loan applications?"  And they would say "Yes."  And then we could say, you know, "What did you do as part of that investigation?"

So I think we would steer as far clear from any reference to a separate investigation as possible, you know, short of somehow causing juror confusion but --

**THE COURT:**  Okay.

**MR. KELLY:**  -- that would be our preference.

**THE COURT:**  All right.  I'll hear from the defense.

First, do you intend to get into this prior

investigation if you had your way?

**MR. DiRUZZO:**  Yes, Your Honor.

**THE COURT:**  Okay.  And the relevance is?

**MR. DiRUZZO:**  Well, Your Honor, I'll put it to you this way.  I think you've probably seen in the course of your career some people make the argument of law enforcement spend a tremendous amount of time, effort and money in an investigation that was, you know, dead on arrival.

And in order to save face, you know, save their career prospects, you know, that they had to find something and, lo and behold, what do they find?  They found X.  And I've personally, you know, made those arguments, you know, myself in different cases.

And of course the witness is going to be allowed to say, if it's true that, no, that's not the case.  But then the argument is going to be to the jury that, of course, law enforcement -- just like everyone has a vested interest to make sure that what they do is not a waste of time that, if a law enforcement, for example, you know, if I pose the question:  Well, it's your job to investigate cases and make arrests?  Invariably the answer is going to be to investigate cases but not necessarily make arrests.

And the follow-up is often, Well, if you didn't make any arrests, it wouldn't look like you were doing a very good job as an investigator.  Right?  That's going to

play out and I think that that's fair game because I don't know how much time, effort and money went into the initial investigation of my client and Ms. Bush.

It seems they both were being investigated for possible conspiracy, either to commit some type of campaign finance violation. But the fact that there was no their there and then, lo and behold, what do we have, a mere PPP fraud case for a mere $20,000. I think that's fair game, at a minimum, to be argued to the jury that, like, this is not something that you would typically see and that goes to the witness's sloppiness.

**THE COURT:** Well, let me stop you there. So I was with you until you said this is not something you typically see because, what do you mean? What is not something you typically see?

**MR. DiRUZZO:** That you've got a rather substantial federal investigation into campaign finance and then you get a fraud case for a mere 20,000, 22,000.

**THE COURT:** Where is that? I don't know if that's true or not. So how is the jury -- what evidence do you expect to come out that's going to substantiate that?

**MR. DiRUZZO:** I can ask the law enforcement, you know, how many cases has he been involved with that results in a -- criminal charges for only $22,000.

**THE COURT:** But I guess, okay, so I denied the

selective prosecution claim.

**MR. DiRUZZO:** Uh-huh.

**THE COURT:** And so the only question for the jury is whether the government has proved these allegations beyond a reasonable doubt or not. And so it's not a matter of -- I mean, I think there's a line -- you know, it can't be the government has proven the allegations beyond a reasonable doubt. There's evidence but this is unusual and it's for a low amount so, jury, you should acquit. Right? That's not permissible.

**MR. DiRUZZO:** Well --

**THE COURT:** What could be permissible is, you know, there is nothing here. The evidence is not sufficient. And this is to save face because the investigators were embarrassed but that doesn't require the, you know --

**MR. DiRUZZO:** The discussion of $22,000? That's fine, Judge.

**THE COURT:** Yeah, I'm concerned about that because, first of all, you know, I don't know -- it sounds like you don't know -- you know, this is not discovery. This is actually the trial, so I don't know that that's a true statement. And it sounds like you don't have any information to suggest that it is the case that this is unusual or not.

**MR. DiRUZZO:**  I would agree with that.

**THE COURT:**  Okay.

**MR. DiRUZZO:**  I'd be willing to, to make it easy for you, Judge, not talk about the dollar amount but be able to say that the witness -- you know, the law enforcement, you know, put a lot of time, resource and effort and manpower into an investigation that went nowhere, and then it morphed into a totally unrelated investigation of my client.  I think that that's fair game.

**THE COURT:**  Okay.  Let me hear from the government.  I'll hear from the government.

And let me just explain, kind of, what I think is the issue, here.  On one hand, I don't want this prior investigation to turn into a sideshow, a mini trial.  I'm not even sure, for the point you want to make, that it matters what the initial investigation was about.  You know, I don't know that you need to say any details to ask those questions.

But I do think I have to let the defense question witnesses about potential bias.  So, you know, if the witness -- again, I'm not suggesting this is the case.  But imagine a case where a witness made an arrest without evidence because -- for some reason or another than the evidence, they are worried about, you know, blow-back from supervisors, whatever it is.

So let me hear about specifically that because I can't shut the defense down in a theory where they want to confront specific witnesses about bias.  I am very concerned about mentioning this dollar amount, which I've said that I would not permit that.

I'm not going to permit selective prosecution arguments.  I've denied that motion.  It's not -- you know, if I thought there was selective prosecution, it would be dismissing the case.  That would never go to the jury.

So let me hear from the government about what you think appropriate bias cross is, understanding that I have to let a defendant do that, and what your response is to the defense's argument.

**MR. KELLY:**  Yes, Your Honor.

A few points.  One, this is all pure conjecture.  There is actually no good-faith basis whatsoever in any of the discovery that the agents or anybody involved in this case was somehow frustrated that the investigation into Ms. Bush didn't lead to charges, so they pivoted to target Mr. Merritts.

And it's our position there has to be a good faith basis on which to attack someone's credibility through bias cross-examination.  I just want to be very clear, Your Honor.  The campaign funds investigation, the only target in that case was Ms. Bush.  Mr. Merritts was not a

target of that investigation.  The only reason that he had any involvement in terms of the investigation was because he was one of the people --

**THE COURT:**  So I guess your point is that, if Ms. Bush was the defendant here, that might be a more appropriate argument but --

**MR. KELLY:**  Yes, Your Honor.  The actual investigation as to Ms. Bush was whether she had provided false statements to the FEC.  Mr. Merritts, by definition, could have never been guilty of making false statements to the FEC.  He was never a target, so this is not a situation where the agents were going after Mr. Merritts and couldn't get him on one thing, and so they decided to get him on something else.

**THE COURT:**  Okay.

**MR. KELLY:**  And Your Honor, I mean, that seems like back door to a selective or even a vindictive prosecution claim by the defense.

And as to the sideshow, Your Honor, we're not really sure how that could be avoided.  I mean, the defense counsel is speaking about Ms. Bush being exonerated.  And I'll just note that the government's position has never been that Ms. Bush was exonerated.  We'll concede charges haven't been brought.

But would the government be entitled to present

evidence in detail about the allegations as to Ms. Bush and the defendant, for example, that Ms. Bush paid her boyfriend, now husband, over $100,000 for security services that were alleged to have never been provided or that the FEC issued a complaint against her?

Should we be allowed to get into the agents about all of the evidence of wrongdoing that they did uncover as part of that investigation?  Should we be allowed to ask them why criminal charges haven't been brought in that case?

Your Honor, if that door is opened, this case is no longer going to be about whether or not two loan applications that Mr. Merritts submitted were fraudulent, which is what this case is about.  And our fear throughout all of the briefing has been that the defendant isn't interested in having that conversation.  The defense is interested in having a conversation about the investigation into Ms. Bush.

And I will also note, Your Honor, that -- I mean to the extent that it matters, the applications at issue here are from well before actually the time period of the investigation into Ms. Bush in terms of the relevant offense conduct.

So we just -- this seems like a back door for a selective prosecution argument.  We don't know how we couldn't open the door wide open for a complete sideshow

here and Mr. Merritts was not the target of that investigation, Your Honor.

**THE COURT:** Okay. Well, let me ask the defense your response to that because, if you were to make a suggestion or ask a witness, you know, you're investigating Ms. Bush and you couldn't find anything so you pivoted and the government has evidence that they in fact did find things, I mean, why wouldn't they be able to put forth everything they found, which I don't think you would want and I don't want that sideshow either.

So how does that -- I mean, you agree that I can't let you ask questions about the investigation and what it turned up and what it didn't without letting the government respond?

**MR. DiRUZZO:** Your Honor, I think there's a happy medium here. Right? I think I should be allowed to get into the amount of -- I'll give a nice example. Imagine this were Enron all over again, an accounting fraud case. Right?

And then you have all of the government law enforcement auditors spending hundreds of thousands of dollars, hundred of thousands of man hours and then, for whatever reason, they don't make the case but a small additional case is found on the side, you know, a 1001 violation. Right?

I think that it's appropriate to say that the investigators who have a personal interest in their own career to say that they weren't wasting hundreds of thousands of dollars on a lark and a detour on an investigation that turned up nothing.  Right?

**THE COURT:**  Well, right, but let me stop you right there.  That's the issue.  You're assuming that it turned up nothing.  And the government is saying, if you want to go down this road, what they're going to -- they want to show that they did turn up something.  There was a complaint, an agency complaint filed.  There was evidence of payments for services not rendered.

**MR. DiRUZZO:**  I think I would agree to limit it to -- we could say that just charges were never brought.

**THE COURT:**  And then do they get to ask:  Can you explain why charges have not been brought?

**MR. DiRUZZO:**  I would say at that point, if the government wants to go there, I would, to be actually honest, I think they would be able to do it.

**THE COURT:**  Right.  I mean, do you want -- you don't know what the answer to that question is going to be.  Do you want that answer?  I mean, this is what I'm a little bit concerned about.

Let me just be clear.  I don't want to cut you off in any way from questioning witnesses about bias.  And so

I'm not trying to do that, and I want to find a way for you to ask questions that get at witness's bias, their motives to curry favor with the government, what could have tainted the investigation --

**MR. DiRUZZO:**  Uh-huh.

**THE COURT:**  -- that the jury could then use to either doubt the credibility of the investigation or to, you know, make other conclusions that the government hasn't carried its burden.  But I don't want this to be, you know, opening the door based on speculation.

So you know, I don't know how much was spent on the investigation or how much time.  I mean, how long was the investigation into Ms. Bush?

**MR. DiRUZZO:**  Unfortunately, Judge, I can't say that because I'm rather new to the case.

**THE DEFENDANT:**  Your Honor.

**THE COURT:**  Do you want to consult with your client?

(Discussion off the record between Mr. Merritts and Mr. DiRuzzo.)

**MR. DiRUZZO:**  It's my understanding that the investigation into Ms. Bush was approximately a year through an IG investigation and in addition to the DOJ investigation.

To answer your question, Judge, how about this:

Trying to be intellectually honest, I think if I go there, I've got to pick my poison.  And it's kind of you're in for a penny, you're in for a pound and then the door is opened.  Just because the door is opened, then the government needs to make their own tactical decisions of whether they want to walk through.

**THE COURT:**  Well, no, I also have to be concerned with turning this into a mini trial about an unrelated investigation.  So I need to know kind of what could come out and what specifically you want to ask.

I mean, if you want to confront a witness with -- I'm not saying I'm going to let you do that.  I'm just kind of thinking out loud.

**MR. DiRUZZO:**  Sure.

**THE COURT:**  So you want a -- the FBI investigator is going to testify.  You want to ask the FBI investigator, you know, Mr. Merritts, you found out about this alleged loan fraud because you were actually investigating his wife for something unrelated.

**MR. DiRUZZO:**  Ms. Bush.  You spent a year of your life and thousands of hours or hundreds of hours working on the case and that case did not amount to an indictment.  Correct?  Yes.

**THE COURT:**  And then the government gets to explain why it didn't amount to an indictment?

**MR. DiRUZZO:**  Well, I think then, again, to be fair, you know, the government is going to have to make the tactical decision whether they want to walk through that door themselves.  Although I personally think that there is -- I'm not entirely sure that the case agent would be able to make that representation as to the thought processes.

**THE COURT:**  Right.  They're going to -- that's the problem.  Then are they going to have to call some other witness to testify about that?  I mean, that's what I don't want to happen.

**MR. DiRUZZO:**  I understand, Judge.  I understand.

But looking back at it or looking at it from the 10,000 foot, you know, I think it's fair game and I should be able to go into the biases, prejudices and motivations of law enforcement.  And at some level, it's law enforcement's job to make a case.

And so to save, you know, that time and effort of a year, you know, and then voila, you've got a $20,000 PPP case, I think that's fair game understanding I will not be able to get into a dollar amount.

**THE COURT:**  All right.  Let me here from the government and then I'm just going to -- now that I have some specifics, I'll think about this.  I might just issue a short Minute Order in the next day or so.  But let me hear

from the government.

Is there anything that you think would be appropriate for them to get into that relates to this bias issue?  I'm just trying to draw a line.  I share your concern.  I don't want to cut the defense off from questioning witnesses about bias.  I don't think I can do that.

I also do not want this case to turn into a case about this former Congressperson's investigation.  I actually think it could potentially be damaging to -- probably more damaging to Mr. Merritts than the government if that door is open, quite frankly.

So let me hear from -- is there any piece of what the defense is saying that you agree is appropriately inquired into on cross and then I'll take this under advisement?

**MR. KELLY:**  Your Honor, I am happy to answer that question if I could just make one other brief point.

**THE COURT:**  Sure.  Yeah.

**MR. KELLY:**  So you know, it occurs there are a lot of -- this goes back to my good faith basis point from before, Your Honor, to exploring bias.  And it occurs that there are a lot of assumptions being made here.

The example that was just given by defense counsel is they would like to ask the agent, you know, would it --

you know, you pursued this case because you wanted a promotion or you could get in trouble with your job if you didn't, et cetera.

They would have to lay the foundation for the potential bias first by asking the more neutral question: Is your job tied to how many cases you closed? Or, you know, if you were to, you know, investigate a case and then it didn't lead to charges, you know, what repercussions could that have for you?

They would have to lay some sort of foundation that what they were hoping to explore as to the other investigation would actually have some potential bias impact for the witness.

And Your Honor, I think, you know, at most -- and this goes back to sort of what we were talking about before in terms of how much would the government want to get into the other investigation in terms of laying, you know, providing contacts for this investigation. And frankly, again, we don't think we need to get into it at all in order to make out the charges here.

But after laying a proper foundation for potential bias through the more sort of neutral questions that would normally be required, if the defense wants to try to elicit testimony from the agents about, you know, efforts that were put into another investigation during which they uncovered

the evidence that ultimately led to these charges, it would still add literally nothing but would certainly invite jury nullification, confuse the issues, greatly expand the scope of this trial, for them to get into whatsoever any of the details of that investigation, the nature of that investigation, the fact that Ms. Bush was the target of that investigation, which, again, seems to be what the defense has been trying to do all along during -- through all of the briefing in this case.

So if Your Honor is inclined or if, during testimony, a foundation is laid for a potential bias based on the fact that resources had been expended in an unrelated investigation, there is no justification at all to get into, as I just said, any of the details of that investigation.

Court's indulgence, Your Honor.

THE COURT: Sure.

MR. KELLY: Oh, and one other point, just -- and I don't think this is a technical point. I think it's an important one. The investigating agents don't make the charging decisions here. The U.S. Attorney's Office does.

THE COURT: Yeah. Yeah.

MR. KELLY: So to the extent -- it's just they're not -- they're not even the decision-maker here, which is another reason that sort of -- if they want to attack the thoroughness of this investigation as to Mr. Bush and what

was done in terms of interviewing people who he may have provided moving services to or people that he were employed by or look into his financial records, that's certainly fair game. But there's really no reason to get into what was done. In our opinion, substantively is an unrelated investigation.

**THE COURT:** Okay. Thank you.

Can I hear from defense counsel? One is, I forgot to ask you your response to the government's argument about the mismatch, meaning, you know, maybe this would be a closer question if Ms. Bush were the defendant. But because Mr. Merritts was not the target of the investigation, this idea that, you know, you had to find something, doesn't that suggest that they would have -- if they were going to kind of pin something on someone, wouldn't they pin it on the target of their investigation?

**MR. DiRUZZO:** Well, I think we all know that, just because one individual is the target, that doesn't mean that individuals close to that person might not be in the proverbial blast radius.

**THE COURT:** Well, no I'm just saying that your -- again, this has to be tied to the government's lack of evidence or inability to prove beyond a reasonable doubt. So what's going on in the background is that, you know, he doesn't have to prove his innocence.

But like the argument is Mr. Merritts didn't do these things. The government can't prove these things. The evidence is lacking and he's only -- you want to say he's only here because they couldn't make this other investigation.

The government's response was, you know, that theory might work for the target of the investigation, meaning we couldn't find anything so we just kind of pinned something that wasn't sound on Ms. Bush. You know, he wasn't the target.

So there's a mismatch between -- you know, if you can just respond to that if you understand what I'm trying to say.

**MR. DiRUZZO:** I understand. There is not a mismatch. And I think for the simple reason that all of the money, Judge, you heard it all of the time from the government. Where did the money come from? Ms. Bush, her and her campaign. Where did it go to? Mr. Merritts.

**THE COURT:** Okay.

And then what is your response to the government's noting that, well, you're going to ask these investigators these questions and they don't make charging decisions. So you have the wrong person in the chair to confront about, you know, why there wasn't an indictment against Ms. Bush.

**MR. DiRUZZO:** There is no indictment is a fact.

And the witness can say that, can testify to that.  And then, to the extent that the government wants to rehabilitate on redirect to say something that you don't make the charging decisions, those are above your proverbial pay grade, that's fair.

THE COURT:  Okay.  And so, again, I'm going to take this under advisement.  But it would be helpful if -- do you have, you know, any authority that you can submit in short order of this kind of bias cross being permissible?  That would be helpful if you could submit or supplement your briefs with authority.

MR. DiRUZZO:  And what is the Court looking for in short order, Your Honor?  And the reason I am hesitating is we're on a Friday afternoon and I've got a Third Circuit oral argument --

THE COURT:  No problem.  So trial is January 12th.  And so I'm not even saying it needs to be a brief.  I just -- if you have authority.  You don't have to.  I'm just saying I'm inviting, I'm giving you the opportunity to submit some authority in support of your position now that you've articulated very clearly what you intend to do.

MR. DiRUZZO:  It's my question, 24 hours?  Half a week?  One week?

THE COURT:  You tell me when you can do it.

MR. DiRUZZO:  My co-counsel is in the middle of a

two-week trial.

**THE COURT:** Okay. You don't have to. I'm just inviting you to supplement the record before I rule.

**MR. DiRUZZO:** Give me a week, Judge. I think -- I'll be able to find someone in my firm to do the research and come up --

**THE COURT:** Okay. I think by the 12th, that's still a month before trial. So that if by the 12th -- and again, if you don't intend to, just let me know so I'm not waiting.

**MR. DiRUZZO:** Yes.

**THE COURT:** But if you -- you know, now that you've identified specifically what you intend to do, and the government, you're free to as well but I'm more interest -- you've made your point. I'm more interested if the defense has authority in which this specific type of questioning has been admitted. But I will give you the same opportunity. If you have additional authority that you want to add, you don't have to.

**MR. KELLY:** Thank you, Your Honor. We would just ask that if the defense does submit something, we just be given a short period of time --

**THE COURT:** Sure.

**MR. KELLY:** -- even a couple of days to just make a response.

**THE COURT:** Respond, sure.  Okay.  Thank you.

All right.  I will take that issue under advisement.

Okay.  So the next piece of this is somewhat related and it probably will be in the same bucket.  It has to do with the government's Motion to Exclude Evidence and Arguments about Political Motivation.  You know, I can clearly grant the government's Motion to Exclude any discussion of a purported legal defense of selective prosecution.

Selective prosecution, as I indicated, I denied that motion.  But I agree with the government's position that that is not an issue for the jury.  That doesn't have to do with guilt or not guilt.  And so it would be inappropriate to make a selective prosecution argument in any way, shape or form during the trial.

So I won't permit anything of that nature.  I trust that the defense understands that.  Again, if there is something that is on the line, the government is free to object but, you know, I think specifically I have made clear that this kind of idea that this is a unique amount or a small amount, I'm worried about that and the jurors thinking, oh, this is not serious and so they think that that means that they don't have to look at the evidence and apply it to the elements.  Right?

He's charged.  He will get -- he should get a robust defense to the elements and an opportunity to attack the government's evidence however he sees fit to do so within the confines of the law.  But the amount of -- for, you know, that this is a small amount relatively.  First of all, I don't even know how that would be elicited in evidence that the jury could consider but I don't think that's relevant to anything.

So I just want to be clear that suggestions that this is a unique case because of the amount, that this is smaller than what the government tends to prosecute, that this is not a lot of money, I don't think is relevant to any of the elements.  So I'm not permitting anything of that nature.

Okay.  So let me ask the defense, in terms of any type of political motivation-type evidence, what, if anything, are you intending to elicit in line with my rulings that I've made so far?  Is there anything I need to rule on here?  Do we understand --

MR. DiRUZZO:  I think you made yourself loud and clear, Judge.  I know where you're going.

THE COURT:  Okay.

MR. DiRUZZO:  And we get it.

THE COURT:  Okay.

MR. DiRUZZO:  Although I just I -- do leave open

the possibility that there might be something said on the witness stand that might open the door to a more -- a line of questioning that we hadn't considered. But other than that, Judge, I think we're good.

**THE COURT:** Okay. Okay. And I want to be clear. I'm going to take this under advisement because I want to be very clear. I appreciate that I have an obligation to ensure that Mr. Merritts can cross witnesses about relevant bias. So I admit that sometimes these lines get blurry and they can be fine.

So, you know, if there is a bias question you want to ask a witness that you think is on the line of something political, I don't want you to take my ruling as that I'm saying that you can't confront witnesses about bias, but I want to kind of flesh that out in advance so that we don't run into issues.

So I'm not suggesting that -- I've not ruled that it would be inappropriate to ask bias questions. But I think, because of the line, if there's something that you think you might want to do, I'm asking that you raise it earlier because...

For example, if a witness, if you had a reason to believe that a witness had some sort of political animus against Mr. Merritts or a political animus against someone affiliated with him, you know, that could be permissible to

ask about.  Again, I would want to discuss that earlier and not be finding out, surprise, that you're going to ask these questions because I do think that there is a fine line here. I just want to be very clear that I am not shutting the defense down from pursuing bias cross-examination.

But I think we just need to be clear about what is appropriately bias and what veers into inappropriate topics. Does that make sense?

**MR. DiRUZZO:**  Understood.

**THE COURT:**  Okay.

Does the government understand kind of where I am going?

**MR. KELLY:**  Yes, Your Honor.  That makes sense.

**THE COURT:**  Okay.  All right.

Okay.  So I will take the balance of ECF -- wait, is this 24?

**MR. DiRUZZO:**  It's 23.

**MR. KELLY:**  This one is 24, Your Honor.

**THE COURT:**  I will take the balance of that under advisement.  If Mr. Merritts wants to provide some additional authority, he will do so by the 12th which is a week from today.  I will give the government an opportunity to respond.

When you get the submission, if you could just -- you can even do this by email to chambers copying

Mr. Merritts' counsel.  Just let me know how much time you need for a response so I know to wait.

**MR. KELLY:**  Of course, Your Honor.

**THE COURT:**  Okay.  And then we will resolve this issue.

Okay.  There's also the government's Motion for Disclosure of Tax Return and I'm not sure if I have the defense position on that.

**MR. DiRUZZO:**  No, Your Honor.  That came in in the last couple of days.

**THE COURT:**  Right.  Are you prepared to provide a position or did you want to respond in writing?

**MR. DiRUZZO:**  Oh, no.  We definitely want to respond in writing.  We'd just ask that we be allowed to brief it in the normal course.

**THE COURT:**  Okay.  Okay.  All right.

And then the government had also filed an evidentiary notice at ECF-20, Notice of Other Acts Evidence, that I don't believe Mr. Merritts filed a response.  Is there any objection or issue with this?

**MR. DiRUZZO:**  It wasn't a motion.  It was just a 404(b) notice?

**THE COURT:**  Yeah, it was just a 404(b) notice. And you didn't file a Motion to Exclude, so I'm assuming that there is no dispute?

**MR. DiRUZZO:**  I think it's fine.

**THE COURT:**  Okay.

**MR. DiRUZZO:**  I would say that we can take it as it comes during the course of the trial.  But in general, I don't find 404(b) stuff to be really that contentious when you actually get down to it.  And so this is not a drug case.  This is not --

**THE COURT:**  Yeah, okay.

Okay.  Well, if there's no dispute, I don't need to rule on it.  But I just wanted to put on the record that the government has filed a Notice of Other Acts Evidence, and I did not receive a motion *in limine* from the defense to exclude other acts evidence.  So I'm taking that to mean that the government can proceed as it intends to unless there is an objection that I need to resolve which I am not hearing one.  Okay.  All right.

Okay.  So we got through all of the motions, except the one issue that I am receiving further submissions on and that I'll need to take under advisement -- or the two issues because we have the tax return issue, which I'll get a written response for, and this issue about the other investigation.

Let me just clarify, with respect to the other investigation though, the defense is on board, to the extent I let anything in, of not getting into the specifics of what

it was.  Or what is it -- just so I understand exactly what you are trying to do, what is it that you want to elicit about the former investigation in terms of what it was for?

**MR. DiRUZZO:**  I don't actually need what exactly what it's for.  It's just -- it can be a:  You had an investigation into Ms. Bush and her then boyfriend, you know, now husband, Mr. Merritts.  The amount of time, effort, money, manpower in that investigation that's entered on Ms. Bush, you know, it didn't go anywhere.

**THE COURT:**  Okay.

**MR. DiRUZZO:**  But here we are on something, you know, that sprung out of that investigation.

**THE COURT:**  Okay.  I just wanted to get an articulation of what he was trying to do.  You can respond. I was just trying to get an articulation of what he was trying to do so I know clearly what his intention -- I'm not saying that I am allowing him to do that.  But I just wanted to know exactly what he wanted to confront the witness with so that, when I get the supplemental authority, I can compare it to the facts of this case.

**MR. KELLY:**  Your Honor, and I don't think I need to repeat myself.

**THE COURT:**  Okay.

**MR. KELLY:**  We've made our position pretty clear on that.  Just to hit the two high points very quickly, one,

there's really no reason to reference, again, the nature of what was being investigated or who was the target of that investigation being Ms. Bush or anyone else for that matter. And I go back to my point of, had it been a murder investigation, you know, I think we would be having a different conversation. It just adds absolutely nothing to what defense counsel seems to be seeking to achieve here.

And the second point being, you know, defense counsel just said again they want to get into that Ms. Bush was being investigated and that investigation led nowhere or didn't lead to an indictment, et cetera.

That just brings me back to the point that we've been making all along, Your Honor, which is that seems to, you know, just -- it just -- the door flies wide open at that point and the government believes that we would have the right and obligation to present evidence as to what, if anything, was found in the course of that investigation.

And for all the reasons we said before, that just it's not relevant, it's a sideshow, there's no need to get into the substance of what was being investigated.

**THE COURT:** Okay.

And then I think -- I don't know if there was a specific request to exclude Ms. Bush as a potential witness, but it's kind of lurking in the background of the pleadings related to this. And I'll say this, I don't think you need

to say now if you're definitively planning to call her or not.

But if you do get to a point at trial where you are planning to call her for something other than as a potential character witness, I want to -- before she takes the stand and before you say our next witness is Ms. Bush, knowing that the government might have an objection, I'm just going to ask that you bring it to my attention so that I can rule on -- get a proffer at that time and hear from the government.

**MR. DiRUZZO:**  Understood.

**THE COURT:**  Okay.  Is that acceptable to the government?

**MR. KELLY:**  I think we're halfway there, Your Honor.

We're still concerned -- we don't know what, if anything, the defense would want to say about Ms. Bush in their openings.

**THE COURT:**  Okay.

**MR. KELLY:**  I think that will somewhat be constrained by whatever Your Honor ends up ruling as to -- you've already denied the selective prosecution motion.

**THE COURT:**  Yes.

**MR. KELLY:**  Depending on what Your Honor orders as

to the motion *in limine* to exclude evidence or testimony about the prior investigation, that will certainly or it could put, you know, pretty clear guardrails on what I can and can't say.

THE COURT: Okay, yeah.

MR. KELLY: We just are still concerned about, you know, somehow trying to plant the seed in the jurors' minds that, you know, Mr. Merritts is married to a former Congresswoman and, you know, any sort of implication that it had anything to do with the government's charging decisions here, which they would not be permitted to do based on Your Honor's ruling.

THE COURT: Right.

MR. KELLY: And so that sort of is why all along we've been seeking some kind of proffer even ex parte frankly, Your Honor --

THE COURT: Okay.

MR. KELLY: -- just to assure the Court at the very least that, you know, generally what she would be testifying to in order to put in place proper guardrails for opening statements and cross-examination of the government's witnesses and the like.

THE COURT: Okay. What's the defense's response?

MR. DiRUZZO: Your Honor, I think at this point it's a little premature. Obviously, we haven't made the

decision on whether to call any witnesses and whether to affirmatively put on anyone in our case-in-chief.

I have no problem for recalling any witness. If the Court would like us to front it at sidebar so that we could address that outside of the hearing of the jury, that I don't have a problem with. And as to the possibility of opening, at this point, I'm going to have to say that I -- it's going to depend on how you rule and -- at least in part. And so it's a little premature.

**THE COURT:** Okay. Why don't I get the supplement rule and then, if I need to set a further hearing, even if it's just by Zoom, because I understand you're traveling, just to clear any issues about what's permissible in opening when we get a little closer to trial, I can do that.

But I've made clear to the defense that, because I know that there will be an objection to this witness, before this witness is potentially called, we'll deal with the issue. But we'll deal with the openings and what's fair game in openings sufficiently in advance of trial as it relates to this issue.

Okay. All right. Is there anything -- oh, go ahead. Sorry.

**MR. KELLY:** Sorry, Your Honor.

**THE COURT:** No, it's okay. I was going to ask: Is there anything else that we need to cover?

**MR. KELLY:**  Just since we're on the topic, I hadn't wanted to revisit it until it made sense.

As to the voir dire question as to identifying Ms. Bush, I think it's Your Honor's proposed Question 22 --

**THE COURT:**  Yes.

**MR. KELLY:**  -- I think that we had suggested and everyone had agreed that she could be referred to as the defendant's family member.  We actually prefer something even more neutral than that and just say:  You heard that you may hear from or about former U.S. Congresswoman Corey Bush, who is a potential witness, during this trial.  And not sort of identify what the connection is between the defendant and Ms. Bush.

**THE COURT:**  Okay.  Yeah.  Any problem with that?

**MR. DiRUZZO:**  That's fine.

**THE COURT:**  Okay.  And let me be clear, the only reason that -- well, I said why I included this question.  But I assumed that, in response to -- I usually ask the government and defense counsel to identify names of people or entities that they may hear from or even about during the trial.

And so I thought that Ms. Bush would be listed on the defendant's list.  So I'm happy to say who may be a potential witness as well in 22.  But, again, if, you know, I thought that the defense might identify her in 6.  Okay.

That's fine.  No problem.  I will make that adjustment.

MR. KELLY:  And Your Honor, just one quick matter, and I apologize if this has already been done in this case before I was an assigned prosecutor.

THE COURT:  Yes.

MR. KELLY:  I just wanted to put on the record, and I raised this with defense counsel before that we were planning on doing this, that Mr. Merritts has previously waived in writing in March of this year any venue challenge for the charged offenses being brought in the District of Columbia as opposed to elsewhere.

THE COURT:  Okay.

Was that something that was submitted on the docket?

MR. KELLY:  It was an email, Your Honor.

THE COURT:  Okay.

MR. KELLY:  Which I believe is sufficient between the parties.

THE COURT:  Okay.

MR. KELLY:  If Your Honor would like us to file something, we certainly can.  But in my experience, just putting it on the record orally that there is a written waiver of venue, assuming that defense counsel and Mr. Merritts, don't object to that.

THE COURT:  That's fine, okay.  Okay.

**MR. DiRUZZO:**  I'm sure my co-counsel, if he sent that email, and I have no reason to doubt the representations of the AUSA --

**THE COURT:**  Okay.

**MR. DiRUZZO:**  -- then we will abide by it.

**THE COURT:**  Okay.  All right.

**MR. KELLY:**  Thank you, Your Honor.

**THE COURT:**  Okay.  Anything else from the government that we need to cover before trial?

**MR. KELLY:**  No, Your Honor.

**THE COURT:**  Okay.  Anything else from the defense?

**MR. DiRUZZO:**  If you could indulge me a little bit, Your Honor.  So --

**THE COURT:**  If you want to come up, maybe come on up just so we can make sure that we hear you.

**MR. DiRUZZO:**  If you could indulge me.  So how many potential jurors do you pull from the pool and like where do you seat them?

**THE COURT:**  Sure.  So how many -- I'm trying to think.  Usually they send up maybe about 40 to 50 people.

**MR. DiRUZZO:**  Okay.

**THE COURT:**  They're going to start, initially, in the gallery.

**MR. DiRUZZO:**  Oh you don't start them --

**THE COURT:**  No, not to begin with.

**MR. DiRUZZO:**  Okay.

**THE COURT:**  And they will start in the gallery. You're going to have a sheet that identifies them by juror number, their name, which we won't use on the record.

**MR. DiRUZZO:**  Yep.

**THE COURT:**  You'll have information.  It may have address information and certainly where they work or their profession.

I'll do the voir dire.  I'll ask the questions. Then I'll clear the room, and they'll come in one by one and sit on the stand here.  And I'll put their number on the record so you'll be able to follow along.  We'll do the voir dire process.

Then when they come back, the first 14 that have not been struck for cause and that are a part of the pool will sit in the box.  One is the seat closest to me.  It goes 1 through 7, 8 through 14.

**MR. DiRUZZO:**  So left to right, front to back?

**THE COURT:**  Yes.

**MR. DiRUZZO:**  The same thing when they're sitting in the gallery, left to right, front to back?

**THE COURT:**  No.  I think they --

**MR. KELLY:**  Your Honor, I think the way I've seen it done before --

**THE COURT:**  Well, Erika can tell me.

MR. KELLY:  I'll defer to the expert here.

THE COURT:  How are they lined up in the gallery in order?

DEPUTY CLERK:  So they will be the first ones will be coming in this way.

THE COURT:  Okay.  So left to right?

DEPUTY CLERK:  Yes.

MR. DiRUZZO:  Okay.

THE COURT:  Okay.  All right, yes.  Okay.  And then you'll have time for your strikes.

MR. DiRUZZO:  Okay.  So you bring the 14 in?

THE COURT:  When it's time for strikes.  So you can see, like if we didn't strike anyone, this is our jury and you can see who is coming up next.  And so if you strike, we play musical chairs.  Does that make sense?

MR. DiRUZZO:  Are you doing musical chairs?

DEPUTY CLERK:  Well, I do it at the end but, yeah.

MR. DiRUZZO:  Presumptive 14 after the cause?

THE COURT:  Sorry.

MR. DiRUZZO:  The presumptive 14 after the cause, they'll be there.

DEPUTY CLERK:  Yes.

MR. DiRUZZO:  And then do the parties do their pre-emps at sidebar, Judge?

THE COURT:  No, you'll do it at your tables.

**MR. DiRUZZO:**  Okay.

**DEPUTY CLERK:**  Hold on.

Two courtrooms individual and then they do strikes first.  I don't put the 14 until they've done all of their strikes.

**THE COURT:**  Oh no, I thought when they came in we put the 14 in so they can see who is in the box before they start their strikes.

**MR. DiRUZZO:**  From what I remember when we did it --

**THE COURT:**  I usually put them in the box so they can see kind of what the jury looks like and then they start striking because they might strike from the box.

**DEPUTY CLERK:**  Okay.  That's fine.

**THE COURT:**  Yeah, yeah.

**MR. DiRUZZO:**  And then I say, Judge, we strike juror number 1.

**THE COURT:**  No, no.  You don't say anything. You'll get a sheet of paper.

**MR. DiRUZZO:**  Okay, okay.

**THE COURT:**  And you guys will trade back and forth then, when you're done, when everyone has made their strikes, give it to Ms. Duncan.  And then she'll move everyone around, and then I'll make sure you're satisfied with the jury.

MR. DiRUZZO: Like I go then they go and then I go or is it like -- or it's like --

THE COURT: No. No. I have you do it in rounds. It will be clear on the sheet.

MR. DiRUZZO: Okay. Okay.

THE COURT: Yeah. And then I do a round for alternates too.

MR. DiRUZZO: Okay. And then if there is an objection like under *Batson*, like how does one --

THE COURT: Well, you would make that -- once you get the government sheet, if you have an issue, you would ask to approach and we would deal with that. Yeah.

MR. DiRUZZO: Okay. Okay. Understood. Thanks, Judge.

THE COURT: Okay.

All right. Anything else from the defense?

MR. DiRUZZO: No, Your Honor.

THE COURT: All right. Okay. Thanks, everyone. Happy holidays. I will see you in January.

MR. KELLY: Thank you, Your Honor.

MR. DiRUZZO: Thank you.

DEPUTY CLERK: All rise.

(Proceedings concluded at 12:54 p.m.)

# **C E R T I F I C A T E**

I, **Lorraine T. Herman, Official Court Reporter,**
certify that the foregoing is a true and correct transcript
of the record of proceedings in the above-entitled matter.


        December 10, 2025                    /s/ Lorraine T. Herman
             **DATE**                               **REPORTED BY**