IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

            Plaintiff,

  vs.

CORTNEY MERRITTS,

          Defendant.

Criminal Action
No. 1:25-cr-00076-JMC-1

January 7, 2026

_____

TRANSCRIPT OF THE PROCEEDINGS
VIA ZOOM
BEFORE THE HONORABLE JIA M. COBB
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:    Brian P. Kelly, Esq.
                    Joshua Seth Rothstein
                    DOJ-USAO
                    601 D Street NW
                    Washington, DC 20530

                    Emily A. Miller, Esq.
                    U.S. ATTORNEY'S OFFICE
                    OF THE DISTRICT OF COLUMBIA
                    Fraud & Public Corruption
                    555 4th Street, NW
                    Suite 5836
                    Washington, DC 20530

For the Defendant:     Justin K. Gelfand, Esq.
                    MARGULIS GELFAND, LLC
                    7700 Bonhomme Ave.
                    Suite 750
                    Saint Louis, MO 63105

Court Reporter:       Stacy Johns, RPR, RCR
                    Official Court Reporter

        Proceedings recorded by mechanical stenography,
      transcript produced by computer-aided transcription

**(Proceeding begin at 1:05 p.m.)**

DEPUTY CLERK:  This Honorable Court is now in session. The Honorable Judge, Jia Cobb presiding.

Good afternoon, Your Honor.  We are on the record in Criminal Case 25-76, United States of America versus Cortney Merritts.

Starting with government counsel, please state your appearance for the record.

MS. MILLER:  Good afternoon, Your Honor.  Emily Miller for the United States.  And I'm here with AUSAs Brian Kelly and Joshua Rothstein.

THE COURT:  Good afternoon.

MR. GELFAND:  Good afternoon, Your Honor.  Justin Gelfand for Mr. Merritts, who is physically present with me in my conference room but not on camera, Your Honor, unless you'd like him to be.

THE COURT:  No, he doesn't have to be on camera.  Good afternoon, everyone.

We are here because there are a number of motions pending including a motion to continue trial.  But I'll deal with and resolve the balance of the motions first because that might moot the motion to continue.

Let's start with the government's motion for disclosure of tax returns.  So, it's my understanding the government's no longer seeking for that order to be nunc pro

tunc.  There was also an objection from the defense related to whether these were certified records, which is an issue separate, I think, from the question about whether the motion for disclosure is appropriate.

So, Mr. Gelfand, can I just clarify, do you have a legal objection to the motion for disclosure in substance?  Again, the nunc pro tunc issue has been withdrawn.  So if I grant it, it won't be nunc pro tunc; I'll just grant it.

And as I indicated, I think if there's a question about whether these documents are properly authenticated or certified for use at trial, that's a separate issue that the government will have to lay a foundation before seeking to admit them.

But do you have a legal objection to the government's use of these documents in this litigation?

MR. GELFAND:  We do, Your Honor.  And then we have an alternative potion in the event the Court is not inclined to go with us on our first position.

Our first position is that the government -- under an 6103(i) order, the government has to establish that there's actually a reason that it's relevant, in essence, to introduce them at trial.  We do not believe that producing IRS records of this nature at trial is necessary.  The government has gone all over the place with the extent of IRS's involvement in this case.

But we also believe, Your Honor, that in the event that the Court believes that the tax returns are relevant and the tax information is relevant and should be seen by the jury, we have an objection to any further disclosure and would ask the Court to take precautions so that only the jury basically sees these documents.

When I was a federal tax prosecutor, Your Honor, we often did that in identity theft cases where tax returns, themselves, would be admissible for purposes of the jury's consideration but would not become part of anything other than a sealed court record and would not be otherwise available to the general public.

So those are our two positions in a nutshell, Your Honor.

THE COURT:  Okay.  I'm prepared to rule on the motion, which I will grant.  This is in reference to exhibits D1 and D2, I believe.  The request is to disclose the tax return information contained in D2 at trial and the lack of records information contained in exhibits D1 and D2 at trial.

I do think that the government has sufficiently demonstrated that these documents are probative to the question of whether or not the defendant is guilty of the charged offense.  And I believe that -- let me just confirm, the reason this is relevant is because it reflects certain inconsistencies -- allegedly -- in Mr. Merritts'

representations about money that the business purportedly generated that are inconsistent with information on the applications. And this is a question about whether -- a case about whether or not the money obtained pursuant to the applications at issue is fraudulent. Is that right in broad strokes, Ms. Miller?

MS. MILLER: In broad strokes, that's correct, Your Honor.

THE COURT: Okay. So for those reasons, I do think it's relevant. And I think I dealt with this issue when I essentially granted the government's request. They had said it was a 404(b) issue. I thought this kind of tax information was evidence of the charged offenses and not other crimes, but I think they just demonstrated this is relevant.

MS. MILLER: Your Honor.

THE COURT: Yes.

MS. MILLER: Sorry. I just wanted to clarify to ensure that the Court understands that in addition to exhibits D1 and D2, which were attached to the motion initially because we had attached them to our opposition to the defendant's motion to prohibit attribution of the business's records to the defendant, we only included those two exhibits. But I do want to just make clear as we established in our reply that we'll also be seeking to put in as proof of lack of records the account transcripts which we obtained certified copies of that

show no records of filing.

THE COURT:  Okay.  Yes.  So that is included in the order.

So the motion is granted.  I think this is ECF 37.

What's the government's position on the defense request for safeguards that would limit the ability of the public to access this information?  Do you have any position on what the defense has suggested?

MS. MILLER:  Your Honor, I believe that Rule 49.1 with its redaction requirements is sufficient at this juncture, particularly given that these tax records reveal nothing other than that the defendant claimed one dollar in income in one record and the rest are lack of records.  So they're not revealing of anything extremely personal.  They're evidence in the record like in other evidence in the record.  And I don't see why if requested by the public, they wouldn't just be provided as redacted consistent with Rule 49.1.

THE COURT:  What's the defense's position?  And maybe clarify, first, your position.  And then if you disagree, what exactly are you asking that the Court do with respect to these documents?

MR. GELFAND:  Yes, Your Honor. We do disagree.  Tax records, especially tax records initially obtained via an I order are particularly confidential.  They should be confidential.  The redactions deal with personal identifiers

like Social Security numbers.  They don't deal with the underlying nature of the documents.

Our request is fairly simple, Your Honor, which is that obviously the Court can see and receive copies of the exhibits, if they're otherwise admissible.  The jury can consider them the way they would any other evidence in the case but they're otherwise under seal and not available to the general public.  And I think the Court is well within its discretion to do that.

That happens all the time in identity theft cases.  It happens with tax records.  It happens frequently with health records.  And it's a fairly simple precaution that doesn't prejudice the trial in any way.  It just impacts essentially what people that don't have a reason to see them get access to.

THE COURT:  I don't think I have an issue with ordering that the documents, to the extent that they're on the public docket or need to be filed on the public docket, for whatever reason remain under seal.

I guess my question is how does that impact the testimony about these documents?  You're not suggesting that I need to clear the courtroom any time a witness is asked about the documents?

MR. GELFAND:  Your Honor, we are not.  I think that would --

THE COURT:  Okay.

MR. GELFAND: -- interfere with the presentation of evidence in the trial.

THE COURT: You just want the documents under seal if they're on the public docket, that's all you're asking for?

MR. GELFAND: Yes, Your Honor. And if they're admitted into evidence, the media, candidly, shouldn't necessarily have access to them.

THE COURT: Okay. I understand the government's position. I do think that these are sensitive tax records. I've clarified because I do think it would be -- we would have to talk if you were suggesting that when this comes up as a subject of testimony, that we treat the testimony in a manner that's confidential. So with the understanding that the information or lack of information contained in the documents might be part of the public record, depending on how that shakes out, it might impact any future ruling on the continued treatment of these documents.

But for our purposes now, I'm happy to order that these documents remain under seal. If introduced as exhibits at trial, that they be limited to viewing by the parties, obviously, the witness who is testifying about the documents, and, of course, the jury.

MS. MILLER: And so, Your Honor -- sorry.

THE COURT: Yes.

MS. MILLER: Just to clarify, then, on your initial

ruling on the motion which pertains to the enclosure of those exhibits with our opposition to their motion for corporate attribution, I would take the Court's ruling to mean that those exhibits as well should remain under seal.

THE COURT: Yes, I'll continue to keep those exhibits under seal.

Again, this is without prejudice for any party to seek further relief from that. I think this is the easiest way to deal with it now. It could be that there's a reason that any party presents that that's not appropriate going forward. But for now, I think it's the easiest way to deal with it.

Okay. So the government's motion for disclosure is granted.

Then there's the motion to disqualify. I'll hear from the defense. I read the party's pleadings. I don't need you to repeat what's in the pleadings. I guess I would just ask you, I understand that you've filed the civil action against the United States. The individual U.S. Attorneys, AUSAs, that are prosecuting this case are not named personally in that suit, and I just want to confirm that you agree that that civil case is not going to be the subject of any testimony at trial such that Ms. Miller or Mr. Kelly or anyone on their team are witnesses.

It would be different if you're saying now that the prosecuting attorneys are witnesses in the case, but you agree

that that's not the case, correct?

MR. GELFAND:  We do, Your Honor.

THE COURT:  In that case, I just wanted to clarify.  I do understand the defendant's position, but I'm prepared to deny the motion to disqualify at ECF 50.  That motion sought to disqualify the U.S. Attorney's Office for the District of Columbia, or alternatively the AUSAs whose conduct is at issue in the civil lawsuit that I referenced.

I don't find on this record that there's an actual or apparent conflict of interest in the case.  The disclosure at issue was done in the AUSA's official capacity.  No AUSA is personally named in the pending civil suit which is against the United States.  My understanding from the government's representations is that these AUSAs would not be participating in prosecuting that action.  And I don't see how the outcome of this case has any impact on liability in the civil suit.  Quite frankly, even if Mr. Merritts was convicted in this case, I don't see how that impacts the civil suit which has to do with whether or not there was an unlawful disclosure.  That doesn't turn on whether Mr. Merritts has a conviction or not, in my view.

So I don't find there's any improper personal interest in the outcome of this criminal case.  I think that the assigned government attorneys have been zealously litigating this case and will continue to do so.  I don't see any

situation or even an appearance of a situation that their motives or manner of prosecuting this case will change just because there's a suit against the United States in which they're not named.

I also do not find, at least on this record before me, I'm not talking about the merits of the other case, but there's nothing in this record to suggest that the disclosure was deliberate or constituted any misconduct necessitating disqualification.  So I don't find it to be appropriate to do so.  So I will deny ECF 50.

MR. GELFAND:  Your Honor, I appreciate and respect the Court's ruling.  Can I make a further record, assuming we are on the record here.

THE COURT:  Yes.

MR. GELFAND:  So to give this Court context, I appreciate that the government sees the 6103 violation both as it relates to this prosecution and the civil case very differently than we do.

THE COURT:  Okay.

MR. GELFAND:  As a practical matter, just to give the Court a little bit on context, I began my career as a federal prosecutor with the Department of Justice's tax division prosecuting federal criminal tax cases.  And I've been on the defense side, so to speak, in private practice since then over the last 11 or 12 years, whatever it's been.

What was particularly drilled in me as a federal prosecutor was that you don't disclose confidential tax records the way that it was. But the reason that I'm saying that, Your Honor, is because while it can expose the government to civil liability, because the government is the only one that can be named as a defendant in a 6103 violation case, civilly and not statutorily, it can expose prosecutors individually or other government employees, federal agents, whoever the person that violates 6103 is, to in certain circumstances potential criminal liability and almost inevitable OPR investigations that can be career impacting.

To be blunt, Your Honor, I have represented federal employees, one in particular alleged to have violated 6103. We represented IRS whistleblower Gary Shapley in a case brought by Hunter Biden. I obviously don't want to litigate that case before this Court, but the allegation there was that Gary Shapley violated Mr. Biden's Section 6103 rights.

And the big issue there, Your Honor, bluntly speaking, was how much that can impact the agent's career even if the case -- which it was -- was against the United States, not against -- in that case, the IRS, but not against the individual.

And my point in saying that is I do believe that creates not only a conflict but an appearance of a conflict. There's no dispute the tax returns in this case were disclosed.

I'm not trying to pre litigate the 6103 case, but based on some of the statements the Court just made, I do believe that there's evidence of misconduct. There's a letter from the IRS saying don't disclose these, in writing, before they were disclosed.

THE COURT: I understand that, but what is your proffer as to anything suggesting that it was willful as opposed to an inadvertent error?

And again, it sounds like for civil liability, willfulness might not be a factor. For criminal liability, it certainly would be. Given the record before me that it was the government that ultimately notified the clerk's office and notified you that this had been done and took steps to rectify it, what is your -- what can I point to on this record other than the fact that it was done to suggest that this was done purposefully or willfully?

MR. GELFAND: That it was done -- the disclosure letter from the IRS disclosure officer that preceded the 6103 violation that occurred. In order --

THE COURT: You can know you're not supposed to do something and do it inadvertently or you can do it willfully. So there's not a question about whether the disclosure -- there may be a question about whether the disclosure violates -- I'm not talking about the civil case. I'm just saying that you're suggesting some threat of criminal liability that would impact

or change the way that these prosecutors litigate the case or suggest some sort of retaliation.

I'm just asking, other than the fact that was it was done, what's on this record to show that it was done purposefully against Mr. Merritts to expose his information to the public?

MR. GELFAND: Two things, Your Honor. Number one, the quote/unquote, inadvertence dealt with whether it was redacted, not whether it was published in the first place. Because it was clearly intentionally published in the first place. It was admitted as -- it was attached as exhibits in a public pleading, and there was no motion to seal.

And anything that happened after that, bluntly speaking, there was email correspondence that we believed it was a 6103 violation. But again, we don't need to pre litigate that.

In other words, efforts after the fact to try to kind of clean up the record and the problem has no bearing on the conduct in the first place. And I think that, coupled with the fact that when the IRS puts you on notice saying don't do this and you do it anyway. In a white collar criminal prosecution, I mean, if they had a letter of that nature against Mr. Merritt's, that would be government exhibit A for willfulness. In other words, the IRS told you not to do something, but you did it anyway. And I think that that's very circumstantial and

I think that does impact how the public perceives this prosecution and it does impact -- you know, to be blunt, if the prosecutors who we believe violated 6103 in this case are found accountable for that, I think that can have very real career implications and consequences. And whether they appreciate that or not is a different question. Whether that ultimately happens is a different question. But it can happen and that's where the conflict analysis comes in.

And our position, candidly, is that Mr. Merritts should be prosecuted, if at all, by prosecutors that are actually disinterested and don't have any -- there's no argument that they can be impacted by what happens in this case based on what happens civilly --

THE COURT: Right. How does the jury's verdict impact the prosecutors in this case in any way other than how it impacts them in any of their other cases? I mean, they've been prosecuting this case before this recently occurred, before the civil suit happened. What is the appearance of impropriety issue that you're concerned about?

MR. GELFAND: Three things, Your Honor. First, Cortney Merritts inevitably will be a likely witness, at least a possible witness in the civil case. And as a practical matter, his credibility is therefore particularly relevant and will be impacted by what happens in the criminal case.

Number two, there can be collateral consequences for

the prosecutors in this case based on what happens.  And I think ultimately sometimes the net result of what happens in a criminal case can be relevant to collateral consequences later.

I think that most importantly, Your Honor -- and again, I'm not trying to pre litigate it but I am trying to, as best as I can, answer the Court's question.

In the 6103 civil case there's a liability question and then there's a punitive damages question.  And I think when it comes to the issue of damages, then essentially one of the things that the government will no doubt ask the jury to consider and ask the Court to consider, unless they waive it right here and right now, is Cortney Merritts' situation:  Was he acquitted, is he a convicted felon, is --

THE COURT:  That's what I'm not understanding.  I don't understand why that's relevant to punitive damages, which is -- first of all, I don't know if you can even -- these prosecutors, it's not coming out of their pocket, whatever the damages are.  I will take that you might understand this particular provision better than I do.  I didn't know that there were punitive damages available against the United States but maybe under this statute there are.

I will learn this statute very well, I assume, because I have this case assigned to me, the related criminal case.  So I will take it at your word that there's some punitive damages available.  I thought that the statute capped the damages

recoverable per disclosure.  But again, I could be wrong about that.  I guess I'm not seeing how Mr. Merritts -- quite frankly is he a witness?  I guess in some sense.  But what happened happened, and the question is whether that violated the law or not.

So I appreciate your arguments.  I am not seeing a situation here where these attorneys have the appearance of or actually have any personal stake at all in how this case is resolved because of this suit.  I understand that there's been a subsequent civil suit.  It can't be the case that if a criminal -- and it happens, a criminal defendant might file a suit against someone related to something that happens in the criminal case, a civil suit.  I don't think it's -- it's not an automatic situation that calls for disqualification.  Otherwise, that could be gamed.  You can imagine a situation in which people file suits against prosecutors to force their disqualification.

I think I'm looking at the cases that the parties have cited and considering very carefully whether or not there's any actual or apparent conflict of interest in this case, and I'm failing to see why there would be a conflict.  So I appreciate your argument, but I am not seeing any reason to disqualify the government in the case.

Anything else on than point, Mr. Gelfand?

I'll let you speak too --

MR. GELFAND: I appreciate where the Court is coming from. I'm not trying to beat a dead horse.

THE COURT: I want to allow you to make your record fully. If there's anything else you want to make sure that I understand, I'm happy to have you complete your argument and then I'll hear from Ms. Miller.

MR. GELFAND: Thank you, Your Honor.

Look, we can all imagine a scenario where some frustrated criminal defendant files some sort of specious lawsuit against the United States or against prosecutors and then says, look, they can't prosecute me. And that is not the scenario that happened here. Mr. Merritts was not the one who violated Section 6103. He's not the one, i.e., congress, who established a serious private cause of action.

I think that the place where I respectfully would push back on the Court's way of articulating the conflict and the appearance of conflict is that even though the prosecutors are not parties to the Section 6103 case because statutorily they cannot be parties. The statute literally says that it's brought against the United States. The collateral consequences that can flow from an adverse judgment against the United States to the prosecutors individually are very real and not speculative. And I think the public -- this is also a reasonable -- especially if the appearance of impropriety standpoint, it's also a reasonable person standard. I think

the public would reasonably assume that if hypothetically -- and I'm not saying the Court should reach this conclusion now, but if the United States is hit with a very large judgment for a 6103 violation involving AUSA X or IRS agent X, then that person would suffer career consequences as a result of that adverse action. And I think any suggestion to the contrary is really just not accurate.

I mean bluntly speaking, and I don't know how much more blunt I can be, Gary Shapley suffered adverse career consequences just because of the allegation that he violated Section 6103 without even a finding. And that's a similarly-situated person to the AUSAs who allegedly committed the conduct in this case. Because it's a government actor who is not a party to the lawsuit but who is suffering possible collateral consequences as a result of their conduct.

In other words, I guess what I'm challenging, Your Honor, respectfully, and what I'm pushing back, is that whether or not there are parties to the lawsuit shouldn't be the determinative factor.

THE COURT: I agree. I agree.

MR. GELFAND: It's whose conduct is ultimately at issue in the lawsuit and it just -- I was candidly surprised that this AUSA whose conduct is -- and I mean this with no personal disrespect to Ms. Miller, but whose conduct is at issue in the 6103 case was the one who signed the

disqualification response.

I think this is the kind of thing where Mr. Merritts has the right to be prosecuted by prosecutors, if there's going to be a prosecution, who truly are not only disinterested but who appear to the general public to be disinterested; not who have possible personal consequences, collateral or direct, to the fact that there are a pending meritorious civil lawsuit. This isn't some sue prosecutors because they're prosecuting me.

THE COURT:  I agree.  I didn't mean to suggest that the fact that they are not parties is dispositive.  I just do think it's -- obviously if -- I was making the point that they're neither witnesses to this case or parties to the other case is kind of a preliminary observation as to issues where a conflict might be clearly apparent.  But I think where I'm struggling -- at the moment I've denied your motion.  I don't think I'm going to be revisiting that.  I'm happy to go back and look at the case law in light of your arguments and if I change my position, issue an order to that effect.  I will consider your specific arguments in light of the cases.

I guess where I'm struggling is the suggestion that because of these other hypothetical, somewhat speculative consequences that may or may not happen, I'm trying to understand how that impacts how they might prosecute this case or their personal interests in this case.

I mean, they have an interest in securing a conviction

regardless, right?  So if you can give me an example of -- I'm not seeing it.  So maybe you can just explain, like because there is a pending case involving disclosure of the tax records, they have a personal interest in this case because you say because they want to discredit Mr. Merritts and secure a conviction.  I don't know how that whether or not he has a conviction is relevant to the issue of whether or not there was a disclosure.

MR. GELFAND:  Again, we hope that the jury finds otherwise.  But it could impact sentencing advocacy, could impact -- I understand the government's general obligation is to prosecute and seek a conviction, but it is to do so by disinterested prosecutors; not to do so at all respects.  I think that that's where the judgment can be clouded, or at least it can be perceived to be clouded, because they are now making decisions on behalf of the United States at every step of this litigation that will impact Mr. Merritts but also could have an impact on them individually.  And that's where the rubber hits the road, Your Honor.  That's why this is different than it was six weeks ago.

THE COURT:  Ms. Miller, you wanted to say something.

MS. MILLER:  Your Honor, I appreciate that the Court hasn't changed its ruling so I'm not going to belabor a lot of these ridiculous accusations by the defense.  But I do want to correct some factual misrepresentations that Mr. Gelfand made,

and I do want to respond to some points of argument that he made, just for the record.

THE COURT:  Okay.

MS. MILLER:  The first thing, Your Honor, is in response to the idea that the disclosure itself was intentional, I believe that the standard is not whether the disclosure was intentional as in did I accidentally file a motion on the docket, but whether it was intentional despite the fact that I understood that I should not have done so pursuant to the applicable law.  I don't think there's been any evidence of that on this record.  So that was really not a correct argument.

The second incorrect fact, Your Honor, is that the email correspondence in which Mr. Gelfand notified us that he believed that the conduct at issue was a violation of Rule 6103 occurred after the government noticed its mistake and asked the clerk's office to seal the documents.  So it wasn't done, could not have been done, in response to any threat by Mr. Gelfand. It admittedly did not occur until 8:00 the next morning, but the government can't help that the clerk's office closes.  We did our best to reach out as early as we recognized the potential violation.

In terms of the fact that there was a cover letter from the IRS saying don't disclose except in -- as permitted by Rule 6103, as I already pointed out in our pleadings is

certainly not dispositive, as I noted there.  The Court's orders granting the ex parte relief we sought to get this information indicated that the information could be used for preparation in a pretrial proceeding.  I think it's entirely understandable that that was interpreted by the government to mean it could be used in a pretrial proceeding.  And further, Your Honor, within five days I double checked myself, went back to the statute and had it sealed.

Moreover, Your Honor, and I just want to note, this was attached to literally an opposition to the defendant's motion to prohibit attribution of corporate records to the defendant.  I'm hard pressed to think of a more boring motion to attach something to should someone be seeking to intentionally disclose it for the world to view.

In terms of Mr. Merritts being called as a witness in his civil case, again, I just don't understand, as the Court pointed out, how his credibility being impacted by the criminal case has anything to do with collateral consequences for the prosecutors.  That whole argument just made no sense at all, Your Honor.

With respect to the idea that you can get punitive damages under Rule 6103, if the statute, at least on its face, says you're entitle to them for willful conduct -- now I understand Mr. Gelfand says that includes gross negligence. Maybe it does.  I don't know.  It doesn't include for sure, I

don't think he's argued that it includes regular negligence, which is the most that this record could be held to have established.

In terms of his allegation about, oh, well, this is different because Congress created a private cause of action. Yeah, against the United States. Not against the U.S. Attorney's Office. Not against the prosecutors in this case. So that's totally irrelevant.

In terms of the career consequences that I could face because of the constitutional violation, that's no different, Your Honor, than the circumstances that were faced by the prosecutors in Heldt, the applicable D.C. Circuit case here who actually were sued in their individual capacity for a bad faith constitutional violation of the defendant's Fourth Amendment rights in connection with their application for a search warrant. And they were not held to have been conflicted, and there was no finding that there was an appearance of impropriety there. So that argument under directly applicable precedent does not hold water.

In terms of the advocacy of which Mr. Gelfand is concerned, he keeps stating that the defendant is entitled to disinterested prosecutors. But I don't think he's citing that standard correctly. He is entitle to a wholly disinterested judge. There's no doubt about that. But in terms of the prosecutors, as we've pointed out, we have a very much direct

obligation to our client to be zealous advocates.  And as the Supreme Court has recognized, it is indeed expected that we will be zealous advocates.

What Mr. Gelfand has not established based on any fact in this record is that I or any other prosecutor would engage in improper tactics to bring about a conviction in this case. That is the kind of disinterest or interest that a disqualification motion should be directed toward.  And there's no evidence of that here.

So I think, Your Honor, for all those reasons -- I just wanted to put all of that on the record.  I know the Court has already ruled in our favor, but I just didn't want to leave these specious arguments unaddressed.

THE COURT:  Okay.  Again, because I was not familiar with the damages available in a Section 6103 case, I've learned today as Mr. Gelfand correctly represented that and as the government agrees, that punitive damages are available.  That's not here or there to what I said earlier, but I did want to correct myself.

Ms. Miller, I appreciate that.  I still stand by my ruling, although I will look at the cases again in light of Mr. Gelfand's specific arguments.  If I have a question about my ruling or feeling less sure about it, I will certainly give the parties an opportunity to make further arguments. Otherwise, I'll confirm for the parties that my ruling has not

changed.

Ms. Miller, just for the last point, I think what I understand Mr. Gelfand's argument to be, and I think you addressed this and I tend to agree, but just so we're all clear, is that even though you or Mr. Kelly or someone on your team is not a party in the civil case, your conduct is the subject of the civil case and thus because your conduct is at issue, because that might have an impact on career discipline or other discipline that you might be motivated or that someone on the outside looking in could think that you were motivated to retaliate against Mr. Merritts in some way in this case, in the litigation of this case, either out of anger that you blame him for putting you in whatever position you may find yourself in or because you think it gives the government a leg up in the other case.  That's what I understand Mr. Gelfand's argument to be, so if you just want to make your point about that specific argument and then we can move on.

MS. MILLER:  Yes, Your Honor.  Sorry, I was trying to make that before.  What I am saying is that my circumstances are not in way distinguishable from the circumstances of the prosecutors in Heldt who would have faced the same reputational and potential professional discipline consequences if it were found that they willfully violated the defendant's constitutional rights in that case.  So if them being actually civilly viable and personally named as intentionally violating

his constitutional rights didn't cause that concern for the Court, then certainly the conduct or the allegations here should not cause that concern for this Court.

THE COURT:  Okay.  Thank you.  As I said, I've denied the motion.  I will just review the cases again.  If I am convinced by something Mr. Gelfand has said, I will let the parties know.  Otherwise, my ruling will stand.

Finally -- or not finally because we still have the motion to continue, but next there's the motion to reconsider. Before dealing with or making my ruling about the selective prosecution issue -- actually, no, let's start there.

Let me make sure I understand, Mr. Gelfand.  I read your motion.  I did not see anything in the motion to reconsider that relates to the effect prong of the selective prosecution analysis.

In other words, it appears that the arguments relate to a purported discriminatory motive that the defense, as I understand, is saying now is not speculative because of these records.  Am I correct?  I didn't see anything in your papers about the effect piece of my ruling that I had determined earlier that I didn't see any suggestion, proffer, evidence, anything that would convince me even that discovery was appropriate that Mr. Merritts is being singled out for this wire fraud prosecution.

Am I correct that this new information doesn't affect

that part of the analysis?

MR. GELFAND:  No, Your Honor, I would push back on that premise because I think that at the point that he is singled out precisely because he is both married to former Congresswoman Cori Bush and congressional candidate, Cori Bush, and because he is working on this candidate's campaign for democratic congressional office, when that's the reason that he is being prosecuted and/or investigated, that is being singled out, Your Honor.  So I think they go hand-in-hand.

What I understood the initial court ruling on until we -- I believe this is just the tip of the iceberg, but I'll wait for the opportunity to respond to that.  But what I understood the initial Court's question is all we had before according to the Court -- and I'm not trying to relitigate that, but all we had before was this seems unusual that they're prosecuting such a low-level PPP loan fraud case in terms of loss amounts and there was clearly a prosecutorial decision in March of 2025 during the current presidential administration to go forward on this case.  And now we know -- and there are still questions we don't know, Your Honor, which is why I think discovery is critical.  Now what we know is that he was targeted by IRS-CI, which was involved in this investigation, because they wanted to generate media attention based on the fact that he's married to a sitting congresswoman and he's working on a campaign for a sitting congresswoman.  And that

goes to both prongs.

I think what the elephant in the room is, Your Honor, is I think if this Court were to conclude that our interpretation of that evidence that's now in the record is correct, in other words, that he was in fact targeted because of who he was married to and who he was working for, I think that clearly falls within D.C. Circuit precedent that says you cannot single him out for that, and that at a minimum requires further discovery. And candidly, perhaps on the record alone, we would argue, warrants dismissal of the case.

I don't think that -- there are two prongs, so to speak, but they go hand-in-hand based on the new discovery and the new evidence. And I would like to be heard on a couple of things related to that issue.

THE COURT:  Sure.  Go ahead.

MR. GELFAND:  So the government's position if I understand it is they're still clinging to this notion that there's two investigations, even though objective evidence reveals that there's one investigation.

But more importantly, they basically say there's no target of the campaign funds investigation because they quibble with our use of the word and their use of the word target versus subject versus focus versus whatever synonym you want to use.

The problem, Your Honor, is that they issued a grand

jury subpoena to the House Sergeant at Arms for documents related to a sitting member of Congress.

We know that IRS-CI, based on new records, was actively investigating this case. Whether you call it two investigations or one, in April of 2024, because DLA Piper represents a processor of one of the loans in this investigation and was emailing an IRS-CI agent in connection with a grand jury subpoena. That ultimately leads to evidence that's on the government's exhibit list in this case.

So they didn't decline participating in this investigation 12 days later. They actually participated in a reverse proffer with me in this case, this was before Ms. Miller and Mr. Kelly were involved. IRS-CI was present several months later in a reverse proffer meeting with us at the U.S. Attorney's Office in D.C., us on Mr. Merritt's behalf. And there's no reason they were there if IRS-CI had declined being involved in this investigation. In fact, it would actually be illegal under 6103 for them to be there, ironically.

And so the fact that they're targeting Mr. Merritts because of who he's married to and because of who he works for, which are two separate prongs of inquiry, any one of which violates the constitutional provisions governing selective prosecution and selective investigation, we anticipate this is just the tip of the iceberg with more discovery.

I'll give the Court an example.  IRS-CI special agents are required to keep time records on their work on specific investigations.  At a minimum, a minimum, those should be disclosed in camera to this Court, and, candidly, I think to us, to establish that the IRS-CI agents, what they were doing on this investigation, how much time they spent and the timestamps of when they were working on it.

The government basically says look this PPP fraud investigation arose out of the Naval Federal Credit Union review of bank records.  The problem for them is that the Navy Federal Credit Union records weren't turned over to the government until November of 2023.  And in March of 2023, they're asking IRS-CI to join in this PPP loan fraud investigation.  And that's based on the U.S. Attorney's letter that we attached to our pleading in this case.

And so the bottom line is, there's a million critical factual questions that go to the core legal issues that must be resolved as a matter of law before this case goes to trial.  So I do think that we're entitled to discovery.

The government basically says, we want to interpret the IRS-CI paperwork in a certain way.  It was only one agent, other people didn't write them.  That's there's no evidentiary support for any of that.  He just was talking about general deterrence.  He wasn't talking about in general notoriety.  We've never heard the special agent under oath say that.

There's no affidavit to that effect.  There's no evidence to any of this.

All the Court has in record evidence as we sit here today is that one of the investigative agencies, IRS-CI, that did actively participate in this investigation, no matter what the government is saying otherwise, that the records are clear; there's no reason they would be CCd on emails involving grand jury subpoenas.  There's no reason they would participate in reverse proffers.  This is an evidentiary record that should be made in the presence of this Court with credibility determinations that must be made.  If nothing more -- and I think it would resolve the issues in our favor, but if nothing more, to establish a fully-developed record and meaningful fact finding before this case proceeds to trial.

And I think the problem is under Rule 12, these motions have to be raised before the jury is sworn, which of course they are timely raised before the jury is sworn.  But implicitly based on the case law as I read it -- and I'm happy to be corrected -- rulings and full factual evidentiary records also have to be established before the jury is sworn.  We want the opportunity to put on evidence as it relates to the selective prosecution motion based on the new evidence that we have.  There's still questions that remain unanswered.  There's under oath testimony that requires credibility determinations.

In particular, at least, at least, the IRS-CI agent

who we say said the quiet part out loud.  They actually said we're targeting him because of who he's married to and who he's working for.  And that's a major problem constitutionally, but it's even a more significant problem from a due process and procedural due process standpoint if we don't have the opportunity.

THE COURT:  Can you direct me to where someone said the reason we are pursuing this investigation is because of who Mr. Merritts is married to?

I saw reference to factual statements that Mr. Merritts is married to Congresswoman Cori Bush.  I saw reference that it looks like there was a form that asks if there were any factors such as notoriety, political corruption, et cetera.  And it indicated that the case would generate media attention.

Is that what you're reading to say that those statements -- that's what you're pointing to for the argument that the reason that they initiated the investigation is because of those factors?  You're not suggesting that someone said I'm recommending that we pursue this investigation because Mr. Merritts is married to Ms. Bush?

MR. GELFAND:  I think in terms of the PPP fraud side of it, I think that's absolutely what they're saying, Your Honor.  And I'll direct the Court's attention.  The question asked is:  Describe the factors that make the investigation

impactful.

And the answer is:  Media attention since he is the husband of a Congresswoman.

The very next question says --

THE COURT:  I remember reading this document, but do you have the ECF number just so I can pull up or locate the specific exhibit?

MR. GELFAND:  Yes.  Hang on one second, Your Honor. Let me pull it up.

THE COURT:  I have it.

MR. GELFAND:  Exhibit 3, Your Honor.  Our Exhibit 3 under seal.

THE COURT:  Here's the thing.  This looks like a form memo.  You can tell me if you think this was generated specifically only for Mr. Merritts as opposed to a IRS criminal investigation form that looks like it has form boxes.  It looks like the question itself says describe the factors that make the investigation impactful, parentheses, media attention, notoriety of subject, effect on community, international nexus, virtual currency, dark web, et cetera.  And so the person responded as to which of those.  So it appears from this form, unless you have a reason to think otherwise, that this is something that is asked in its investigations and then it's up to the person to identify whether any of those factors or factors related to it are present in the case.  Right?

I just want to confirm, that's what you're referring to when you say --

MR. GELFAND:  Well, yes.  To answer the first question directly, that's what I'm referring to.  I think there's a lot more evidence that's critical that an evidentiary hearing the would establish.

And again, I'm saying this as an officer of the court anticipating this just based on my experience.  I know I don't know what I don't know.

I know the following occurred.  The IRS has two ways, unlike every other agency, including the FBI, of investigating a target of a criminal tax-related investigation, any IRS involvement.  They can either open what's called an administrative investigation or they can open or join a grand jury investigation.

In this case we know that in March of 2023 they were asked by the U.S. Attorney's Office by letter -- it's one of the exhibits that we included in our motion -- to join an ongoing grand jury investigation into four separate targets that included former Congresswoman Bush, then Congresswoman Bush and Mr. Merritts.  And there were two other names we redacted but we provided the Court the full names.  And that was just out of respect for the government.  We don't really care if those names get out.

As a practical matter, at that point the government,

because this involved Cori Bush, went and tried to seek a long time later in March -- I'm sorry, in May of 2024, according to the government's timeline, that they had to basically elevate this up, all the way up to the IRS-CI chief. And that's obviously not common. That is uncommon. The chief doesn't have to approve investigations of random targets that are ongoing.

THE COURT: I'm sorry, that point is not obvious to me. Where do I look to understand that?

MR. GELFAND: I'm telling you as an officer of the court that that's how the IRS operates. And I've been a prosecutor and on the defense side.

THE COURT: Got it. Okay.

MR. GELFAND: I believe we could establish that through evidence, if the Court needs it.

THE COURT: Okay. Go ahead. I was just asking. I wasn't that obvious to me.

MR. GELFAND: Fair enough. If I'm wrong, I'm wrong. Let the evidence play out.

But as a practical matter, the IRS-CI agent at this time is saying, look, one of the appeals to investigate this case for IRS to get involved because bluntly -- again, I'm not trying to criticize the Court's prior rulings, but IRS does not investigate $22,000 cases.

The reason the IRS is saying we should get involved

here is this will be impactful. In other words, it's worth our resources. That's how I interpret it. But again, the author is the one who needs to testify about this. The media attention that it will generate because he's the husband of a congressman (sic) and in the very next line, section four, Roman Numeral IV, it acknowledges that Merritts is not a sensitive subject under this Internal Revenue Manual, it's the IRM provision, but that since receiving the PPP loan, Merritts has worked for his wife's campaign.

So the IRS, the way we interpret this, the way we anticipate the evidence would come in, is we should prosecute him because this will be worth our resources, because it will garner media attention because this guy is the husband of a congresswoman and working on the congresswoman's campaign. And if that, in fact, was even a motive for the investigation, much less the motive for the investigation, that is per se unconstitutional.

And what's particularly confusing, and I'll use that word very intentionally, is that this is May 1st, 2024, according to the government's proffer to the Court, or at least representation. I'm not sure I actually saw that date on any documents, but it may have been there. If this is on May 1st of 2024, the government says look, IRS-CI declined being involved in this investigation on May 1st of 2024, somewhere around there, and therefore as a practical matter none of this

really means anything.

Well, first of all -- and that he was just getting supervisory approval to be involved in the first place.

First of all, 12 days earlier it's clear from the DLA Piper email -- and this is just the tip of the iceberg.  That's why discovery is necessary -- that IRS-CI is actively investigating this case because there is no other credible reason a DLA Piper lawyer representing a grand jury witness would email the FBI agents on this PPP loan fraud case and CC, the IRS-CI agent before he's even investigating this case. There's no credible explanation for that.  It's not logical.

And so then the IRS-CI agent continues to actively participate in this investigation because he's present with me at a reverse proffer months later talking about this case, interestingly enough threatening criminal tax charges when the government now says they already declined criminal tax charges. Meaning they couldn't bring criminal tax charges.

And so what I'm sitting here doing, Your Honor, and I'll be completely candid with the Court, I'm sitting there very confused saying IRS-CI is clearly involved in this case. They're clearly targeting my client because of who he's married to and who he's working for.  There's unambiguously more that needs to be considered by the Court based on this witness's under-oath testimony as it relates to selective prosecution. And there's some crossover here, perhaps, with bias and

impeachment and things like that.  But as it relates to selective prosecution, that testimony should happen in this Court's presence outside the presence of the jury.

So that was the logic in me saying, I think it would be benefit all the parties to hit a big time out, have an evidentiary hearing.  I think we're entitled to discovery before then, but at a minimum let us put on evidence at an evidentiary hearing so that the Court is not guessing as to what these forms are or what these forms mean and we can actually have a fully-established, developed record and meaningful fact finding with the law applied to it before this case proceeds to trial, if it ever does, which it shouldn't because of the motion to dismiss.

But in any event, that's where we're coming at it from.  So I think that when the Court looks at this whole package of documents that within the context of the other facts, that to no fault of the Courts aren't before the Court because we haven't had that evidentiary hearing, that's the problem.

THE COURT:  I guess the problem that I'm having is -- and we'll talk about what's relevant at trial and what's not is we're talking about selective prosecution, which we've already discussed is a demanding standard and there's a certain showing that you have to make before we even get to the question of discovery.  And you're focusing on kind of why they pursued the

investigation and investigation questions.  And I guess my initial question at the prior hearing, and I'll ask it again in terms of the discriminatory effect, is what is the proffer, what has changed with respect to whether the government, who has brought charges and indicted this case and is pursuing this prosecution, whether or not Mr. Merritts has been singled out for prosecution and for these charges and treated differently than similarly-situated people.

I'm hearing you raise issues about the motives of IRS investigators, et cetera, but let's talk about what has changed since I ruled about whether or not Mr. Merritts is being treated differently in terms of the charges that have been brought against him by the government that are different or that members outside of whatever class you're saying he's in have been -- others that have allegedly committed wire fraud offenses haven't been prosecuted for.

And then with respect to that, I think I'm a little bit confused about what class you're saying he's in.  Because I think at the last hearing I was under the impression that the defense theory was, well, the Biden administration initiated this investigation, essentially the long and short of it was didn't pursue it.  And then once the administration changed, the current administration decided to indict this case because Ms. Bush is in the opposite political party and was outspoken against the administration.

Now the evidence that you're bringing forward is actions that occurred during the Biden administration.  And now I understand you to be saying, well, you know, she was outspoken against the Biden administration and so that might have motivated this, which is something different.  So I'm not exactly sure what the theory of discrimination is in this case. I guess it's just that he was married to this particular outspoken person.

But I still am caught on -- the question that I focused on initially is has anything changed with respect to my ruling.  And I understand that you disagree with my ruling and your argument is preserved. I found that this is a wire fraud case and I didn't see anything before me to suggest that Mr. Merritts is being prosecuted for a wire fraud crime and that other similarly-situated people outside of his class, however defined, have not or would not be prosecuted.

So if you have something about what's changed -- what this evidence changes with respect to that conclusion, I'll hear you.

MR. GELFAND:  I do, Your Honor.  And I appreciate the opportunity and the clarification.

So the District of D.C. in the Judd case, J-U-D-D, 579 F.Supp. 3d 1 inside page four says in no uncertain terms that while it acknowledges there's a presumption of regularity that applies to prosecutorial decisions, quote:  The government

cannot base its decision to prosecute on some unjustifiable standard such as a defendant's political beliefs.  End quote.

And the Judd case is quoting for political beliefs the D.C. Circuit's Branch Ministries case, 40 F. Supp. 2d 15.  I'm sorry, I might have miscited that but the Branch Ministry's case that cited in our brief.

The reason that that's all important is because the three things that have changed, at least, since the initial argument and the Court's initial evaluation and analysis of our motion is number one, IRS-CI's involvement in this investigation as an active participant in this PPP loan fraud investigation has now become clear, and before it was represented to us that IRS-CI was not actively involved.

And that's very significant in light of what the IRS-CI records show because they're an investigative agency that is actively investigating, at least participating in the investigation that leads to the two wire fraud counts that are currently pending against Mr. Merritts.

Number two, we believe that the IRS documents when considered in the context of what an evidentiary record would establish are really a smoking gun and establishing that he is being investigated and prosecuted because of who he is -- because of his political beliefs, because of who he's married to, a democratic Congresswoman, because he's actively working on that person's political campaign.

And in the event that the Court wants to make credibility determinations after hearing under oath testimony of the author of those documents or authors of those documents subject to cross-examination by both party -- you know, subject questioning by both parties and this Court's questions, the Court can make those. But the Court's now -- it's impossible for the Court to reach that fact finding without hearing that evidence and making those credibility determinations.

The other thing that has changed dramatically since the pretrial hearing is that there are effectively inconsistent representations as to what this one ongoing investigation was and wasn't and why that's relevant and how that's relevant to the selective prosecution claim. Because what's crystal clear is there was one ongoing grand jury investigation. It clearly involved FBI, IRS-CI and the U.S. Attorney's Office for the District of Columbia. That one investigation was initially focused on campaign funds-related expenditures. And that fell flat because there clearly wasn't a crime.

The targets of that investigation were the people listed in the invite letter in March of 2023, because there's always a target of a federal grand jury investigation, especially one where you're subpoenaing the U.S. House of Representatives. And at that point they make a decision to go after Cortney Merritts for essentially what they believe is left in this investigation. And that decision is motivated

based on the current record before the Court, by the way, exclusively by who Mr. Merritts is married to and whose campaign he's working for.

It's literally the smoking gun, but I think that we need to have a fully-developed record so that this Court -- to be blunt, if the Court's inclination is to buy what the government is selling which is this really had nothing to do with why he was prosecuted, that has to be based on evidence, not just assertions.

We've clearly established threshold evidence, all of which -- and I understand there's been some frustration with my use of the word "hidden." I don't really know or care whether it was intentionally hidden from us. It was hidden in the sense that it wasn't available to us, which is why it's the basis of a motion to reconsider.

And the government's position there is, well, we gave it to you as soon as we have it. Fine. I take the at face value. That's not the issue. It's not a disclosure issue. It's that the Court now has evidence of this. So I do believe candidly, Your Honor, our initial suspicion was that this may have actually been a -- more than suspicion. Our initial allegation was that this has a certain partisan motivation. But now you have to consider what's actually in the record, which is let's go after this guy because he's married to a democratic congresswoman during the President Biden

administration.  And it was true, Your Honor, that what Cori Bush -- and I'm not here to talk politics, but what Cori Bush has in common is that she's outspoken against the establishment, whether that's the Biden administration or whether that's the Trump administration.  And so this is not just some baseless allegation.

The Court in Branch Ministries in this judicial district says, look, of course you're entitled to discovery because how would you have access to -- it's ironic, they actually say internal IRS records, and these are the kinds of internal documents.  We have some of them.  We want to establish evidence on the stand for this Court to consider the IRS-CI special agent or agents who wrote those documents.  The government has said it's only one even though other people's names are on them.  The evidence will establish what that is or what that isn't.

If the Court has questions about, well, what's the context of this form, what does it mean, why did you write that, the Court needs to not only hear the evidence from the witnesses with firsthand knowledge, but to make credibility determinations as to whether that's true, whether it's plausible.  And that's the problem.

So there's a lot that has changed since the Court initially -- I understand it's a demanding standard.  The irony of the whole thing, Your Honor, for whatever it's worth, is

that I can't imagine a case where the evidence is as clear where the government actually says the quiet part out loud as they did here. And there's more documents there. There's more testimony here. And we're entitled to fully develop that record, at a minimum, so that this Court can make a reasoned decision, as obviously the Court wants to. That's what I'm asking the Court to do in no uncertain terms.

THE COURT: Okay. I'll hear from the government, whoever is dealing with this.

MS. MILLER: Thank you, Your Honor. I'm just going to try to respond to all of those points that were made there at the end in response to the Court's questions, as those appear to be the issues that the Court is most interested in.

I think, though, just before I even go there, Your Honor, the very large question that just keeps occurring to me is let's assume everything that Mr. Gelfand is saying is true, which it isn't. But if we did, what he would have established is that there's a suggestion that an IRS agent drafted a document showing that that agent wanted to prosecute or investigate, I should say, him for political reasons. It doesn't show that. But I'm saying that's what it would show.

Unfortunately, neither that agent nor his agency makes charging decisions. The U.S. Attorney's Office decides whether to present to a grand jury and whether to seek charges. So again, while this might go to the bias of that agent were he

called as a witness, this has nothing to do with prosecution. And certainly doesn't rise to the level through this one document of establishing the elements required to even get discovery, which are almost as high, frankly, as the elements you need -- the standard of proof you need to prove a case on the merits for getting discovery in selective prosecution.

So just for that reason alone, we could stop and say how have you shown the government decided to prosecute your client. Because what the IRS says in a document, they're not the prosecuting authority. And the U.S. Attorney's Office is the prosecuting authority.

But putting that aside, I just want to say the first thing that Mr. Gelfand said was that we represented that the IRS didn't have an active part in the PPP loan fraud, which is honestly, Your Honor, just a lie.

First of all, Mr. Gelfand had full discovery in this case since day one. The letter that he's referring to, for example, where he's saying, oh, the agent exchanged messages about a grand jury subpoena in the case, he had that well before the motion for reconsideration, well before the initial motion to dismiss for selective prosecution. There was nothing hidden about IRS-CI's participation and nothing he's saying now is new evidence that would warrant reconsideration at all.

Further, as we explained in our opposition to his motion for reconsideration, we never said the IRS didn't

participate.  As we laid out in detail in that opposition -- and I don't want to belabor this forever for the Court, but essentially, Your Honor, as the IRS -- and it's right there on their website, IRS-CI -- or it's cited in the motion, they can do a primary investigation.  And if that primary investigation in which essentially their powers to investigate are somewhat limited, leads to additional information, they can open what's called a subject investigation.  And this is all explained in our motion.

And what the record is in this case, Your Honor, is that in May of 2023 the IRS began a primary -- basically a preliminary investigation of the campaign fund case at the FBI's request.  And then essentially after investigating in connection with the investigation to the campaign fund, they observed the inconsistency between the defendant's finances and the loan documents and brought that to the attention of government prosecuting authorities who then said, okay, go with that.  And they continued in their primary investigation by doing the very things that Mr. Gelfand's talking about, like asking us to issue subpoenas that they served in connection with this case.

And I imagine that included participating in the reverse proffer to answer any tax questions that might be raised by Mr. Gelfand since everybody understood that his background was in tax.

So no one ever said that the IRS wasn't present and never suggested it. And the discovery that Mr. Gelfand's had in hand from the very beginning has always made that very clear. And if he had wanted to argue that, he could have argued it at the initial motion hearing.

And ultimately what happens is the IRS agent does go further with the preliminary investigation of the Paycheck Protection Act case, doing things like issuing the subpoena or helping us facilitate our ex-parte request for tax records in relation to just that investigation. And then at our -- and then -- sorry, I shouldn't say at our request because I don't know that it was.

But then the next thing that he did after getting back the grand jury records and seeing that indeed the bank records or the lender records and the information that he already had about the Covid loan, et cetera, and whatever else he observed was not consistent, he began drafting what's called the Subject Initiation Packet, and that is the item that we attached to our opposition. It's comprised of the documents that Mr. Gelfand attached to his motion, but it puts them in context. Which is to say that the agent drafted a packet of information to go up to his supervisors to request permission to take this from being a primary investigation to a more in-depth subject initiation investigation. And that is what his bosses declined.

They said, no, you're asking to investigate a bank fraud case here, but the IRS has certain standards for whether or not we will assist in the investigation of bank fraud and what we've set forth here in your packet doesn't meet it. And that's why that pact is just a draft. And that's why the evidence in that packet shows that there's no signature from any chief or of that from anyone. It's literally the agent drafted it and his bosses said, no.

So while it might have been drafted for the signature of these high-up officials, they never signed off on them because the request to open the investigation was declined for totally normal business reasons, which, by the way, also completely undercut the argument that this is a politically motivated case because the IRS actually pulled out.

THE COURT: Wait, I'm sorry. I'm getting some feedback or something. I don't know what that is.

MS. MILLER: I'm saying --

THE COURT: Go ahead.

MS. MILLER: The IRS pulled out. First of all, they have no say in whether charges are brought. But second of all, they actually declined to go beyond a primary investigation in this case. And my understanding is that after the indictment was brought finally with no charges that this IRS would sign onto, that's when they closed out their primary investigation in this case.

And so, Your Honor, all the facts that Mr. Gelfand keeps saying are facts are not facts.  They're not shown by the document that he's relying on.  And so he has not met the standard for getting additional discovery.  Honestly, we probably shouldn't have even disclosed this document to him, Your Honor, because unfortunately, I learned after the fact that Brady doesn't even apply.  The whole issue here is whether he's entitled to discovery of selective prosecution.  There is no Brady element in respect to selective prosecution.  And I cited the cases for that in my -- in the most recent pleading I filed on this issue.

So the fact that we gave him something that allowed him to make all the specious arguments that he's making now that still don't satisfy the standard doesn't entitle him to more discovery, because this is his burden.  Not ours.  And when he's asking for an evidentiary hearing, what he's saying is, I want to go on a fishing expedition in front of the Court and seek discovery on the record.  But he hasn't established that he's entitled to discovery, so he shouldn't get that hearing.

So that's in response on that Your Honor.  In response to his --

THE COURT:  Can I just stop you, Ms. Miller.  This has been going a little bit longer than I anticipated this.  I do need to take about a 10-minute bathroom break, a

collect-your-thoughts break.  Actually, let's make it since it's 2:25, let's just say we'll come back at 2:40 and then I'll hear the balance of your argument.

Ms. Duncan, can everyone just stay logged on and with their cameras off and muted, or do we need to have people log off and log back on?

DEPUTY CLERK:  No, I can place them in the waiting room for the time being and then I'll bring them back in.

THE COURT:  Okay.  So we'll see you guys back in a little less than 15 minutes at 2:40.

(A recess was taken at 2:26 PM)

DEPUTY CLERK:  This Honorable Court is back in session.

Your Honor, we're back on the record in Criminal Case 25-76.

THE COURT:  All right.  Welcome back.

Ms. Miller, I think you were finishing up your argument.  Is there anything more you wanted to say on the selective prosecution piece?

MS. MILLER:  Yes, Your Honor.  And I won't be much longer.  I promise.

THE COURT:  That's okay.

MS. MILLER:  Basically, I just wanted to say to obtain discovery relating to a selective prosecution claim, the defendant has to make a colorable claim of selective

prosecution. That means he has to show some evidence tending to show the existence of the essential elements of the defense, meaning some evidence of both discriminatory effect and discriminatory intent. And as the Court has already acknowledged, this is a very rigorous standard which is intentionally a significant barrier to the litigation of insubstantial claims. He doesn't get discovery or any evidentiary hearing or anything else if he hasn't made that colorable claim.

So with respect to the intent part, Your Honor, as to my earlier point, or I said he hasn't shown the intent that the decision maker acted with discriminatory intent, I just wanted to point the Court to the Stone case, 394 F. Supp. 3d 1 at 36, which clearly states that the defendant has to show that the decision maker acted with a discriminatory intent. Obviously for all the reasons I've already stated, neither the agent nor the IRS-CI is a decision maker about what charges to bring in this case.

Second, Your Honor, even if they could somehow be conceived to be a decision maker, which they can't be on this record, the document in question is not a smoking gun. It doesn't show discriminatory intent by anyone for the reasons that the Court already observed and that are further completely addressed in detail in our motion where we take the Court -- or in our pleading where we take the Court through the entire

document and explain it.

But the Court in sum is correct, that the agent was responding to language that was already in there. The agent was explaining the case would get media attention, which is a completely legitimate basis or factor for the government to consider because it goes to the issue of general deterrence. And so that's not an issue. And to the extent that the agent is noting that the defendant is married to a congresswoman or working on her campaign, it's clearly in response in that document to questions about the sensitivity of the investigation. And that's because at the IRS, if the investigation is sensitive, it goes to a higher level of approval authority than if it's a non-sensitive investigation. And so the agent was, of course, obligated to note the potential for this to be classified by his bosses as something sensitive because of his status as being married to somebody who would be considered a sensitive subject.

So had he failed to include that information, the Court could certainly understand how his bosses might feel if they found out later in the press that they hadn't been told that before they approved the investigation.

And finally, Your Honor, I'll just say to the Court's point, we still don't know what protective class he's claiming. First it was that the Republicans, I guess, were against his wife and therefore were against him. Now it's because the

Democrats are against his wife and therefore against him. And so, best I can tell from the current arguments being provided here is that the best way to get immunity from prosecution is to marry an outspoken politician who has issues with both major parties, and that's now a protected class. That appears to be the argument in this case.

So, Your Honor, at bottom, he just has not satisfied the standard. And given, like I said at the beginning of this discussion, that he's shown no new evidence of discriminatory effect and given that this Court already ruled that there was insufficient evidence of discriminatory effect to warrant discovery, this conversation should really just be over at this point.

That's all I have.

THE COURT: I'm prepared to rule on the motion to dismiss, and then we will talk, then, about the other aspect of the motion to reconsider.

I do appreciate the defendant's arguments, but I am going to deny the motion to reconsider my order denying the motion to dismiss for selective prosecution.

I do want to say one thing that I think Mr. Merritts' additional filings have, I don't know, clarified, maybe changed is -- I did see that there was some reference early on to Mr. Merritts being, maybe not a target, but a subject of the investigation that involved, perhaps, campaign finance and

other charges.

I did talk at the last hearing about my concern about -- I think I called it a mismatch with respect to the defendant's theory that if they were targeting Ms. Bush and never prosecuted her but prosecuted her husband, it seems to me it would have been a stronger argument to say they were targeting Ms. Bush and then prosecuted her for something.

So whether "target" is not the right term of art, I'm not suggesting that there were any misrepresentations, but I do see where it appears that Mr. Merritts was, at minimum, a subject of investigation, it looks like even before these specific financial PPP loan issues were discovered. I don't know if wire fraud is referenced and that initial letter involves these charges or something related to the campaign finance issues, I don't know. But I did want to clarify that. I do think that my opinion on that piece has changed. I don't have that concern anymore.

Nevertheless, I don't see these documents as providing any basis for me to change my ruling. I don't read the documents to be the smoking gun Mr. Merritts did, but if it was just about that, that wouldn't be the basis for my decision because I would let Mr. Merritts make the record to establish that his reading of the documents should -- makes more sense over mine. But I don't see anything from these documents changing my view that the defense has not made a proffer that

political affiliation or animus or whatever other discriminatory motive factored into the U.S. Attorney's prosecution of the case in their decision to prosecute this case. At most, again, I don't read them the way that the defense does, but at most it seems to reflect the response of a single IRS agent and doesn't change my prior ruling as to the selective prosecution elements.

Even if I was on the fence about that piece and could attribute -- and both read the documents the way the defendant does and attribute that to the U.S. Attorney's Office in terms of its prosecution decision, I still don't see how this impacts the aspects of my ruling that go to the effect prong. And that is that Mr. Merritts was treated differently than similarly-situated individuals. I put my ruling on the record at our pretrial hearing as to why I was denying the motion with respect to that, and I don't see that these documents change or suggest a change of my ruling. So I'm not dismissing this case or permitting discovery based on these documents or reconsidering my ruling.

Now there is the issue of what, if anything, this changes about the scope of the Court's order about what is permissible for Mr. Merritts to inquire about or elicit at trial in terms of bias or other information that can implicate -- implicates his theory of defense.

So Mr. Gelfand, I guess my question for you is what is

it you want to elicit, ask about, argue that in light of these new documents that you don't think my order allows?  And I'll say, I thought my order largely ruled in your favor with respect to what you were attempting to do at trial.  My concern was that I didn't want to make this a mini trial about -- whether related or unrelated about the details of the investigation of Ms. Bush, meaning the nitty gritty of the campaign finance violations, what was uncovered, what wasn't uncovered.  I didn't think those details were relevant to anything.  But I thought I clarified and made clear that even though I denied your motion for dismissal based on selective prosecution and that the question of selective prosecution is not a jury question, I'm not going to limit your ability to cross-examine witnesses about their alleged bias against Mr. Merritts, whether that's because of him or because of people he's closely affiliated with.

I do think that the investigation into him is relevant.  If you want to show the bias of the people who investigated him, if you want to poke holes in the investigation that was done, if you want to make other arguments to the jury about the lack of evidence because of an issue with the investigation, that's always fair game in a criminal case, and I don't rule differently here.

So I guess separate from the subpoena issue which we'll deal with next, what is it that you're asking me to

reconsider that you want to do in light of this new information that you don't think my prior order permits you to do?

MR. GELFAND: Your Honor, candidly I appreciate the Court's clarification, because maybe we didn't understand fully your prior order, which is fine.

THE COURT: Okay. That's good that we're here.

MR. GELFAND: And so if that's the case, I guess to clarify, my understanding -- but it sounds like that's not the case -- was that the Court was basically treating this as essentially two investigations. One is off limits. One is on limits.

And what we intend to do is question the agents as otherwise appropriate on the single investigation into both -- not getting into the nitty gritty -- I mean, I agree with -- I understand the Court's limit there -- but the fact that there was an initial investigation into Mr. Merritts and Ms. Bush, the general subject matter of that investigation and challenging the government's premises of basically how we got from there to today. I don't mean in terms of prosecutorial decisions but in terms of the investigative decision making and the investigative aspects that were made. And that includes by FBI, by IRS. That includes subpoenas that were issued. That includes what they did and didn't do, who they did and didn't talk to.

Before there was some ambiguity where there was some

concern -- I mean, bluntly speaking, the jury needs to know that Cori Bush is Mr. Merritts' husband (sic), that Cori Bush and Mr. Merritts were both at least the subjects -- use whatever word we want to use -- of an initial investigation. And here we are as a result of that investigation. And then basically challenge like the Court just said biases that come from that, holes in the investigation, the lack of certain evidentiary maneuvers. I mean, I don't want to pre litigate the case right now.

So I'm not sure any of that is actually inconsistent with what the Court is saying.

THE COURT: Let me just clarify my order. So I had said -- and I'm glad that we're here so I can say this, because I do think there's a fine line, potentially, between permissible questions about bias and then prohibited questions that could go to selective prosecution.

So I granted the motion to exclude the details of -- and again, I didn't think Mr. Merritts was necessarily a subject of the earlier investigation. I knew that the earlier investigation dealt with payments that were made to him. But I maintain that, again, it seems like you appreciate the kind of -- there was some proffer about what was found or what was not found as it relates to Ms. Bush, and I don't want to get into the details of the campaign finance investigation that seemed irrelevant to the investigation of Mr. Merritts, but

certainly how the investigation started generally and then as detailed as you want to be about the holes in the investigation as it relates to Mr. Merritts, I think I could not prohibit you from asking about holes in the investigation or things that were not done in the investigation that should have been done or the bias of any individual investigator.

So, again, my concern was kind of twofold. One is I didn't want it to be a mini trial on what happened with Ms. Bush. So I expect there to be very little in the way of that investigation in terms of the details of what was found, what wasn't found, what was looked in to, what wasn't, and what the details were.

Second, at the pretrial hearing there were sometimes -- I think your co-counsel would say things like they were starting this investigation and now we're here for just $20,000. I said, look, I have denied the selective prosecution motion. Your record is preserved on that. But I don't want there to be any evidence, argument, suggestion to the jury that if they find that the government has proved their case that they should somehow acquit or discount that because this is a small amount or this is not an amount that's usually charged. The jury is not going to ever hear what others are charged with to be able to make that assessment.

MR. GELFAND: I understand that, Your Honor.

THE COURT: That is what I was largely concerned with.

Again, I understand there is a fine line. I think it was difficult at this juncture for me to anticipate. I'm not going to ask you to proffer your examinations here. I think if the government thinks that a question crosses the line into something irrelevant, then we'll treat it like we do every trial. And that is the government will object and I will hear the question, I'll make a contemporaneous ruling. But I'm not prohibiting you from asking questions about the testifying witness's investigation of Mr. Merritts that led to these charges. To the extent you want to ask the jury to discredit the investigators or the evidence that they turned up in the investigation or the quality of the investigation, I think that would be error to do so.

So, Mr. Gelfand, do you understand the contours of my order?

MR. GELFAND: I believe I do, Your Honor. And I was taking notes as we were talking. The goal -- we will certainly keep this away from a mini trial, as the Court aptly put it, of Ms. Bush regarding the details of that investigation. I assume from what the Court is saying, that it's just from a 30,000-feet level, it's fair game to ask, for example, a law enforcement witness who's testifying when you initially began this investigation, you were investigating both Cori Bush and Mr. Merritts.

THE COURT: Yeah, I think if that's about this

investigation, I don't think that's off limits.

MR. GELFAND:  And I understand what the Court is saying is essentially don't get into, there was a transaction from Ms. Bush's campaign account to so-and-so.  We're not going to get into that stuff.

THE COURT:  At the other hearing there was some suggestion about that, broadly, the theory being, you didn't find anything when you were investigating Cori Bush so now here we are for $20,000.  And I thought that the "you didn't find anything" was complicated, because, one, it would require to get into the details of what was found and what wasn't, and it could potentially open the door for the government to put on a lot of evidence about what was found.

So that's what I was more concerned about was getting too much in the weeds of what happened with Ms. Bush to the point where it's unrelated to Mr. Merritts.

Again, your question was about an investigation that involved Mr. Merritts, and it may have involved others.  It's fair for you to ask that.

And again, it is hard for me to kind of, other than the broad contours I've laid out to again -- I don't want to suggest what your questions need to be or ask you to proffer in detail the questions or get permission for what you want to ask.  So that's my ruling.  And again, if there are questions that you ask or arguments that the defense makes that the

government thinks crosses the line into either inappropriate information that would not relate to the question of guilt or lack of guilt but to selective prosecution, I will entertain those objections in realtime.

And again, I expect there to be very little in the way of what happened in connection or the details of this campaign finance investigation into Ms. Bush.  So the government is free to object.

So with that, is there something about these documents that you think that you want to do that requires me to reconsider my earlier ruling?

MR. GELFAND:  Your Honor, I don't think it requires you to reconsider your earlier ruling.  I do intend to call the IRS-CI special agent who undisputedly authored at least some, if not all, of these documents as a witness, if the government chooses not to call him.  He is under subpoena.  We've complied with the two E regs.  And to the extent that these documents that he authored are otherwise appropriate for impeachment or whatever it may be, obviously the Court can make contemporaneous rulings at the time.

THE COURT:  That's Agent Sequeira.  I don't know if I'm saying his name correctly.

MR. GELFAND:  Agent Sequeira.  The government has represented, and I guess can correct me if I'm wrong on this, that the two -- initially my read of the documents was that

there was a supervisory special agent whose name is escaping me right now, but the person who is on the documents that we subpoenaed as well as the IRS-CI chief whose name was on the documents.

If the government's representation is that those individuals have not -- did not in (inaudible due to audio distortion) then I think that Agent Sequeira is at least the appropriate beginning witness. Perhaps the end.

THE COURT: Let me start with --

MS. MILLER: Sorry, Your Honor. We have lots of questions too. I don't know if the Court wants to --

THE COURT: Let's just deal with the subpoena issue while I'm here.

I would not quash the subpoena as to Agent Sequeira, but to the other two, the IRS-CI chief and Agent Carter, does the government have any information about -- were they at all involved, to your knowledge, with any substantive aspect of investigating Mr. Merritts?

MS. MILLER: Your Honor, I've never affirmatively asked that question. All I know is what I represented to the Court already, which is that the basis for wanting to call them, which is that they're on these draft documents, because it was presumed within Mr. Gelfand's motion that there must have been finalized, signed versions of these documents somewhere, that that's not true. So I have no -- and I have

never heard of them being involved.

As I stated previously, to our knowledge, Agent Sequeira's involvement was extremely limited. He's not the lead agency. He wasn't the primary agency. He was asked to join at the FBI's request and then did a very preliminary investigation, which, Your Honor, for that reason alone, I will say I understand the Court's not quashing the subpoena, but I am really requesting that the Court require Mr. Gelfand to proffer the purpose for calling him because other than trying to back door impermissible arguments about why the prosecution was brought, it doesn't seem like there would be a purpose in calling him as a witness. This isn't a tax case. There are no tax charges. His agency bowed out of an in-depth investigation. The tax documents that we got were not provided by him; they were provided via an ex parte order that we had to go get because it wasn't a tax case and the IRS didn't join the case fully.

So it just -- again, Your Honor, I don't understand really -- I just want to ensure that there's not going to be any back dooring of impermissible suggestions or argument on that point.

THE COURT: I think Mr. Gelfand understands my order. In my experience, both sides often don't necessarily call everyone that they subpoena. I think I would not at this juncture before the government has presented its case,

require -- I think it's premature to require Mr. Gelfand to proffer what these witnesses would testify to. I think there has been some proffer as to what Agent Sequeira would testify to.

He's the one that filled out that the form we were talking about earlier?

MS. MILLER: Yeah.

THE COURT: So I think I would not quash that subpoena. I would deal with him with the understanding that I think I've made my order clear that Mr. Gelfand understands that he can't back door inappropriate or impermissible arguments and that if he asks a question that is impermissible, that the government can object. And before the witness answers, I will not permit the witness to answer any questions that are impermissible.

With respect to these other two individuals, I'm not necessarily hearing from the defense why the defense would call these individuals. I don't think the defense would put someone on the stand without any indication about what they would say to just kind of just discover what they know.

So I guess I would say if you get to a point in your case, Mr. Gelfand, where you think it's necessary to call either of these two individuals, before you put them on the stand I'll hear a proffer as to what their relevance is because there's nothing that I see that would necessarily make them

relevant in the case.

MR. GELFAND:  Can I ask a question, Your Honor?  I'm sorry, I didn't mean to -- I apologize.

THE COURT:  Sure.  I was going to say I would defer any motion essentially to exclude these witnesses from trial because, again, to preclude a defendant from calling a witness in his defense, to preclude any party from calling a witness is a serious matter.  And I want to make sure, one, that I'm not doing it hypothetically, if it turns out that these witnesses are not going to be called.

And two, I think it's a little bit premature to have the defense proffer what they think their defense will be or what they will ask defense witnesses on the stand.  So we can address this before the defense case when I think you'll know whether or not you're calling them and you'll know why based on what the government's case has been.

Go ahead, if you have anything additional to add.

MR. GELFAND:  Yeah, I was only on that one point, Your Honor, going to ask.  I mean, it sounds like Ms. Miller has said they have not actually asked these two witnesses, meaning the supervisory special agent and the chief, what, if any, involvement they actually had in this investigation and/or in the drafting of those documents.  I understand that those drafts may have been initially drafted at least including by Agent Sequeira.

If we could get answers to those questions from the government. Obviously, as the Court knows, it's a federal criminal case. I can't depose these witnesses. These are IRS supervisory agents, they're not going to take my call right now. And so I'm a little bit limited other than what is disclosed and discovery into what these people did or didn't do. So it's a little bit of a chicken and an egg problem.

THE COURT: Ms. Miller, is that something you're able --

MS. MILLER: Your Honor, I don't understand --

THE COURT: Go ahead. I was --

MS. MILLER: I'm sorry. He has the ability to subpoena them and it's up to them whether they want to interview with him or not. It's not our job to ferret out the defense's case for the defendant. This is no different from every other case where the defendant wants to talk to a police officer or somebody else who is involved in the government's case. We don't go asking the officers everything the defense wants to know and then telling the defense what they say. If he has a good faith basis to call them and wants to put them on the stand, he can do that. But I don't think the Court should order us to do his job for him. He has the ability and has, in fact, subpoenaed them. So if he wants me to make them available and if they want to interview ahead of time, that's up to them. But I don't think it's up to us.

THE COURT:  I understand.  I'm not going to order you to do anything.  I understood Mr. Gelfand was just saying he can subpoena them and try to talk to them and require them to come to court.  But before he does that, if you knew or if it was the case that they weren't involved, he wouldn't go through those motions.

I won't order you to do it.  I'll let you two confer --

MS. MILLER:  Your Honor, when you say "involved" he has the discovery from this case.  If they took steps that were related to the investigation of this case, they would be on the documents that he got.

The fact is that Mr. Gelfand only subpoenaed Agent Sequeira after he got this document, which as far as we can tell is only relevant to his selective prosecution discovery argument, which the Court's denied.

That's why we question why he wants to call Agent Sequeira, and we don't see any reason why he would possibly otherwise want to call these other two witnesses, and we're not going to try and ferret that out for him.  He can look at discovery he's been provided and he can make attempts to interview witnesses in his own time.

MR. GELFAND:  Your Honor, we will call them if we choose to.  And I was simply responding to the government's whole point of proffer for us.  They've turned over what

they've turned over so they understand the government's position.

MS. MILLER:  And, Your Honor, also, I should say I've already informed -- two things.  I assume the Court is not going to require me to have the defense witnesses present on January 12.  They have to travel.  They're not local.  And I asked Mr. Gelfand via email if he would agree with that but I did not receive a reply.

MR. GELFAND:  We agree with that.

MS. MILLER:  And further --

THE COURT:  He agrees.

MR. GELFAND:  We agree, not the first day.

THE COURT:  I'll let you-all talk about witness scheduling issues.  I hope not to get involve unless I have to.

MS. MILLER:  Sure.  I'm just saying we need sufficient notice if Mr. Gelfand plans to call them to make travel arrangements, et cetera.  I've already informed Mr. Gelfand that one of those two supervisors already has leave planned, travel plans for what would likely be the week that he would be calling them as a witness.  And I don't want to tell that person they have to cancel their travel plans based on non-existent reasons and no reasons known at this point in time that they will be called as a witness.

So that's another potential issue.  I suppose there are unique times when we could do a Rule 15 deposition or take

their testimony out of turn, but I don't think anyone has established a basis for doing that at this time.

THE COURT:  Okay.  I'll let you-all deal with the witness issues.  Mr. Gelfand, you can tell Ms. Miller when you would -- if you know you're not going to call them --

MR. GELFAND:  Yeah, of course.

THE COURT:  -- let her know sooner rather than later and make sure there's sufficient notice and all of that.

MS. MILLER:  I mean, Your Honor, I'm not telling that person to cancel their travel plans, and I'm not hearing the Court ordering me to tell them to cancel their travel plans.

MR. GELFAND:  Well, the travel plan is week two and I think we all anticipated this was going to be a one-week trial. Obviously, you know.

MS. MILLER:  Your Honor, look, trials sometimes don't go as expected.  The witness will be here the first week of the trial.  He will have to travel and will have to make travel arrangements.  He's not -- it's not someone I can just call up and ask to come here.

THE COURT:  Ms. Miller, now that we are really close to the date of trial, how many days do you anticipate the government's case taking based on your prep now if you had to give an educated estimate.

MS. MILLER:  Mr. Kelly has, I think, probably a better sense, but I'm going to guess after jury selection --

THE COURT:  After the jury is selected.

MS. MILLER:  I'm going to guess two to three. Mr. Kelly thinks resting Thursday.  That's why I was saying, Your Honor --

THE COURT:  I'm not going to hold you to this, but assuming everything in the government's case happens as you're expecting so you can exactly know what your defense case would look like, how many days do you think for your case?

MR. GELFAND:  One to one and a half, Your Honor.

THE COURT:  So if you were to call these witnesses, you could do so on Friday the 16th?

MR. GELFAND:  I could, Your Honor.  I'm happy within reason to call people out of order within our case.  We're reasonable people.

THE COURT:  So it sounds like there's no issue there, but I'll let you-all discuss that.

Anything else?

MR. GELFAND:  I've got to make one request for the record, Your Honor.  But I know how the Court's going to rule, I just need a ruling.

THE COURT:  Okay.

MR. GELFAND:  On the motion for selective prosecution, we have requested today and are requesting an opportunity to put on evidence in support of our motion prior to the Court's final ruling on that.  I gather from the Court's ruling the

Court is denying that request but just wanted to make that clear for the record.

THE COURT:  Wait.  Put on evidence not obtained in discovery but evidence that you have now?  I would have --

MR. GELFAND:  In other words -- I'm sorry, I keep interrupting you and I apologize.

So Your Honor, what I was referring to is there's been a lot that's factored into the discussion today and the Court's analysis about what these IRS agent records are, what they're not.  And there's no evidentiary record before the Court as to, to be blunt, what our position is on those records and what the government's position is on those records.

And so to the extent that the Court is factoring in -- in other words, there's a difference between discovery to find out additional information and an evidentiary hearing to basically establish, for lack of a better way of putting it, what we believe the evidence would show.

And so just from a procedural due process standpoint wanted to have a clear record that we were requesting the opportunity to put on evidence.  And it sounds like the Court is denying that.

THE COURT:  Can you hear me?

MR. GELFAND:  I can hear you but can't see you.

THE COURT:  For some reason all of a sudden I froze and then the camera went out.  So I'm going to try to fix this

while I'm talking.

The evidence that you want to put on related to the documents, I mean, I've looked at the documents. I have made a determination that (inaudible due to audio distortion) to the elements of selective prosecution that would change my ruling. So I don't see any gaps that that an evidentiary hearing about these documents -- yes, I will deny that just so the record is clear.

MR. GELFAND: Thank you, Your Honor.

THE COURT: I don't know what's going on with the camera, so I apologize.

MS. MILLER: Sorry I'm not a cat.

THE COURT: Hold on. For some reason -- can you-all hear me better now?

MS. MILLER: Yes.

MR. GELFAND: Yes.

THE COURT: I know our court reporter was having difficulty hearing me. Ms. Duncan, can you ask Ms. Johns if it's better?

DEPUTY CLERK: Yes. She says it seems to be better.

THE COURT: I don't know what's going on with my camera. But let's keep going while I try to fix this. We're nearing the end. I don't think it's worth me trying log off and go back on.

Okay. Anything else, Mr. Gelfand, about the issues

related to the motion to reconsider?

MR. GELFAND:  No, Your Honor.  I would just obviously stand on and preserve all the previously raised arguments and objections, but nothing further to be heard on.  Thank you.

THE COURT:  Okay.  Ms. Miller, you said you had questions.

MS. MILLER:  I do, Your Honor.  I think we're confused about the Court's ruling on what the defense can elicit.  And so we just want to really make sure that we understand because -- so for example, Mr. Gelfand is apparently allowed to elicit that Cori Bush is the wife of the defendant and that both were subjects of an initial investigation.  Is the topic of that investigation something -- it doesn't seem to be relevant, Your Honor.  And I guess what I'm saying is it seems like we're going down -- the Court's calling it a fine line. I'm very concerned that essentially where Mr. Gelfand is trying to go here is to say the investigators are politically biased against him.

THE COURT:  If he wants to ask them about their political bias, why can't he argue to the jury, the jury instruction talks about biases affecting credibility.  If these are your testifying witnesses and he wants to attack their credibility, I don't think I can --

MS. MILLER:  I understand, Your Honor.  And so I'm really just seeking clarification.  But if he's going to get

into are you a Republican, are you a Democrat, I guess the first question I have in terms of that being bias is I guess the argument would be they're incentivized to lie because they're of a different political party than the defendant. I mean, all right. I mean, I guess we can address that.

THE COURT: If he wants to ask them if they're not being truthful because they don't like Mr. Merritts because of who he's married to, if that's what as an officer of the Court -- I don't know all the discovery. I don't know all the ins and outs of the case. If that's what he's suggesting, that he thinks there's a plausible possibility of given the information and he wants to ask that request, if they say no, then that's the evidence in the case, or if they say no and they're impeached on that because of some prior statements. Again, I don't know how I would craft an order that does not allow the defense to ask a witness if they are motivated by some dislike of Mr. Merritts for whatever reason.

MS. MILLER: Okay.

THE COURT: Do you understand? You get what I'm saying?

MS. MILLER: Yes, I do understand that. Our concern is if he even starts saying what the prior investigation was about at all, it just starts to create the side show that the Court said it wanted to avoid. And I think he can get -- the Court has the right to balance against non probative,

cumulative evidence and letting him establish the bias that may or may not be present.

And as soon as there is discussions about what the prior investigation was about, what's going to come into play then is, well, it was a prior investigation where Cori Bush was the main subject.  All the charges that could have been brought had to require her.  It was for campaign finance abuse that primarily related to her paying money to him for security services even though there was no evidence established that he ever had any real security company.  That was, in fact, what started this entire second investigation which is the Paycheck Protection loan wasn't for a security company at all, it was for a moving business.

So we start to go down this well, what was it about and what did it show about them.  And a little while ago Mr. Gelfand made some comment about "and clearly it showed that they were innocent."  And obviously the Court's well aware that not bringing charges doesn't clearly establish someone's innocent.  There's lots of reasons we may not bring charges.

THE COURT:  Let me ask you, Ms. Miller, so you're going to present your case in chief.  You're not going to just tell the jury -- I'm assuming that the jury is going to have some information as to how the testifying witnesses discovered this potential violation, which is going to --

MS. MILLER:  The way we were going to do it -- the way

that we understood the Court's ruling, which obviously is not what was intended was when you said don't mention any details of the prior investigation, we were essentially just going to do a very brief leading question to the agent to the effect of during your unrelated investigation did you become aware of -- did you obtain Mr. Merritts' financials and learn that he had sought a loan. And that was it. We weren't going to go into -- and we were going to intentionally lead to keep out of any of that.

But if the defense is permitted to go there and start getting into all the details of all of that, then how we address it on direct changes. So I guess we really do need to understand.

THE COURT: What I'm trying to do is just pull up -- just one second.

(Pause in the proceedings)

THE COURT: I think this is where the initial document when I said that there is some things that the defense has presented that have kind of changed in my mind, I was under the impression that there was an investigation of Ms. Bush and that in the course of that investigation they learned about something involving Mr. Merritts and kind of opened a second investigation.

Now I see that there is this notice, this letter, whatever you want to call it. It says: This office has been

involved in an ongoing grand jury investigation of Cori Bush, Cortney Merritts, two other individuals.  It involves allegations of incidents.

Is it fair to say it was unrelated if part of that investigation was of him?  I didn't understand that initially.  So I was thinking, why are we bringing up any details about this completely unrelated investigation of a third party other than as necessary to just give the jury an understanding of why Mr. Merritts is here.

If he was -- whether it's target subject, if they were looking into him for various things and that investigation is kind of what led us here, again, my concern is if the defense wants to ask questions about the holes in the investigation or lack of investigation or steps that weren't taken in the investigation, how do you propose I prohibit him from doing that?

I was concerned about the details of Ms. Bush and the campaign finance issues.  I don't mean to be going back on what I said before.  I think now I have a different understanding of the nature of the, whether it's prior or initial investigation, however you want to call it.

Ms. Miller, maybe I'm misunderstanding.

MS. MILLER:  I think, Your Honor, that at bottom, I'm struggling with a few different things.  Number one is I really feel like we're veering into this idea that he's trying to

suggest to the jury that the case was brought out of political retribution.  You had one political investigation targeting his wife and even him.  And when you couldn't make that investigation, you brought this case that any reasonable person would think is insignificant.  That is exactly what the Court is saying he can't do.

THE COURT:  I am saying he can't do that.

MS. MILLER:  So then the question becomes how far does he need to go or can he go to ask agents essentially just are you a lier.  I want to show you're a lier by showing you have corrupt political motivations for saying what you're saying here.  And I don't think that that requires going into details of the investigation into Cori Bush.

The Court keeps saying he can go into the details of the sloppiness of the investigation, I think he means the entire -- and maybe the Court does too -- the entire thing.  Or does the Court mean we were sloppy in the Paycheck Protection Act investigation because it seems --

THE COURT:  Let me just clarify because I'm looking at this language that suggests that there was an ongoing investigation into Cori Bush, Cortney Merritts for campaign funds, campaign expenditure reports, false statements, wire fraud, which is what he's charged with here, falsification of records, et cetera.

Maybe clarify for me, that is the investigation that

has brought us here, correct?

MS. MILLER:  I think that Mr. Rothstein, who's on the phone, can answer that better.  Because what I don't know, Your Honor, I truly don't, is whether that wire fraud charge that's listed there is in reference to wire fraud involving the campaign fund money as opposed to -- meaning, not this investigation.  Not the investigation into --

THE COURT:  If we're talking about an investigation -- let's put Ms. Bush aside.  If we're talking about an investigation of Mr. Merritts and the story of who investigated him and how we got here, and how the government developed its evidence that it's using against Mr. Merritt's in this case.  Let's put Cori Bush aside.  Now I have a document that suggests that Mr. Merritts -- I don't care if it's "target" as a term of art or subject, that he was being looked into.  And that that process of looking into him, investigating him, revealed the evidence that is going to be introduced against him in this case.

MS. MILLER:  I think that's a relevant fact, Your Honor.  It's a relevant fact that he was being investigated, not his wife, not that it was political, that they were investigating it him for one thing and they couldn't make it and therefore they have a career motivation to pin something else on him and lie.

THE COURT:  Put aside the career motivation.  I'm just

saying -- put aside the bias. I'm just saying that he should be able to ask -- I will permit him to questions about the investigation of his conduct that resulted in the government obtaining evidence that it is introducing against him in this case. I don't understand how I can preclude him -- and we'll talk about Cori Bush later. But just he was the subject of an ongoing investigation. Through that investigation, I understand the government gathered evidence, is introducing evidence against him at this trial based on than investigation. He can ask the people that investigated him about the investigation into him and the evidence that was obtained.

MS. MILLER: Okay.

THE COURT: So the question is, well, what can he ask about the investigation into Cori Bush and what was obtained. I think very little. This document says that they were investigating Cori Bush and Mr. Merritts for X, Y, Z. I expect the questions to be focused on the investigation, now that I know that he was a subject of this investigation, to the investigation of him. I've already said, I don't think the details of any investigation against Cori Bush separate and apart from the investigation of Cortney Merritts and kind of what was found that implicated her and what was not found and why she was not prosecuted or what the status of the investigation -- that doesn't feel very relevant to me at all.

MS. MILLER: Right. Sorry to interrupt.

THE COURT:  No, go ahead.

MS. MILLER:  What I'm confused about, Your Honor, is if the investigation into him that didn't result in any charges that he's allowed to, quote, get into the details of, where we end up is the government putting on prejudicial evidence to the effect that he's going to say that investigation didn't go anywhere and we're going to say, well, was that because there was no evidence?

No, it wasn't.

Well, why?  What did you find?

Well, we found -- we were looking into whether or not he had a legitimate security company.

We were not going to offer evidence in this case that he also lied about security services.  But if he's going to get into that, then in our direct we should probably start getting right into what was the first investigation about.

Whether he was improperly paid by a campaign fund for providing security services when he wasn't really a security guard and didn't have any security company.

Oh, so he lied about not having a security company.  And then you found -- and the way that you discovered that lie was because the only company that you could find was a moving business; is that right?

And so I'm just saying, that's why I was saying we were going to just keep it -- at bottom -- I don't think

that -- and it also sounded like Mr. Gelfand wanted to compare every step that was taken in that investigation to every step that was taken about the Paycheck Protection Act case to sort of say, see, you were much more diligent about trying to find evidence in the first case and much less diligent in the second.

But again, that's irrelevant. What matters is were they sloppy here. It's not a comparison. This Court knows all cases get different levels of attention or investigated in different ways. If he wants to cross-examine the agents: You were sloppy, you didn't talk to this person, you didn't get records from this person, you didn't go here, you didn't go there, that's fair game. But I don't understand why it's relevant to compare that to whatever they did in the earlier investigation. And that just really opens the door to all those details the Court just said it was trying to avoid but I understand Mr. Gelfand is wanting to get into.

So this is where I'm very confused on the ruling.

THE COURT: I think I'm confused too now. And the reason I'm confused is this. Maybe someone can clarify this for me. You keep saying the investigation didn't go anywhere, and I think it went somewhere to the extent we're here. So I guess my question, my question is --

MS. MILLER: The investigation into campaign --

THE COURT: Campaign finances.

MS. MILLER:  I'm sorry, that's what I'm trying to say. I'm saying details of -- I understand that there's -- we're calling it one investigation legalistically, Your Honor, but in fact, beyond the fact that one grew from the other or that they were conducted by the same agencies, there's no relation. Right?  There's zero relationship between the conduct being investigated in the campaign fund case and the conduct being investigated here.  So drawing in details about how that one was investigated and whether it was more comprehensive or sloppier or whatever else is creating the very side show with very little, frankly, probative evidence that would be elicited, that can't be elicited with the traditional means of crossing about sloppy investigation.

THE COURT:  Okay.  So, Mr. Gelfand, here's the issue that I'm having.  One is I maintain, as I said, that you can ask any witness who testifies about their bias.  That is black letter law, and you can do that.

Second, I cannot craft an order that prohibits or limits you in any way into asking about the testifying witness's investigation of Mr. Merritts that led to the evidence that's being introduced against him in court.

However, I think I am confused a little bit about when we say "the investigation", if we're really talking about one investigation that might have started with one thing and then ended up at a different place but it's all one investigation,

or if we're talking about kind of distinct investigations.

I do think Ms. Miller raises a good point.  I am sure that there are a lot of details of the government's investigation into alleged campaign finance violations.  For example, she brings up this allegation of a misstatement in connection with something else that the government wasn't intending to introduce because it wasn't relevant to the PPP loan fraud issue that I'm sure you don't want to come in.

So I guess I don't want to necessarily have you proffer in detail the questions that you want to ask, but I think I do need some just so I can make a clear ruling -- because it seems like both parties were confused by my prior ruling -- to make a clear ruling about what is allowable and what isn't.  What is it you want to elicit with respect to the investigation?

Are you going to get into or are you trying to get into all the details of what the government investigated Mr. Merritts for with respect to some of these other criminal allegations, which would include alleged false statements that he made?  I'm assuming you don't want to go into all of that.

MR. GELFAND:  First of all, Your Honor there's good -- I'll back up for a second, because 30,000 feet in the air, I think the Court hit it on the head.  Where the parties perhaps disagree, but that's one of the reasons we have trials, is that there was one investigation, not two investigations, and that

it was an ongoing investigation.  The investigation initially focused on Cori Bush, Cortney Merritts and two other individuals.  We have no interest, no desire, as we have throughout this litigation, to talk about the two other individuals.  I don't know if that's an ongoing investigation. It's none of my business.  But it has no -- from what I've seen in the discovery -- and we know the identity of the two other individuals -- from what I've seen in the discovery, we're not intending to go there.

The investigation into Cori Bush and Cortney Merritts ultimately -- it lasted a long time and it ultimately resulted in the two charges that are currently pending against Mr. Merritts.  And we do intend to get in in broad stokes to essentially how we got -- as the Court was saying, who investigated this case, what agencies were involved, when did it begin, how did we get here.  I'm not meaning to be exhaustive, Your Honor.  But how did we get here, how did the government develop its evidence, what investigative tools did the government use, who was the government looking into in the sense of Cori Bush and Cortney Merritts.  The investigation goes back a long time.

There's a disagreement, Your Honor, factually as to how this PPP loan investigation, so to speak -- I mean, the government has represented repeatedly their theory of the facts as to how we got here.  Whether that bears out factually at

trial and cross-examination, time will tell. But as a practical matter, I think my understanding of the Court's ruling is consistent with, I think, what the Court's questions were to Ms. Miller, which is -- we're not going into here's the 27 -- I'm making up numbers. Here's the 27 subpoenas you issued in regards to the security investigation. That's not where we're going with that. But I think that treating this as if there wasn't one investigation that ultimately brings us here is what really would kind of disable us from representing our client and putting on a complete defense.

MS. MILLER: Your Honor, I guess my response is I don't understand -- I really am having trouble with -- and maybe the Court can make it clearer for me. I don't know. I'm really struggling with -- let's call it one investigation. One investigation into two different crimes occurring over two different time periods involving different conduct and different evidence, I don't understand the reason that the investigation into what I'll -- the crime that's not charged is relevant beyond things like you were unhappy that you didn't make that and so we shouldn't trust your testimony on the crime that's charged here because you were just out to get him and so we shouldn't trust your testimony because you're biased against him or you're worried about your career or your promotions or whatever. Or even I guess if Mr. Gelfand wanted to get into it to say -- he can still make the political argument, you know,

you were married to Congresswoman Bush.  You were during the first investigation that wasn't charged.  You are now.  He was and he is now.  And gee, Mr. Agent, you went after him the first time because of that and then you were upset and you did that because of political bias and now you're doing -- and then when you couldn't do that because of your political bias, you went after him again.  But again, this is just about whether the agent has a political bias or a corruption -- like corrupt intent in their testimony.  And I get that.

In terms of sloppiness of the investigation, so to speak, the sloppiness that matters for this jury, the sloppiness that is relevant is what steps were or were not taken with respect to the conduct that is being charged here.  Period.

And as soon as we start getting into anything about the nature and extent of the investigation that didn't result in charges, it just opens up a massive can of worms that nobody wants, except perhaps Mr. Gelfand.

THE COURT:  I don't think he wants it.  I understand.  So my question is the applications or the way that the government discovered the alleged PPP loan fraud, right, that was in the course of this other -- whether it's the earlier stage of investigation --

MS. MILLER:  The other conduct that was being investigated.  In connection with the other conduct that was

being investigated, how about that?

THE COURT:  Yeah.  So I don't know that the nitty-gritty of the nature of the earlier investigation is relevant, but what would be -- I cannot preclude the defense have asking questions about how the government obtained the very evidence it wants to introduce against Mr. Merritts, and that might require the jury understanding that it happened in the course of this other -- what did you call it --

MS. MILLER:  We agree about that.  The thing is, we're agreeing about that.  We're just saying why does it matter even -- in other words, what the investigation -- it seems to us that the fairest ruling to both parties is that conduct has nothing to do with his guilt or innocence in the charged conduct, and all the other avenues of political bias or sloppiness of investigation are wholly testable without reference to the details of the investigation that didn't result in charges.  Whereas identifying that investigation and what it was about, that immediately starts to imply issues that aren't -- that the Court has already deemed are impermissible to get into and to open the possibility of the government then needing to rebut details.  Because I can promise that the way the questions that are asked on cross-examination won't reflect the government's position about how that investigation was conducted or why it was conducted or what led to that investigation or how thorough it was or what the evidence in it

showed.

So in order to avoid all of that is why we were going to just lead with in connection with an unrelated investigation involving different -- we weren't even going to suggest he was a subject. We were even willing to go so far as to, if the Court ordered us, find a way to say -- imply that he wasn't, that it had nothing to do with it. But I think that the irrelevance of that investigation is a much fairer way to -- like keeping that investigation out avoids the side show and does not impermissibly keep Mr. Gelfand from exploring what he needs to.

If I were investigating a murder that you committed and conducted a search warrant on your house and found a ton of drugs under the sofa, and I then prosecuted you for the drugs under the sofa and then as the government I came forward and said, Your Honor, I just have to put on evidence that what we were investigating him before was this murder, the Court would say, are you out of your mind. And that's exactly the ruling that I'm asking for here in reverse.

THE COURT: I was thinking about the same example. I agree with that completely. The question is -- it's really hard to do this in the abstract.

I agree that if in the hypothetical you gave you could sanitize it. You would have to explain how the officers found the drugs and you could simply say officers were executing

search warrant and found X, Y, Z.

MS. MILLER:  That's what I'm saying.  We don't even have to mention the other case.  We were investigating an unrelated case and his financial records became an issue in that case.  Period.  Or some other way.  I'm certainly open to language.

THE COURT:  I understand that.  Let me hear from you, Mr. Gelfand.

Again, I think we're all on the same page about what in theory a person can do in attack and bring up.  Again, it's really hard in the abstract.  I'm just going to ask you directly:  Are you intending to get into or do you understand my ruling to permit you to ask the testifying witnesses questions about their investigation of Mr. Merritts allegedly receiving these security payments?

MR. GELFAND:  In broad strokes, yes.

THE COURT:  What does that mean?

MR. GELFAND:  That for well over a year before you even saw bank records from Navy Federal Credit Union, which are the bank records, Your Honor, that are relevant to this case, to the origin of the so-called -- this part of the investigation, that you were engaged in a federal investigation, it involved X agencies, it involved X agents, that that investigation was looking into the conduct of Mr. Merritts and Ms. Bush, that you knew that, you were looking

into that.

I don't want to handcuff myself right now, but I'm trying to answer the Court's question. I don't intend to get into whether or not Mr. Merritts had a security company. I mean, I will tell you -- I don't want to mislead the Court. This is separate and apart from if we get into evidence about Mr. Merritts' background that I believe is relevant to criminal intent, you know, evidence of what he has done professionally and by way of education and all that will come in. That's a different question than the Court's asking.

THE COURT: So Ms. Miller, what's wrong with what Mr. Gelfand just said? This is not a selective prosecution issue. This is not a jury nullification issue, but he wants to make the argument that this government has been -- there's some sort of animus. These investigators have it out for Mr. Merritts and they have for a long time. And if that's what he wants to -- if that's his theory, I can't provide --

MS. MILLER: For that purpose, Your Honor, the fact that the investigation was into his wife is irrelevant. And the nature of the charges being investigated.

THE COURT: Part of his theory is that the reason -- I mean, they wouldn't be biased against Mr. Merritts', according to the defense, but for the fact that he's married to Ms. Bush. That's what they're saying.

MS. MILLER: That's a matter of her being a topic --

okay, so you were investigating her. You were investigating her for political reasons. And they're going to say, no. And then he's going to say, well, it was about politics and the fact that it involved campaign funds; is that right.

Well, campaign funds are naturally a part of politics, so, yes.

And you came after her because you hate outspoken Democratic Congresswoman, right?

No, not true.

Okay.

Now nothing's established.

THE COURT: I don't know that those are going to be his questions. What I'm saying is, look, I understand and I'm sorry I haven't been as clear. I share the concerns and will be vigilant about making -- I don't think Mr. Gelfand is -- I think he understands what's permissible. This is not going to turn into a mini trial about the investigation into Cori Bush. This is not going to be -- there's not going to be any suggestion that although the government has proven this case beyond a reasonable doubt, wink and nod, disregard that because this is not a big deal, this is all just political. That can't happen. And I appreciate the government's concern about that. I share that concern. I've ruled that way.

It is a relevant part of his theory who his wife is because the defense wants to ask the testifying witnesses about

their bias against -- they're not biased against -- according to the --

MS. MILLER:  We don't object to that.

THE COURT:  That requires him to get out who she is in broad strokes and that he's married to her.  And he just said at a very high level, this started when you were looking into Ms. Bush and Mr. Merritts, and then I expect the questions to focus on Mr. Merritts from there.  I don't want this to be very detailed about what happened with Ms. Bush that's unrelated to why Mr. Merritts is in court.

And I agree with you that a lot of the details of crimes that were investigated that ended up not being pursued seem largely irrelevant.  But where there is financial information that was obtained and Mr. Gelfand wants to ask questions about how it was obtained and you didn't talk to this person, you didn't talk to that person, or you hate Mr. Merritts and you've hated him for a long time and you've been out to get him, that seems all fair game.  And again --

MS. MILLER:  Your Honor --

THE COURT:  It's really hard for me to draw -- short of me writing the examination and telling Mr. Gelfand what he can't do, I have to do this in broad strokes.  So I'm sorry irrelevant's confusing but --

MS. MILLER:  I understand, Your Honor, but the way the Court just gave the example didn't actually use the topic of

what was being investigated.  Which, again, saying who was being investigated, sure.  And that it didn't result in charges, and so therefore the agents are bias because they were investigating her because she's a Democratic congresswoman and when they couldn't make that charge against her and him, they decided to go for this charge so they're not trustworthy, their testimony, because they have an improper motive in testifying. I get it.  It's like corruption bias.  But why does even the type of charge at all matter?  And I say that, Your Honor, because I don't think the jury is entitled to really know what that investigation was about.  I don't see why that even --

THE COURT:  Okay.  Let me pose that direct question, because it seems like that's the only area of confusion.

So Mr. Gelfand, what Ms. Miller and what I want to know so I can clearly rule on it is to do everything that I have agreed that is permissible for you to do and to do everything you think you need to do to prove your -- not prove your case, sorry, to poke holes in the government's case and establish that they haven't proven their case, why is it necessary or is it necessary for you to inform the jury that initially the government was investigating Mr. Merritts and/or Ms. Bush for campaign fund violations, false statements and falsification of records?

MR. GELFAND:  Because campaign funds are innately political; whereas if they were hypothetically investigating

Mr. Merritts and Ms. Bush for a bank robbery in Nevada two years earlier, that's a qualitatively different question. So I don't think that the nuanced details beyond that matter that much, but the idea that it was directly related to Cori Bush's congressional campaign is relevant.

THE COURT: So beyond just making the point that will go to questions of political animus, that's the only reason why you want to let the jury know that at the start that the government was looking into Mr. Merritts for political-related offenses?

MR. GELFAND: Yes. I don't know that I'll call it offenses, but allegations.

THE COURT: Violations. Political-related violations.

Ms. Miller, you actually had given this as an example when you were talking earlier about how that theory could spin off. That's all he wants to do with it. He doesn't want to get into the details, he wants the jury to know about the political nature of the investigator's work in the case.

MS. MILLER: Your Honor, so we are going to get into the fact that that's a corruption investigation, fine. But then what I suspect based on the way, at least, Mr. Gelfand argued it previously in this hearing, is that he's going to say and your investigation showed they were innocent, didn't it. And I just think he shouldn't be able to ask that. That's what he said to this Court.

THE COURT:  Mr. Gelfand, are you going to ask if that investigation showed they were innocent?

MR. GELFAND:  I wasn't intending to unless there was a suggestion by the government --

MS. MILLER:  Is the outcome of that investigation at all going to be a subject of questioning?  That charges weren't brought and that's --

MR. GELFAND:  Judge, I think what I would say is I think that we all have a clear understanding of at least where we should all aim for the lens to be, and I think the Court can and will make contemporaneous objections if necessary.  I'm not trying to hide the ball from anyone.

THE COURT:  Here's what I will say because I'm not -- I think in broad strokes I will permit the defense from asking a question to testifying witnesses about the political nature of the matters for which Mr. Merritts was being investigated, but not the details and the nitty-gritty of that investigation beyond anything you need to make the argument about political bias, which we understood.

In terms of any further questions, I think I'm going to have to address that on a case-by-case basis.  Right now I don't see in the abstract why it would be relevant about what was or wasn't brought in that investigation.  Certainly if I would allow you to ask that question and you asked the question that implied that nothing was found, you know, as I said, that

would open the door to the government putting on everything that was found. I don't know if the defense wants to open that door. But I think the best way to do that is if he asks that question, you object. And then I'll have the whole context of the full direct examination up to that point and I will be able to judge very clearly whether or not that is relevant or whether it goes into irrelevant, prejudicial, inappropriate lines of questioning.

MS. MILLER: Sorry, I was just going to ask, given the Court's ruling just now, is the defense -- is the Court permitting the defense to open on saying that this was politically motivated because of that -- because of how the investigation came about?

THE COURT: Look, if that's his theory of the case and he has a basis to believe that's what the evidence will show, he can tell the jury what the evidence will show. At the end of the day there's -- the jury will be instructed that counsel's questions are not evidence. I'm not going to permit questions that are inappropriate or irrelevant. He can open on what his theory is on the case, yes.

So I'm sorry this is confusing. Again, it's hard for me to do this in the abstract, but I think we've delineated clear lines as best as we can. Otherwise, I'm going to have to take it question by question.

To be clear, Mr. Merritts can interrogate witnesses

about their political biases.  Mr. Merritts can interrogate witnesses about the evidence that was obtained against him that's being introduced and the investigation of these offenses.  Whether it should be credited or not is an appropriate topic.  There is maybe a dispute about whether the campaign finance violations, false statements, et cetera, were a separate investigation or full investigation.  Regardless, Mr. Gelfand did not intend to give details of that.  I do think that absent some further proffer, I'm not seeing the relevance of the details of that aspect of the investigation if it was the same investigation, because I think it would require the government then to go into detail that I think could be not only prejudicial but unnecessary and result in a mini trial on something completely different.

Notwithstanding that, Mr. Gelfand has indicated the political bias of the individuals involved in the investigation as part of his theory, so I will permit him to elicit that the investigation involved political violations, political views, whatever.  But beyond at least the details beyond (inaudible due to background audio disruption).

DEPUTY CLERK:  I'm sorry, Your Honor, Stacy's not -- if you're not talking, can you please just mute.  There seems to be some kind of feedback and it's not letting the court reporter --

THE COURT:  Yeah, everyone mute.  Okay.

DEPUTY CLERK:  Thank you.

THE COURT:  So again, that's as clear of a line I can do at the outset without asking Mr. Gelfand to tell me question by question what he intends no ask, which I don't intend to do. I don't think this government is asking me to do that.  I think I'm going to have to take it question by question.  Those are the broad strokes of my ruling.

Again, getting out in the broad strokes that the investigation began looking into certain political-related things, yes.  The details of what those were, what was found, what wasn't found, how that proceeded does not feel relevant absent further proffer.

So again, Mr. Gelfand, if you get to trial, if you think the government has done something or you're prepared now with further preparation to make a proffer as to why anything beyond what I've said is appropriate is permissible, you'll raise that before you do it so I can hear from everyone.

It sounds we're in agreement that the details of these unrelated offenses, violations, whatever you want to call them, for campaign funds for personal use, campaign expenditures, falsification of records, false statements, et cetera, are not feeling particularly relevant beyond the fact that the defense wants to elicit that this started from a political place.

Ms. Miller, is there anything else?  I hope that clarifies it.  I'm sorry if it's not more satisfying.  I wish I

had everyone's examinations in advance and we could kind of prescreen the trial, but I think I'm going to have to do this question by question. I invite you, and I'm sure you will, object if something comes up and it's not permissible.

MS. MILLER: Your Honor, could I ask the Court's indulgence just to have a couple of minutes to discuss this with the other two lawyers who are on the phone here?

THE COURT: Sure.

MS. MILLER: I think that they may have some additional issues, but I'm not sure that I totally understand them.

THE COURT: Do they want to speak? I don't mind if you guys tag-team.

MS. MILLER: Brian or Josh, would you like to speak?

THE COURT: If you want to take a minute to confer, we can do that. We don't have to be formal about this. Tell me what you prefer.

MR. KELLY: Your Honor, this is Brian Kelly. Thank you.

THE COURT: Yes.

MR. KELLY: So one of the things that was just discussed and Mr. Gelfand, I think if I'm understanding, said that he was not intending to get into contradicts what his colleagues said at the pretrial hearing, when the defense's position at that hearing was that details, including the

outcome of the other investigation or the campaign funds piece of the investigation, would be relevant because they would be able to cross-examine the agents on such topics as how many resources were put into this investigation, into the campaign funds piece, over how long, how many agents were involved, and you all weren't able to get charges as part of that investigation, weren't you?  And it's not good for your career if you can't get charges in an investigation, is it?  And it would have been egg on your face if you had come up empty handed.  And you didn't get charges in that case, did you?  And you couldn't get charges against my client or his wife as to the campaign funds investigation.

So isn't it true that then you went and cherry picked this evidence -- I'm putting on my defense hat right now, Your Honor, but you went and got this evidence about that you've trumped up for these PPP funds and so your investigation was biased and you're biased.

I mean, that is literally what was said at the pretrial conference.

THE COURT:  Okay.  Thank you for reminding me, Mr. Kelly.  Let me say this.  Would that, in your view, be impermissible?  It might open the door to lots of things.  But the way you've done that very excellent cross-examination sounds like it's pretty targeted to bias.  Do you think if that's their theory I can tell him he can't do that?

MR. KELLY: No, Your Honor. I think you were going to allow them to do that. But I think our understanding of your prior ruling and I think possibly the defense's understanding, although I can't be sure, was that the details and nature of necessarily who was sort of -- I don't want to use the word "target" but the focus of that investigation or what was being investigated didn't need to come in to get out this sort of bias.

THE COURT: I agree with that.

MR. KELLY: That the details don't matter. But now we're getting closer. Frankly, Your Honor, it seems like -- we're concerned that we're over the fine line that Your Honor has I think put your finger on.

We're now in the position where it's not just some undefined perhaps unrelated investigation in which his finances were relevant and they were investigating a crime and that didn't lead to anything and perhaps Mr. Merritts was -- his conduct was at issue in that investigation, by no means would that require them to say and Ms. Bush was under investigation and it was a political investigation and it was the public corruption squad investigating that case.

But now that we've added that piece into this and now they're allowed to then do the additional sort of cross that I just came up with, it absolutely looks like a selective prosecution argument: You investigated my client and his wife

for a political crime.  You weren't able to get charges for that political crime and so now you're trying to hang this around his neck.

And that absolutely seems like a selective, vindictive prosecution argument that Your Honor has already said is off limits.  We certainly understood from your prior order, which I think I now understand we didn't fully understand, but we have now added not just a sort of procedural fact that there was an investigation but now it is this political investigation in which his wife, Cori Bush, who was a member of the Squad and outspoken blah, blah, blah, that absolutely -- this is now a selective prosecution argument.

And, Your Honor, I think that if they do get into -- you said "open the door" a couple of times, and I think perhaps your ruling would necessarily open the door.  If they are allowed to get into the cross of the investigation of Cori Bush and Mr. Merritts did not lead to charges in the campaign funds investigation, then we absolutely would, I think, be required to, frankly, possibly even in our case in chief on direct examination, elicit testimony before cross-examination. Because at this point, Your Honor, if we do direct examination of the investigating agents and we try to sort of sanitize things and not get into all of this, and then Mr. Gelfand gets up on cross and elicits all of this testimony, that would not be a good look for the prosecution, Your Honor.  Frankly, I

think at this point we would almost be looking at having to put on an entirely additional case. Not entirely additional but certainly additional evidence that we had not contemplated putting in.

THE COURT: So let me just say this. In terms of what you reminded me about the pretrial hearing and the kind of mock cross you just did, which was a very good bias cross that I don't think I could prohibit a defendant from doing, I do think that -- again, Mr. Gelfand, if you don't intend to do that, I think you should say that. Because I do think that if you're saying that is a line you might take, I think it's fair game for the government to explain in ways that we'll have to discuss that that's not what's going on here. So that's one.

Two, Mr. Kelly, I think the issue that I think makes this difficult and when I say that there's a fine line is the way you phrased the theory does sound like selective prosecution. The idea that you were targeting me, you tried to pin one thing on me, but you couldn't so now you're pinning this on me, that does sound like selective prosecution.

On the flip side a argument that you're targeting me, you have animus against me, and so, jury, you should not credit this person who's testifying against Mr. Merritts, that is permissible. And that's the fine line.

One line presumes that even if you believe everything that every witness has said you should nonetheless discount

that because this is a small amount and we're only here because of who he is, that's not permissible. But it is permissible to ask the jury to consider any personal interest that any witness has and to use that to assess that witness's credibility.

So can you just respond to that? Because, again, I think it's a fine line. It may not be so much the question but how it's argued. It would be impermissible to say this is a petty case. This is only $20,000. We wouldn't even be here if he wasn't married to a congresswoman, so jury, you should acquit. That's not appropriate.

But don't believe or doubt the quality of the investigation, doubt the people that are testifying because they have a personal interest or they're motivated by something and you should consider that in assessing their credibility, I mean, that seems like textbook credibility.

So maybe you can help me understand what line you think I could draw that would address that other than clearly saying one is appropriate and one isn't. I mean, you understand where I'm coming from?

MR. KELLY: Yes, absolutely, Your Honor. I think Mr. Gelfand has said, or perhaps it was Your Honor has said a few times they would be allowed to sort of poke holes in the investigation, right?

THE COURT: Yes.

MR. KELLY: And I think our understanding of that had

all along been perhaps there's a single grand jury number for all of this.  Right?  But there are separate investigations in the sense that it's -- the only overlap between the two, frankly, is Mr. Merritts.  It's completely separate conduct.  It's completely separate timelines.  It's completely separate potential crimes that are being investigated.

And so to the extent that they are going to be allowed to now, as we understand it, elicit testimony or even open on the fact that this was somehow a politically motivated investigation of Mr. Merritts and his wife, that somehow that investigation possibly was sloppy or certainly that investigation did not lead to charges as bias cross, I just don't know how the government puts on our case without having to be --

MS. MILLER:  Can I ask -- sorry -- a question of clarification on that?  Is the Court saying that the defense can open and say this was a politically motivated prosecution, or is the Court saying the defense can open and say, you will see that the witnesses have political motivations --

THE COURT:  I think it's -- again, I don't think the motivation of the prosecution at this juncture is irrelevant for the jury's assessment of whether the government has proven the charges beyond a reasonable doubt.  So it would not be appropriate to tell the jury this is a politically motivated prosecution so the only reason -- the government doesn't bring

these case but they're doing it here because of who Mr. Merritts is.  It has to be tied to the evidence in the case.

So if he wants to say don't trust these witnesses because they're biased against Mr. Merritts, they had it out for him because of him and who he's married to, again, I don't see how I can prohibit a defendant from making that argument and trying to elicit that evidence and asking the jury to make those kind of credibility findings.

Again, I understand this is a little bit sloppy because everything is intertwined, but it touches on issues of the defendant presenting a defense that relates to questions of bias and the investigation.  And again, I don't see how I can prohibit him from doing that.

The line that we drew that I thought we were in agreement of is the details of unrelated -- I'll call them offenses that he's not charged with in this case seem irrelevant and that you can elicit these points and make all these arguments without getting into details of that beyond what we discussed.

But, Mr. Gelfand, if you're going to do that, if you're going to suggest that -- don't trust them because they're just out to get him because they don't like him and that's evidenced by the fact that they were after him for years and couldn't find anything, so essentially fabricated this evidence or fudged this evidence or exaggerated this evidence,

I mean, you understand the government can meet that testimony and anticipate it and put on evidence to the contrary, right?

MR. GELFAND:  I do understand, Your Honor.  I think that -- again, I don't want to beat a dead horse.  I think the elephant in the room -- and there's a problem here.  I'm not trying to belabor it -- is that this government's view as Mr. Kelly just said is there's essentially -- I don't mean this in a term of art, but essentially two separate substantive investigations.

I'll just give the Court just by way of example, I'm not meaning to be exhaustive, the same month they claim that they found the PPP loan transactions in the Navy Federal Credit Union records, there was a grand jury subpoena issued to Cori Bush for Congress.  So it's revisionist history, for lack of a better way to put it.  It's inaccurate to say that there's different time periods.  There was an investigation that was ongoing.  They're claiming they're investigating Cortney Merritts, but they're actually subpoenaing, literally, Cori Bush for Congress.

MS. MILLER:  I'm sorry, we're saying that the conduct is from different time periods, not the investigation was different --

MR. GELFAND:  No, but my point is, as Your Honor has stated correctly in our view based on binding precedent, we're going after the credibility of the investigation and the

investigators, and they're happening at the same time.  So that's where there's a major elephant in the room here, which we keep saying.  And it's been frustrating, candidly, from the defense standpoint.

The government keeps saying we're trying to conflate some old investigation into some new investigation.  They're literally simultaneously saying, okay, we're going to now go after Cortney Merritts and subpoena Cori Bush for Congress.

THE COURT:  I understand that.  I guess the difficult part is even if they were happening at the same time, because they're dealing with different subjects, there's different questions and testimony and evidence that might be relevant to one versus the other.  So I guess getting into the weeds of any alleged campaign finance violations doesn't seem relevant to Mr. Merritts' PPP loan case.

And I thought that you were in agreement with that when you said you were not intending to get into the weeds of some of the other subjects that were -- subjects meaning topics of investigation.  The investigation might have been sprawling and involved different topics and that your examination was going to be limited to those relevant to Mr. Merritts, which could, as I've indicated, go to the general sloppiness of the investigator and why the jury shouldn't credit the investigation that was done that led to these charges.

I don't know how I can say that another way.  I think

the problem is I don't know, I never in a case get all of the evidence. You all know the case better than me. I don't know what kind of landmine I might be walking into in this ruling. I just know that I can't prohibit the defense from questioning witnesses about their individual biases that might have impacted how they investigated this case and might bear on their credibility.

But I want to be clear, Mr. Gelfand, my understanding is that you're not getting into -- if you think the details are relevant, you should tell me so that I could rule on it and the government can be heard. My understanding is for what we're talking about, you're not trying to get into the details of what the campaign finance investigation entailed, what was uncovered, what wasn't uncovered, what the false statements -- that they were investigating false statements, what they were looking into, what they did, what they didn't do. You're not getting into all that? You're not trying to get into all that?

MR. GELFAND: I think that's accurate, Your Honor. Again, I don't think it's encompassed with what you were saying but investigator's investigative activities, for example, the dates certain subpoenas were served, who they interviewed, as it relates to the overlap between Cori Bush, personally, and Cortney Merritts I believe does go to the credibility and political bias of investigation and the investigators.

That's different from talking about was the security

payment made on January 23rd -- I'm making up dates, whatever it was -- which was very, very different.

I think some of this -- and this is the nature in the same way that the Court is obviously limited in not knowing everything, I don't know what these witnesses are going to say on direct or on cross. And I think that we all know where the Court is attempting to draw these lines.

THE COURT: Yeah, it's just hard. I have a concern that I'm not stating it clearly and I don't want to mislead the parties. So I don't know what else I could say to make it more clear other than I've articulated the ruling and that I think I'm just going to have to take it question by question. And anticipating what your proffer is, the government is going to put on its direct evidence to meet your anticipated theory so they can do so in the first instance and pull the sting out of whatever they anticipate is coming on cross, and so that's fair game.

MR. GELFAND: I think that the Court has made it pretty clear.

THE COURT: I'm trying. I'm trying. Like I said, I maintain that there may be a fine line, and I will be very vigilant in making sure that line is not crossed.

Okay. Now that I have resolved -- anything else that we need to -- oh, Mr. Rothstein, sorry. I can't hear you. Are you on mute or is your speaker not connected?

MS. MILLER:  I believe he's going to Mr. Kelly's office, if I had to take a guess.

(Pause in the proceedings)

MR. ROTHSTEIN:  Judge sorry, good to see you, Your Honor.

Two questions on my part.  One is I keep hearing the phrase "political bias" being used.  But political bias would be the agent is a Republican and the target is a -- the person being prosecuted is a Democrat.  And as a result of their political beliefs, they cannot be trusted because they are against the defendant because he's a Democrat.

THE COURT:  I hope it's more nuanced than that.  That doesn't sound like a very compelling theory, but go ahead.

MR. ROTHSTEIN:  Yes, Your Honor.  But saying that the agent has a political bias is misleading to the jury because it leads them to believe that because of the agent's political beliefs, they cannot be trusted.  So I think it is one thing to say the agent is biased because it's good for their career if they convict somebody, it's not good for their career if they investigate and ultimately it doesn't result in a prosecution.  That's totally fair game for cross-examination.  But I think using the phrase political bias is not correct.  That's my first question or my first point of clarification.

And the second is, I've heard Your Honor say a couple of times "if the defense opens the door."  But the reason that

we moved in limine and filed these motions is to have the Court rule that they cannot open the door such that we would have to put on additional evidence about the initial -- the details of the initial investigation.  So I just want to make sure it's clear that we're not looking for a well -- there are some circumstance where I can see the government wanting this to be the case, but we are not looking for it to be the case that, oh, the defense opened the door and now we want to shove in everything from the first investigation.  We're trying to be very clear that we want that information other than what Your Honor specifically has permitted to not come in such that we don't have to bring in the other security guards, the people -- right.

So those are the two points that I just wanted some clarity on.

THE COURT:  Let me start with the second.  I completely agree.  That's what I tried to say just now.  And I think I got Mr. Gelfand's agreement that he's not seeking to get into the details of the -- I'm not going to call it another investigation because that's a factual dispute.  He's not trying to get into the details of other topics of the investigation that are not at issue in this case.

But I also said that he may or may not go into this but it is fair for you based on the proffer to craft your directs anticipating that he's going to attack animus of the

witnesses, the investigation and even what Mr. Kelly had proffered earlier about you were trying to just pin something on him and you didn't want to have egg on your -- whatever the beautiful bias cross that Mr. Kelly mocked out for us. So you can anticipate that in your direct now because you have a good faith basis to believe that that will be a topic of trial unless Mr. Gelfand confirms that he's not going to go into that, which he hasn't done.

So I am not anticipating -- I think I've ruled it with understanding from Mr. Gelfand that he's not trying to go into that. So that's my ruling.

Again, things happen at trial. If something happens and Mr. Gelfand thinks he now has to go into it for some reason, we will deal with it when it comes up. But I agree that you sought pretrial clarification so that -- I thought Mr. Kelly was right, that you want to know what to do in your direct and present your strongest case in direct and not just be scrambling to meet the defense testimony after the fact.

So I hope we're on the same page there.

MR. ROTHSTEIN: Yeah.

THE COURT: Okay. Yeah. With respect to political bias, let me just say this. I have no idea who these witnesses are, what their political affiliations are, what their beliefs are. But I think in general I don't think it's sufficient just to say that because someone is of a different political party,

you shouldn't believe them.  And we can tweak the credibility instruction or talk about specific instructions if we think necessary to make this point.  But I do think that if the defense wants to ask questions, whether it's political animus, whether he has reason to think these investigators don't like for whatever reason Mr. Merritts because of his affiliation with Ms. Bush, I can't prohibit him from confronting the witnesses and asking them whether or not they have any personal bias because of Mr. Merritts and who he's affiliated with.

Again, I don't want to suggest in the jury that they should -- if there are certain witnesses who are in opposite political parties than Mr. Merritts that that's a basis in and of itself for discounting their testimony.  But I think the argument will be a little bit more nuanced than that.

Go ahead.

MR. ROTHSTEIN:  Your Honor, sorry.  On that point, defense has to have a good faith basis to ask that question. So it would be one thing if they were to get, like, the campaign donations of an agent and show that they donated to an adversary of Ms. Bush or something like that.  But to get up there and just sort of lodge these questions, which they know that the agent is not going to give the affirmative answer they want and just using the questions to inject selective prosecution, vindictive prosecution, is not -- Mr. Gelfand keeps saying, well, I don't know what are were going to say.  I

mean, we have a pretty good idea of what they are going to say on those questions.  And I don't think that using questions as a way to inject impermissible arguments into the trial is appropriate.  And I think that's is big concern of mine.

THE COURT:  No, I agree, I agree 100 percent.  I think, again, because I don't know what questions Mr. Gelfand is going to ask.  I'm just opining about what the appropriate areas of inquiry are in general, in terms of what's relevant in any case, which is bias.  You do have to have a good faith basis to ask the questions.  I think if there is a question posed that is inappropriate, I will deal with that before the witness answers it.

If it becomes a pattern of asking questions that I think are designed only to get the question before the jury, I will not allow that and I will contemporaneously strike the question and instruct the jury that the questions of counsel aren't evidence.

But again, I suspect that Mr. Gelfand is an experienced trial attorney who understands what the basis for the question has to be.  I'm not going no get into detail line-by-line of what he intends to ask at this juncture.  But your concern is a fair one and I assure you I will be vigilant in making sure that that does not occur.  I'm not suggesting that it will occur because I think Mr. Gelfand -- if it does, we'll deal with it.

Again, my apologies that my prior order wasn't clear. I've done my best to make it as clear as possible now, the best I can in the abstract without having the details. But I think we've landed at a place where hopefully everyone understands the contours of my order. And beyond that, we'll just have to deal with it question by question. And quite frankly, once we're in the trial and things are not hypothetical anymore, if I have to make more categorical carve outs or clarifications, I can do so. But hopefully what I've done so far is sufficient for your preparation.

Okay. With that, now that I've resolved all the pending motions, I'm assuming, Mr. Gelfand, the motion to continue trial is now moot?

MR. GELFAND:  Based on the Court's rulings, it is, Your Honor.

THE COURT:  Okay.  So we will proceed with trial on Monday.

MR. GELFAND:  What time does the Court want to start on Monday?

THE COURT:  9:30.

MR. GELFAND:  Understood.

THE COURT:  Thank you for being available at short notice.  This was a long hearing.  I have appreciate everyone's advocacy, and if there's anything else that comes up, I'm here so just let me know.  But otherwise, I will see everyone Monday

at 9:30.

Thank you.  Have a great day.

(Proceedings concluded at 4:36 PM)

C E R T I F I C A T E


I, Stacy Johns, certify that the foregoing is an

accurate transcription of the proceedings in the

above-entitled matter.



/s/ Stacy Johns                    Date: January 8, 2026

Stacy Johns, RPR, RCR
Official Court Reporter